FILED
CLERK, U.S. DISTRICT COURT

02/17/2016

CENTRAL DISTRICT OF CALIFORNIA
BY: ____DC____ DEPUTY

## Final Report of Receiver Thomas J. Flynn

## Regarding Duroville Operations and Compliance with Court Orders
### Issued by Hon. Stephen G. Larson and Hon. David T. Bristow United States District Court, Central District of California

## Case 05:07-01309-DTB

## United States of America v. Harvey Duro Sr. and Desert Mobilehome Park Inc., a California Corporation

### *Hon. David T. Bristow, presiding*

February 12, 2016

I was appointed as Receiver April 30, 2009. This Report: (1) summarizes the wind-up of Receivership operations at the Duroville mobile home park January-June 2013; (2) presents an overview of receivership operations 2009-2013; (3) reviews receivership participation in the successful relocation program of the majority of Duroville residents to the newly built $28.4 million Mountain View Estates mobile home park.  By Order of the Court, Duroville was closed to rental residential occupancy June 30, 2013. The remaining residents had by then vacated and the Receivership ceased on-site activities and permanently left the property.

This Report summarizes the six month period January-June 2013 leading to the termination of Receivership activities as one segment rather than in separate monthly Receiver's Reports as submitted 2009-2012, usually 15 days after the close of each month. Forty-four monthly reports were submitted 2009-2012 before this sole report for the combined last six months. In addition, the consistent format and headings in those previous monthly Reports are replaced by this integrated narrative.  A similar narrative approach is employed to provide an overview of operations May 2009-June 2013 (50 months of the Receivership). Also included are a few closing observations. This is followed by Summary Collections/Expenses January-June 2013, Summary Collections/Expenses May 2009-June 2013 (50 months of the Receivership) and Appendices with several supporting documents cited in this Report.

Could Duroville operate safely long enough for the County of Riverside to complete replacement housing? This purposefully over simplified question encapsulated Receivership purpose from day one and for its 50 months of on-site work? Of course, we know now the answer was affirmative. Receivership work produced the result intended by the Court, but it is far from exaggeration, particularly considering reasons for necessary operating extensions, that the result as it was finally realized was anything but inevitable. From the creation of the Receivership, it was a race of how fast a residential development of new manufactured housing could be planned, funded and installed for Duroville residents' relocation versus whether Duroville could be operated at acceptable health and safety levels until that new housing was completed. A significant major negative health or safety occurrence at a rapidly deteriorating Duroville whether from fire, disease, or collapsed infrastructure could not only endanger people in the park but would necessarily cause quick closure resulting in the very crisis of mass homelessness that the Court and County sought to avoid. In fact, even after overcoming so many challenges over the years, the destructive flash flood September 11, 2012, came very, very close to stopping us nine months short of our then final extension closure date.

Over the years 2009-2013, I believe the Duroville staff, major contractors, outside organizations and volunteers, supporting government agencies, and others working with me genuinely embraced the many significant challenges and reacted to the setbacks with consistent energy, resourcefulness and resolve.  I believe we followed Court directives with fidelity and produced the intended results albeit more than two years after original proposed schedules for reasons that were presented in contemporaneous monthly Receiver Reports and discussed in status hearings.

### *Report Contents*

**1.0 Summary of Operations January-June 2013**

1.1 Declining Resources for Routine Maintenance

1.2 Sharp Increase in On-Site Crime

1.3 Frequent Trespassers

1.4 Uncertainty Whether There Would Be Hold-Out Tenants

1.5 Preparation for Hand-Off

1.6 Condition of Park When Receivership Ended

1.7 Hand-Off to Tribal Representatives

**2.0 Overview of Operations 2009-2013**

2.1 Repair and Maintain the Physical Plant

2.11 Maintenance program

2.12 Fire Peril

2.13 Sewer Lines and Effluent Lagoons

2.14 Toxic Substances

2.15 Electricity Distribution

2.16 Water Systems and Quality

2.17 Home Repairs

2.18 Flooding and Disaster Recovery

2.2 Protect Residents and Facilitate Residents Access to Outside Resources

2.21 Security

2.22 Canine Overpopulation

2.3 Assistance for Residents from the Outside

2.4 Responding to Media Interest and Managing Proactive Public Outreach

**3.0 Relocation of Residents**

**4.0 A Few Observations**

**5.0 Summary Collections/Expenses**

    5.1 January-June 2013 Collections/Expenses

    5.2 Collections/Expenses May 2009-June 2013 (50 months)

**6.0 Appendices A, B and C**

    Appendix A. Letter May 15, 2012 Receiver to Department of Finance, State of California

    Appendix B. Letter May 15, 2012 Receiver to Department of Finance, State of California

            Fax September 14, 2012 Receiver to Department of Finance, State of California

    Appendix C. Memorandum July 18, 2011 Receiver to United States Department of Agriculture

**1.0 Summary of Operations January-June 2013.**

    This six month period leading to termination of on-site Receivership operations presented particularly exacting and formidable challenges to me and necessarily dwindling on-site supporting staff and contractors. There were circumstances and instances during the wind down that were anything but ordinary and predictable despite our planning or easy to solve with the minimal and lessening resources available. The primary dynamic was obviously the systematic departure and relocation during the six month period of a majority of Duroville residents to the Riverside County sponsored replacement mobile home complex and simultaneous exodus of other remaining residents moving elsewhere.

    Challenges included but were not limited to a rapidly deteriorating physical plant (ground level electrical, water, sewer) and sharp revenue decline due to departing tenant base that reduced staff eventually to four but with ongoing maintenance and security needs that did not necessarily correspond to declining occupancy levels. There was increasing, significant and brazen criminal activity during the six-month period. It was necessary to commence demolition of abandoned mobile homes by County contractors using heavy equipment and to remove resulting debris while the park still had residents including their children spread throughout the park albeit in declining numbers. There was sustained interfering with park operations and safety. There were increasing numbers of trespassers seeking to scavenge from abandoned trailers, attempting to take park fixtures, even to try to take electrical wiring and panels that were still energized.

    We interrupted this negative activity as often as we could but we were only a few. Other trespassers were just curious sight-seers in the 40-acre park with ongoing demolition, partially demolished structures, and piles of debris. The park's perimeter fences and barriers were disappearing in sections as part of demolition progress and from theft so there were numerous increasing points of unimpeded Park access and egress. In fact, most of the fencing was by gone by mid-Spring. There was aggressive and sustained activity by at least two organizations encouraging a number of remaining tenants to stay at the Park demanding and expecting move-out payments and others expecting an extension by the Court for continued occupancy. There was a steady stream of media following the last stages of what for years had been a rich source of print and broadcast news.

The successful conclusion of the efforts of all involved in the shut-down process was, as obviously known in retrospect, that the Court Order for closing Duroville to residential occupancy was achieved by the June 30, 2013 final extension deadline. During this period, at last it was time to retire excerpts from Court Orders that I felt compelled to post over the years because of periodic rumors or mistaken media accounts that the park was closing imminently without sponsored relocation too often causing resident panic or overreaction.  For years it was periodically necessary to post (with Spanish translation): "Until and unless alternative housing is available – alternative housing that is safe, healthy, affordable and truly available to the residents – this Court will not close Duroville." "In the interim, because the commercial operation of a mobile home park and related businesses on the allotment is unlawful, relocation of the residents of the Park must proceed with all deliberate speed, but in a manner that does not engender a greater health, safety, or cultural crisis than the one that currently exists in the Park." Court Order Re Remedies after Bench Trial April 30, 2009. Now the Park **was** going to close imminently so ordered by the federal court.

## 1.1 Declining Resources for Routine Maintenance

By January 1, 2013, the physical relocation of Duroville residents to Mountain View Estates had been underway for six weeks since November 19, 2012, and therefore the final depopulating of Duroville had begun as new mobile homes were delivered, installed, and made ready for family occupancy at Mountain View. It was well understood by us that the revised plan of three to five new Mountain View unit installations per week, increasing to up to eight per week over 27 weeks of installations, would sharply decrease the financial ability of the Receivership to keep a full maintenance and security staff along with adequate supplies and support right up to the departure of the last residents.  Attempts to create a financial reserve well before this closing period were genuine and there were hopes by me at times in previous years that upon closure there would be funds for the Court to distribute. That was frustratingly illusory as it turned out.  There kept being unexpected and unwelcome major expenses for repairs, replacement and other capital and service needs often requiring outside licensed contractors. This had been the case throughout my tenure. Examples of sudden depletion of potential reserve funds over the years would include the total replacement of the collapsed Water Well #2, costs to try to repair that well before having to replace it, extraordinary costs from the massively damaging freakish flash flood on September 11, 2012, the increasing and in fact accelerating numbers of water system and sewer breaks in a deteriorating Park, increasing ground level electrical problems with some being quite major, defoliating the sewer lagoons at the insistence of Vector and Mosquito Agency officials.  So we had gone into the last phase of Duroville operations that was simultaneous with the 27 weeks of relocation knowing we would have severe financial constriction.

At times, as parties may recall, it was discussed in status hearings that a number of new homes might be installed at Mountain View but not permit Duroville residents to move in until they could do so in several large groups rather than a few families a week as new homes were finished. This would have created a final base of rent revenue to close Duroville more efficiently and certainly more smoothly by holding back a large group of Duroville residents to move as a final group. For many reasons that was never going to occur with the irresistible attraction of available new homes that were ready for moving in. The correct safety imperative was to get Duroville residents out of their dilapidated structures and deteriorating park as soon as possible, family by family, over the 27 weeks. Duroville residents would move into new units as soon as units were available for occupancy.

Revenue decline from resident relocation was partially lessened because those moving into Mountain View had a Riverside County obligation to pay back-rent to Duroville before literally getting keys to new units. However, it became clear early on that successful candidates who had qualified for

Mountain View units were most likely to be current or nearly so on Duroville rent while those moving elsewhere usually moved out, as we had experienced over the years, without notice, without paying back rent, and without a forwarding address. The financial impact of declining revenue on the Duroville operations in the winter and spring of 2013 included but were not limited to reductions in available labor and included discontinuation of the monthly Receiver's fee, Mr. Duro's monthly stipend, the monthly CDFI repayment, payment to the lead licensed security contractor who nevertheless continued to help. Garbage removal using filled forty foot bins and having a skip loader for maintenance became unaffordable but we received some limited but very welcome outside sponsored help.  CRLA arranged for a foundation supportive of the mission of CRLA to pay our refuse hauling contractor directly for two months to help protect health and safety of their Duroville clients.

In March, Riverside County Supervisor John Benoit, Mr. Rudy Gutierrez from the South Coast Air Quality Management District's Environmental Justice Advisory Group, Riverside County Economic Development Agency and C.L.E.A.N. ("Community Leaders Enhancing Area Neighborhoods") arranged for 80 volunteers to spend a morning at Duroville to pick up and remove widespread refuse, debris and garbage into 40-foot bins donated for that one day and that were hauled away pro bono by Burrtec Waste & Recycling Services LLC  that we had ceased being able to afford for that service. It should be noted that they were not all complete volunteers. Eight were on work release and assigned to the debris field on the south side of the park. Supervisor Benoit personally led the effort that March morning that included a couple dozen local high school students and lunch donated by the owner of the close-by truck stop at 66th Avenue and State Highway 86-S. I mention this level of detail as one example to highlight that there was community support for helping in some appreciated and important ways in the difficult closing phase of Duroville.  In short, as the spring progressed it became more challenging to meet our duty for the health and safety of residents until all residents could move out.

**1.2 Sharp Increase in On-Site Crime.** Crime involving park and receivership property and intimidation directed at remaining park staff was a serious problem in the closing months. On February 13-14 the office space we called the "post office" (where resident mail was delivered to mail slots, rent paid, tenant services available, inquiries handled) was burglarized. The entire back door frame, locked metal gate covering the wooden door, and surrounding part of the wall had been pulled off the building leaving a gaping hole. The "tower" of the park's computer was missing but one of the responding Deputy Sheriffs noticed the smashed computer screen in nearby outdoor bushes. Drawers of paperwork and files were gone and other papers dumped inside and outside. The most recent records (impression copies of used deposit slips, unused deposit slips, recent manual rent logs, and recent bank statements) were gone. But a basket of coins used for making change was untouched as were other items of some value. We had to close our bank account and open a new one.

Early one morning two resident women on a dawn walk saw two literally masked men furtively filling metal barrels on their pick-up truck with a hose from the park's gasoline barrels in the double doorway of our maintenance building. The thieves made threatening gestures to the frightened residents who ran away and from a distance watched the thieves drive away within a few minutes. Gasoline was gone along with tools from the building with now destroyed locks and battered doors. On another occasion during a night every park vehicle had all four tires completely slashed and heavy hammer like damage to the vehicles.

In closing months, sewer and water lines were severed apparently by wielded shovels, hoes or other hand tools with a sharp edge. The lines are only six inches below the dirt streets and service alleys behind rows of units so sabotage was not at all difficult. Ground level electric lines were severed shorting surrounding unit service. Sewer lines were plugged and clogged with wadded cloth material

and solid debris at places where there was surface access from removable plastic plates like small manhole covers along with severing – again, easy to do with pipes only six inches below dirt street level.

I received reports of gun shots at night but never heard them personally on periodic nights when I was in the Park in my pick-up on part time night watch because of our low head count. Sheriff Deputies were concerned about our situation and would make periodic drive arounds for which I was always grateful.  They responded to 911 calls to our remote location. The Sheriff Deputies were increasingly concerned as time went on and incidents increased and were particularly concerned about possible arson and potential assaults.

Of tremendous concern were threats and taunts directed at park employees while they were working by an in-and-out* resident who was an ex-felon and had been arrested at the Park over the years for parole and probation violations (*in and out of jail). The ex-felon often had a familiar group (non-residents) with him. In closing months, aggressive shouts usually included taunts to employees about losing their jobs shortly or that they should watch out when in less populated parts of the Park. Deputies always counseled us to stay away from him which was the obvious instinct. When he was picked up at the Park over the years, usually a half dozen Deputy Sheriffs were in the operation. He was picked up by law enforcement during a brief part of the spring 2013 but returned shortly. I encouraged staff to work in pairs when possible which was problematic when there are only a few on the staff.

On June 25th, just days before closing, it was discovered in the morning that the main office next door to the "post office" had been burglarized. The alarm had been cut which took a ladder and knowing what to do. Desk drawers had been pulled out and dumped, files with resident information had been taken and other aged not as important paperwork and files had been dumped and spread around. A long powered sewer line "snake" had been taken. At the maintenance yard, it appeared that there had been an attempt to break into the reinforced battery box on a National Demolition company tractor. The box held but there was damage from the attempt.

The crimes and incidents of intimidation in the closing months were beyond troubling.  It was dangerous, and even in retrospect with more than two years gone by, I speculate about individuals involved (we knew the one bad actor) and what were the motives. I do not know if it was intimidation to try to get us to abandon the park abruptly to leave it wide open to nefarious activity, or retaliation aimed at me, staff, or the federal government and Court for perceived wrongs. Was some of it just theft for profit, or just an urge to vandalize? Was it a small number of actors working in concert for one purpose, or multiple actors working independently? The nighttime burglary and theft of park paperwork and the tower of the computer with its park contents was likely not a random or chance criminal undertaking but rather had a purpose.  In terms of the one known perpetrator of intimidation, I was not a direct witness to his acts and none of the employee victims were going to file a complaint for fear of violent retaliation from a known local violent felon who was a resident. I would not have hesitated to file a complaint had I been an eye witness or a target or victim of a direct assault or expressed threat but did not get the opportunity.

**1.3 Frequent Trespassers.** During final months and weeks some former Duroville residents came in and out of the park picking up items from their previous residences. There were too many other visitors who were driving through the park looking for items to take as had been the case starting earlier in the spring. What most concerned us were attempts to steal electrical wiring and electrical distribution equipment that was still live. Stealing copper wiring and electrical switches is a problem in the area and there had been serious injuries reported in the Eastern Coachella Valley particularly that spring. With 110,000 acres of agriculture there were many miles of electrical wiring and electrical equipment

involved with irrigation and water pumping.  There was also a stream of visitors and previous residents who were just curious and we didn't have the staffing to patrol 24x7 to encourage people to move along let alone interrupt all nefarious activity at theft or more serious activity like arson had that been attempted. There were too many confrontations that became heated. As mentioned, the Sheriff's Department did send through periodic patrols for which I was grateful. It was very difficult to fence off most of the roadway entrances and exits because, quite frankly, fencing and barricades were repeatedly and quickly stolen and the demolition activity had created large gaps in the site perimeter where previously there had been a line of mobile homes and fences.

**1.4 Uncertainty Whether There Would Be Hold-Out Tenants.** On Thursday June 6th the last Duroville resident family that was moving to Mountain View vacated their Duroville mobile home. By Monday June 17 with two weeks until closure there were 10 occupied Duroville units. This was down from 21 units in May of Duroville with residents who were not bound for Mountain View. In May and June and reportedly earlier, representatives from two community organizing groups had been at the park for night time meetings encouraging residents to demand move-out payments that the community groups facilitated for tenants in similar situations in the Coachella Valley when commercial entities, non-profits, or government agencies desired the vacating of residential units and move-out fees were offered to hold-out tenants. These meetings at Duroville were unknown to us ahead of time. Information I received was that in several sessions thousands of dollars in move-out fees were suggested as attainable. The suggestion was that the Receiver or federal government would be desperate to close Duroville by June 30 and avoid publicity or other negative reactions associated with physical evictions covered by an alerted press.

In April, May and June, both County representatives and CRLA representatives had multiple meetings with individuals and groups of remaining tenants counseling about the jeopardy of violating a federal court order and what that could entail, and assuring that the park would be uninhabitable after June 30. This reinforced what we had been saying. Importantly, it was reiterated there was temporary emergency housing available through County programs. Move-outs continued in early June but it was uncertain when and in what circumstances the final Duroville units would be vacated. With their diligence and frequent counseling, CRLA and the County succeeded. That notwithstanding, on June 18, 12 days before the deadline for closing, I was informed by Units #215 and #13 that they had never been informed that the park was closing. A response was offered. On Saturday June 24, #215 moved out.

By Monday June 26, four days before closing, there were six remaining units (#13, #14, #16, #70, #94, and #172). Unit #14 accepted County temporary housing and would move by the Saturday deadline and the others had one by one offered assurances that they would leave. We observed in the next days they appeared to be packing vehicles and filling boxes. They moved. Only #172 wouldn't provide plans but as it turned out they moved at the literal deadline of park closure. During this entire period, there were media representatives actively following developments surrounding the closing of Duroville and particularly the possibility of hold-out tenants. Calls and visits from media were steady.

**1.5 Preparation for Hand-Off.** I was informed in May by Superintendent Robert Eben of the Southern California Agency, Bureau of Indian Affairs ("BIA"), that an agreement had been reached with the Torres-Martinez Cahuilla Desert Indians Administration to assume on-site responsibilities on behalf of the BIA for the Duroville property as of July 1, 2013. I was shortly thereafter contacted by Tribal executives to work out details. I had previously informed the Court and parties including the BIA that there were no funds left to keep any staff on the Duroville site during the upcoming month of June preceding their taking over day to day responsibility for the property.  Tribal Administrator Rodney Bonner and Planning Director Roland Ferrer, with whom I had successfully interacted over the years on a

range of matters, were in charge of the transfer from Court Receivership to contracted Tribal responsibility for the site. They facilitated the advancement of BIA funds in a contract with me for services for June operations: $16,970.00 (June 6, 2013 $8,485; $8,485 June 28, 2013).

As an individual, I was to:

> "Provide experienced personnel, management, equipment and vehicles, and supplies required to execute Court Order for safe tenancy of remaining residents at Duroville until termination of Receivership on June 30, 2013, at which time all remaining residents must vacate.
>
> Tasks include essential on site management, on site patrol and security, assisting last residents in departures as needed, short term maintenance of water pumping and distribution system, maintain electrical distribution, interface with County of Riverside officials in final resident family relocations to Mountain View Mobile Home Park, interface with Tribal officials. All on-site activities terminate on June 30, 2013."

With the BIA funds, I was able to keep four staff members for June and provide what was needed to complete the mission of closing the park with all residents departed.

I was not aware or informed of the specific finalized plans or timelines of activity for the Duroville site after termination of the Receivership, nor did I need to be. I was aware of preliminary plans and planning. In the time period immediately following transfer of on-site responsibility from the Receivership, I assumed there would at least be continued demolition of abandoned mobile homes and clearing of debris. National Demolition, the County contractor for demolishing and removing mobiles abandoned by those moving to the County sponsored new park, would presumably continue their work. The executed access agreement between the County and me as the Receiver executed in January 2013 had an expiration of June 30, 2013. I assumed this had been extended or revised and executed. Tribal officials were particularly concerned that there could be hold-over tenants. So was I. They were informed about the trespassing problem even with our presence on site, however limited in coverage. I kept the officials informed of progress of tenants leaving the park and I was prepared to assist in informing the Court about hold-overs and any needed orders or needed official personnel relating to hold-overs if that was required but was confident that the United States BIA and US Attorneys were on top of this possibility. By the end of June we were thankful that even if there were a hold over situation, the effective work of CRLA and the County had greatly reduced to very few the numbers of possible hold-overs.

**1.6 Condition of Park When Receivership Ended.** I assumed, incorrectly as it turned out, that immediately after we left there would be need of use of the "permanent" buildings for a period of time. Therefore, I had the buildings we used left in clean, very clean actually, and immediately usable condition. We even cleaned and stocked the rest rooms, cleaned the floors and surfaces, made sure lights and fixtures were working if new site managers so needed and if they had arranged power. The main office had the three desks with swivel chairs and a dozen straight back chairs. There was a one ton safe that could have been of use to someone when removed and cost $1800 when new (acquired after park robberies in previous years when rent was then mostly paid in cash before we would only accept money orders). Regrettably, the safe was not holding park paperwork and bank paperwork when the recent burglaries occurred. There were usable phones and a fax machine although the phone service had been terminated. In the "post office" there was office furniture along the couch and chairs. There were three air conditioners in the offices and two more in the community center double wide (the

bright green building). Hand tools were left in the store room. We left labeled keys for the site including keys to offices and store rooms, keys to vehicles, keys to vacant spaces from old businesses, keys to gates to water wells and the effluent lagoon, keys to the community center double wide. The row of binders and volumes that had belonged to the managers of the business in 2008 were still on the shelves on a south wall of the left side office within the main office where they had been for years.

In the area we called the maintenance yard and close by within the park were at least six auto/pick-up truck vehicles and a very large tanker truck painted bright red that had been used to spray water on dusty streets or available for trash or debris fires.  None of the vehicles were operational because they failed in previous years or because of more recent tire slashing and parts thefts. The tanker vehicle was from the 1960's and a donor had paid thousands of dollars directly to a skilled truck mechanic to rebuild the transmission to keep it going. I believe three of the vehicles were from the previous management, a white pick-up truck marked "security" had been acquired for park use by the Provisional Receiver, and two passenger vehicles had been donated to a charity for use at Duroville by generous donors at a local church. At the time we left them behind, none were registered and we never used any outside the park. By the final time period, staff used personal or leased vehicles. By the end, all park vehicles had deeply slashed tires.

Also at the park were the large tractors, skip loaders, and bins used by National Demolition for the County contract to demolish and remove mobile homes vacated by those going to Mountain View. The skip loader we had leased was long gone from the park. The water well pumps, tanks and lines were functioning as were the pumps for the sewer lines to the effluent evaporation lagoons. The electrical system for the forty acre park was intact that included transformers, electricity distribution "boxes" and panels, meters for units that had not yet been removed, and street lights. There were seven park buildings.

**1.7 Hand-Off to Tribal Representatives**. On the morning of July 1, 2013, I met Tribal executives with members of their staff outside the front entrance to the Duroville site next to Pierce Street/State Highway 195. The County had representatives there to assist in case there were hold over tenants who might need assistance for temporary lodging. Local law enforcement had asked me to stay in contact in case there were problems. Some press had been tipped off that there might be a news story involving hold over tenants but they only had a quiet story of the closure of the mobile home park that had consumed so much media attention over the years. After a conversation and hand-shakes, the Tribal Administration executives and staff entered the park in their vehicles and I drove away from Duroville for the last time.

Four hard-working and reliable men were on the staff at the conclusion of operations. They were Jack Gradias, Delfino Mendoza, Manuel Marroquin, and Carlos Arroyo.

## 2.0 Overview of Operations 2009-2013

This section provides an overview of operations from May 2009 through June 2013. In a very general sense, the Court's expectation of the Receiver in addition to overseeing continuing transactional and service operation of a rental residential mobile home park were: (1) to repair and maintain the physical plant at acceptable health and safety levels; (2) to protect the residents and facilitate assistance from the outside if available; (3) to encourage, direct, and help residents relocate from Duroville to safe and affordable housing "with all deliberate speed."

It took five years to complete our mission, two longer than the first plan presented to the Court that anticipated a 2011 closing of Duroville. It is not necessary herein to reprise the context of or

reasons for extensions of Receivership terms but they were each related to delays in best efforts schedules beyond County control for completing Mountain View. I believe it should be emphasized that most of those who contributed to operations and the well-being of residents were aware or made aware of the unambiguous mandates of Court Orders involving the safety and protection of residents. This included park staff, contractors, leaders among residents, officials and staff from different levels and jurisdictions of government, volunteers and staff from a wide range of organizations and many visitors. Reinforcing and highlighting the imperatives clearly presented in the Court Orders was important when there were distractions from various sources about why certain decisions by Park management were made. The biggest burdens and distractions for residents emanated from just living in a terribly overcrowded deteriorating slum in extreme economic deprivation, having to work exhaustively in the fields, and being fearful about legal status.

Repair, protect and relocate were our overly simplified summary of operating goals while the important legal case in chief continued to be litigated and proposals or ideas were offered involving long term Duroville site rehabilitation, rebuilding, or new enterprises. It was important to build and maintain momentum towards our clear goals without distractions of seemingly endless rumors, incorrect media stories, and genuinely intriguing conversations about long term plans for the property most of which involved new housing. Momentum was crucial, that is, momentum to repair, to protect, and to relocate while always ensuring respect for the residents and their community. Momentum was propelled by: the monthly Court status hearings that included the County on a voluntary basis; reporting of those status hearings by independent informed media and observers; continuous briefings, one-on-ones, and presentations on developments to residents by CRLA; open ended meetings by Receivership staff with announcements, discussion, sometimes debate, and welcoming complaints and soliciting suggestions; presentations and hundreds of one-on-one meetings by the County as the relocation process built its own momentum; and multiple trips to the Park by Judge Bristow for inspections, his comments before assembled groups of residents, and his extensive and lengthy conversing with residents staying on each visit for every resident question or comment.

The staff was constantly aware that all that we had to do must be done entirely with tenant rental collections in that no government funds for park operations were available, identified or offered until the last month of operations. Rents received by the receivership from tenants were used to provide for all park operations and management, electricity, insurance, security, trash and debris pickup and removal, other obligations, and to fund repairs large and small by staff and outside licensed contractors.

The operating plan by Court Order from the beginning was to close as soon as possible 17 of 19 rental paying but illegal businesses including in part used cars, auto and truck repairs, tires, welding, second hand clothes, fast food vans-trucks, frozen fish, small sit down restaurants, and take-out restaurants. Legal businesses that could stay by Court Order were the grocery store (open to the end of operations) and laundromat (closed by owner choice in 2010). Our operating plan from the beginning did not permit any replacement of residential tenants who moved out.

Thus, a known challenge from the beginning was to have unreplaceable revenue decreases as tenants moved out while we had to repair and maintain a deteriorating physical plant. There would be no rent increases. At the beginning of this Receivership on May 1, 2009, there were 296 rental units decreasing to 267 by year end 2010, 231 by year end 2011, 177 by year end 2012. The park would close on June 30, 2013, so the number of units being abandoned in the first six months of 2013 would hopefully be 177 getting us to zero occupied units, which was the case. We had a business plan based on constant attrition as residents moving out, sharp attrition in the last three quarters of operation during

relocation, but with repair, maintenance, and security requirements that did not necessarily correspond with revenue decreases along the timeline that was meant to result in our going out of business.

**2.1 Repair and Maintain the Physical Plant**. The work product of the study group appointed by Judge Larson in 2008, in-person inspection by Judge Larson in December 2008, and testimony from expert witnesses of the Plaintiff United States and Intervenors during the eight day bench trial in April, 2009 resulted in an uncontroverted compilation of the park's physical deficiencies. It served as a baseline for our repair and maintenance work for sewage lines, water lines, electrical distribution to units, water wells and pumps, roadways, fences, fire hazards and fire suppression lines, water supply and quality, the sewage evaporation ponds (lagoons) and more.

**2.11 Maintenance program**. From the beginning of our activities, repair and maintenance items were prioritized based on imminent danger, resources needed, and budget available. A smart decision and a key to our many repair and maintenances successes against sometimes long odds was the retention and extensive use of Mr. Jack Kerin as an active consultant to analyze physical plant issues, recommend practical repair approaches and maintenance methods in the distressed conditions at Duroville, and closely observe and tutor our maintenance staff. Mr. Kerin was the retired Division Chief of Codes and Standards for Mobile Homes for the State of California Housing and Community Department. He had a 40 year career with the Department. Mr. Kerin also served as the president of the board of directors of the National Conference of States on Building Codes and Standards and also Committee Chair of National Fire Protection Association for mobile homes. Mr. Kerin was decidedly hands-on, energetic, and decisive and extraordinarily understanding of resources available during his multiple working visits from his home and business near Sacramento to Duroville that usually each lasted several long work days.

Mr. Kerin made a first inspection to Duroville as an expert witness for the trial retained by Intervenors. I asked him to help us starting in 2009 at the beginning of this receivership, as he had assisted the Provisional Receiver Mr. Mark Adams. Mr. Kerin prepared a detailed progress report that was filed with the Court in 2011 entitled "Duroville Follow-Up Park Inspection" on the performance and progress of the repair and maintenance work. Mr. Kerin's last four day visit to Duroville was on an emergency basis immediately after the September 11, 2012 flash flood that heavily damaged the park and many units.

Mr. Kerin opined in 2009 and repeated over the years that most of the park's maintenance problems were caused ten years earlier when Duroville was built with an original use of materials that were substandard and would not have been approved in a State of California inspected mobile home park. Many of the materials were not meant to be durable in the climate or as used at Duroville. He recommended and taught our staff coordinated optimal maintenance organization, best practices maintenance scheduling, and optimal and efficient maintenance and repair methods. Mr. Kerin attended our maintenance meetings and accompanied maintenance staff on their rounds over several days on his visits over the years. From his 2011 analysis executed and filed with the Court: "This proactive approach (under the Receivership at Duroville) has improved the living conditions and reduced the duration of health or safety problems." He provided specifics and concluded to the Court, "The general condition of the Duroville Mobile Home Park has improved under the direction of the current receivership."

From its inception, the maintenance program had a clear mandate. It was to repair only to extend park operations at acceptable health and safety levels until the relocation of all residents could be effected to Mountain View or elsewhere. It was not our job under the Court Order for long term

rehabilitation, remodeling or rebuilding of property. If that were to occur in the future, it would be approved and done by others. Our staff members and contractors were reminded often of the intended life frame for adequacy of repairs and other items of maintenance.  We would repair physical deficiencies or introduce changes in maintenance procedures to meet existing or imminent threats to the health and safety of residents but not long term rehabilitation beyond expected inhabitation of the Park. The original term of the Receivership was two years "… because the evidence at trial indicates that no safe, healthy, affordable and available housing for the residents of the Park will be available for at least 18 to 24 months, the Court exercises its equitable power to appoint a Receiver to administer and manage the park for two years." (Page 9 Court Order April 30, 2009)

The County presented a schedule to the Court for completing Mountain View by late 2011. As delays in that schedule occurred because of reasons beyond County control, we had at times indefinite extensions that made maintenance planning challenging. However, once a schedule for completing Mountain View had an actual active and funded countdown for late 2012 to mid-2013, we had firm end dates for maintenance expectations always but always with severe budget constraints. Repairs were not meant to be long term.

Unfortunately, as mentioned earlier, certain repairs could not be incremental or tailored to a one year or two year repair life span. For example, when water well #2 started to falter, we contracted with Sixkiller Drilling for a repair. Unfortunately, the repair attempts were not successful after $9,000 of expense. It was finally determined that the well had totally caved in down hole at 550 feet and would require complete replacement – that is, new site, fresh drilling, new casement. There was no way the park should rely on use of only well #1 that itself had experienced intermittent problems. There was no other water source for thousands of residents. So we expended $32,000 for a complete new well that can pump at 400 gallons a minute. Even though the residents would only rely on that well for a couple of years, the property would have the new well for many years to come. Electrical repairs had the same dynamic. A 400 amp electrical panel to replace a panel that had completely failed and burned had a full replacement installed cost of $20,000 and another $10,000 for keeping affected units energized while the replacement installation was planned, permitted, new parts ordered, completed, and added to the park grid. The electrical panel would have years of available use after residents had been relocated from Duroville.

Another example was the 11 acre effluent lagoon that had at least eight years of unmanaged foliage growing in and covering most of the open surface. The Mosquito and Vector Control District considered our lagoon the largest and most fertile breeding place for West Nile Virus incubation in the entire Eastern Coachella Valley. That this was proximate to a large populated residential community was dangerous. Remediation, expensive as it would be, was mandatory and is discussed in a subsequent section. This was another example of tremendous expense for a repair/abatement that would serve Duroville residents for the few years they remained but could inure to the benefit of future property users. But by far most of the expenses in maintenance man-hours were required by the "routine" day to day work involving reduction of fire peril, safe electricity delivery, integrity of water and sewer lines, water quality, trash removal and other challenges of an overcrowded park of hundreds of units of 35 to 50 year old deteriorating mobile homes.

**2.12 Fire Peril**. Fire danger was anything but speculative at Duroville. In the time period immediately preceding the Receivership 2006-2007 at least six units burned completely, and in an initial period of  Receivership four units burned completely in three separate instances before all of our fire hazard reduction work was effected. The fires probably started from poor and overused electrical connections and accelerated by exploding improperly installed propane tanks. No one was seriously

hurt, thankfully, and no further fires occurred during the subsequent years of the Receivership, thankfully. However there was an instance of arson that destroyed a modern donated mobile home temporarily parked near the entrance that had been donated for community use. The impacted residents in these four home fires in the initial period of Receivership had to find alternative housing elsewhere after Red Cross relief because no replacement units were permitted at Duroville.

On recommendation of the Cal Fire Battalion Chief, the Court ordered initial fire control measures during the term of the Provisional Receiver in 2008. We **continued** these measures with vigor. Under the leadership and active direction of Provisional Receiver Mr. Mark Adams all wooden structures, wooden add-on rooms to mobile homes, wooden sheds, wooden car port and wooden shade structures were removed. Photos of the park in that period reflect the sheer scale of the task. Wooden structures were everywhere at nearly every unit. The work was primarily accomplished by the community itself with support from park staff and a contractor. By Court Order the task had to be accomplished in a month. As unpopular as this diminishment of room and shade were with some, the community was eager to meet a Court Order involved with the interim operation of the park and of course many understood the fire hazard (fuel) that was being removed from inhabited units in a crowded park. I mention this level of detail because this strict policy was aggressively enforced by my Receivership staff and me over the years and at times this involved confrontation with some residents desperate to add space to their 900 or 1800 square foot mobile homes, or desperate for outdoor shade. (Metal car-port and metal shade covers were permitted but not readily available or affordable).

I actively solicited outside donations of fire extinguishers and smoke alarms and was fortunately successfully. Sources through Sister Gabi Williams made initial donations of 304 extinguishers and alarms with batteries. Home Depot provided a discount below even bulk purchase rates. Our staff did installations, and resupply donations of this safety equipment were made over the years.

We had a mandate for correcting the placement and security of propane tanks at units. Nearly every unit used propane for cooking and heating water but nearly all units placed propane tanks inside their units for fear of theft or a false sense of convenience. Tanks outside units rested on the dirt. Cal Fire showed how remnants of burned down mobile home units all showed evidence of ruptured and exploding propane tanks accelerating the fires and adding fuel for fire. Park staff poured concrete pads aside every unit for level and supported propane tank placement with vertical metal bars and straps to prevent toppling. The safety procedures and enforcement for all propane tank installations included ongoing testing of fittings and shut off valves, and testing for leaks. Over the years we checked that all propane tanks remained outside the mobile units and checked integrity of extension hoses linking outdoor propane tanks to the indoor use connections. This policy of mandatory safe outdoor propane placement was **aggressively enforced** over the years.

Access and egress from the park funneled through one front entry/exit. However, in an emergency this could be catastrophic. We added and maintained three additional exits and graded the dirt exit roads.

"Spaghetti wiring" is a term describing amateur installed crisscrossing wiring and multiple extension cords that were common in too many units, particularly apparent outside units extending into windows or door frames. Also, too many units had removed electrical fuses in a mistaken belief that it could prevent without danger repetitive short-outs from overloaded circuits. Attention to these dangers was ongoing and corrective action was **enforced and re-inspected regularly**.

Garbage bags and boxes and loose garbage awaiting pick-up outside units were a fire hazard and obviously a health concern. Dogs were always ripping through the garbage. The Receivership solicited an original donation of 300 very large plastic and metal garbage containers with snap lids. We were fortunate that generous donors purchased such containers and replacements were donated over the years.

The eight fire hydrants at the Park were regularly tested by us for back-up water tank volume, line integrity, and water pressure. State Code enforcement would have required 23 hydrants at a mobile home residential park of Duroville's size and density. That kind of capital expense was beyond contemplation. We had regular drive-thru by and with Cal Fire representatives and I met with Cal Fire officers at the fire station, at the Park, and would join senior officers at quarterly meetings of the County Housing Review Committee for the area and the quarterly Oasis-Thermal Community meetings (never missed a meeting of either in four years I am pleased to add). Cal Fire had ongoing observations and suggestions for fire safety that we embraced.

**2.13 Sewer Lines and Effluent Lagoons**. The sewage system at Duroville was crude and fragile, and it required frequent ongoing repairs and maintenance. Based on my experience with the U.S. Department of State assigned to the United Nations as well as information shared by the Peace Corps, I believe the Duroville sewage system would be very familiar in many Third World villages. Sewage flowed from the aging mobile home units into a grid of mostly four inch plastic PCV pipes that were buried a few inches to a foot underground although some links of sewage pipes lay on top of the ground. The sewage was gravity fed through approximately 10,500 linear feet of pipes that ran through the mobile home park to two open air collection ponds on the southern perimeter of the Duroville residential community (across the boundary line from the illegal dump on the next door allotment that was closed by the federal court a few years earlier.) At the first stage sewage collection ponds, chlorine was added and the sewage was then pumped about 2000 feet in two four inch pipes into a series of seven contiguous sewage evaporation ponds that covered approximately 11 surface acres.

The design, materials and workmanship on the sewage system were below or simply beyond any applicable equivalent code standards. First, most mobile units themselves were decades past their designed expected useful life and had not had consistent or in most cases minimal meaningful maintenance over the decades. The sewage pipes in  park that were installed to handle sewage discharge a decade earlier were predominantly four inch thin walled PVC irrigation piping or plastic piping appropriate to indoor plumbing..

We discovered that mobile home units had broken sewage lines inside units or between units and the hook-up to the park sewage system. It was clear that over the years, duct tape, cardboard, glue and paste and other remedies had been used to attempt home repairs on unit or park sewage lines.

The receivership made repairs to most units and the park's system at Duroville primarily by replacing tees, elbows, couple piping or a combination of the aforementioned, and splicing failed segments.  The sewage lines that formed the grid in the park showed evidence of innumerable previous breaks and failures on which ineffective repairs were attempted. Active breaks and leaks requiring repair were seemingly endless. During the receivership, most repair were made by splicing in new sewer line sections with appropriate ABS DWV rating and proper ABS fittings. Approximately 40 drain access points were installed or replaced throughout the system. In retrospect, had we known the extent of work that would be required on the sewer lines over years, it may have been more cost effective and certainly efficient to replace the system with some type of portable system as used in temporary military camps or international refugee camps, but that is obviously 20/20 hindsight.

**Effluent Lagoons**. To repair sewage ponds (lagoons), the receivership expended over $50,000 of accumulated tenant rents on outside contractors, $35,000 in rented earth moving equipment, and hundreds of hours of maintenance staff time. Besides the weakened integrity of the earthen berms and lining of the ponds, the receivership inherited a particularly dangerous condition involving public health involving the sewage ponds. The Coachella Valley Mosquito & Vector Control District (CVM&VCD) informed the receivership that because there had been no defoliation or other preventative or remediation work on the 11 acres of ponds for at least eight years if not longer, the buildup of foliage had created a serious mosquito breeding problem impacting the entire agricultural and residential area surrounding Duroville. The area has had positive West Nile virus tests for years. The 11 acres of sewage ponds were a prime breeding place for mosquitoes. In one reporting period there had been 48 positive test traps.

The 11 acres of sewage ponds for Duroville had the eight years of tall and dense foliage including extensive salt cedar and tamarisk, and thick jungle like tulle reeds. For the CVM&VCD to apply the organic treatments by tanker and helicopter to destroy mosquito larvae and breeding in water surfaces, the water surfaces obviously must be clear of foliage. The sewage ponds were a serious Eastern Valley public health danger to the area. The massive remediation work by the receivership was important to the district after years of not often being able to even inspect the breeding problem because access was reportedly prevented. The authorities told me they not had access previously for eight years. During the Receivership, the district continued its mosquito abatement and vector control spraying treatments by helicopter and tanker truck. They placed testing traps throughout the park and nearby over our years.

We were rigorous in our inspections, repairs and maintenance of the effluent lagoons. Our maintenance was continuous on both the integrity of the berms and the defoliation.

**2.14 Toxic Substances**. There was speculation for years and many assertions were made before the receivership that Duroville had toxic substances in the soil. One of the first studies ordered previously was a comprehensive study by Brown and Caldwell ($35,000). The full report of soil and water analysis was filed with the Court. It was concluded that the park did not have conditions that disqualified it for inhabitability but some soil removal was required where illegal auto repair shops had been located. In addition to drilling core soil samples and testing surface soils and debris, this comprehensive study looked for indications of high toxicity presence from multiple fires or ground seepage from the next door 40-acre open pit dump that the Court had closed several years previously. A different conclusion indicating danger from unacceptable levels of toxicity could have certainly brought forward a prompt park closure. The comprehensive study and was certainly a necessary expenditure during the interim receivership and it was consulted with frequency during this Receivership when issues and questions arose. In fact, the report became a model for testing in other mobile home parks with questions of toxic soils.

**2.15 Electricity Distribution**. Safe and reliable distribution of electricity was a challenge from the very beginning of responsibility for park operations. Previous pre-receivership management had caused to be installed by IID an overhead power grid that more than met the power needs in many sections of the park. There were 14 separate power sections at the park receiving power from the utility source and unfortunately certain sections of the park had more demand than available electricity during peak demand summer periods. Sections of the park with adequate power supply were not designed to share or off load power to under-served sections. Outages and shorts in under-served sections were ongoing caused by demand surges, and often causing damage that required repairs. In one of our worst incidents, an entire transformer had to be replaced by contractors and the electric utility. This was in an

area of the park that was chronically overloaded, so redesign of distribution and an increase in power delivery was completed at that time. This incident and subsequent project required an expense for emergency power generation to units from a large portable unit for an extended period. The scope of work involved redesign, re-engineering, permitting, and installation of increased and redesigned electrical distribution in that electrical section of Duroville (involving the utility, tribe and contractors), and the relocation of 19 units to spread out future demand. It also involved a new 400 amp distribution panel for use by the grocery store and that part was paid for by that court approved commercial tenant. All electrical work at the park was done by licensed contractors although our staff provided trenching, removal of de-energized lines and other manual work augmenting the licensed electrical contractors.

During the Receivership, there were about 50 electrical failures that cut off service for extended periods in parts of the park. Some of the larger failures could not be repaired quickly and for extended periods generators had to be used to supply electricity. Of course, replacement components and electricians were paid by tenant rents. Electricians were constantly concerned when they invariably encounter what they called "spaghetti wiring" causing dangerous electrical situations created by clearly unlicensed workers or residents. This was astoundingly dangerous to residents and too prevalent until we discovered it and caused remedial action.

As mentioned repairs were in order at units for exposed conductors and exposed energized components, missing dead front covers and open wiring connectors in open boxes or outside boxes, and missing cover plates. There was a need to provide and monitor correct over current protection rated higher than the wiring they protected. Drop cord wiring was a constant problem. There was a need to protect electrical conductors on all non-metallic cable (NMC or ROMEX) and the cable needed to be protected from mechanical damage and weather. There was a need to place NMC into conduit. The staff and electricians were engaged with all of this over the years requiring the use of tenant rents, and contributions from unit tenants when they had the means for their unit repairs and we could supply the electricians. It was not prudent to allow a dangerous condition at a unit in such proximity to other occupied units to exist because the tenant did not have funds for repair. In essence, we expended collective tenant funds to repair a deficiency at a tenant unit.


**2.16 Water Systems and Quality.** The Receivership worked closely with the United States Environmental Protection Agency Region IX and contractors approved by the EPA to comply with regulations involving the water systems and rigorous water quality testing. Duroville had two water wells drilled to about 550 feet. There is no access to Coachella Valley Water District lines that did not come closer than several miles away. The entire area has ground water that is in excess of the current arsenic level limits that the federal government reset in 2006 from 50 to 10 parts per billion. Duroville wells drew water at 16 parts per billion. System wide treatment equipment for all of Duroville water would have been approximately $386,000 which was not available. Therefore, we assisted residents to have access to portable reverse osmosis water treatment devices on a on a unit by unit basis that had replaceable filters. Many units used bottled water extensively.

The water lines in the park were checked in segments very regularly for leaks or deterioration and repairs were made promptly when detected.  Water samples were collected weekly on the strict EPA schedule and submitted to an EPA approved laboratory with results being transmitted to the EPA and the receivership simultaneously. Visiting EPA staff made inspections of the water supply and water lines and our testing system.

As mentioned earlier, water well #2 failed irreparably and after six weeks of attempted repairs by a contractor, a new well was drilled and connected. With a limited life expectancy of some duration for Duroville, it was unfortunate that scarce tenant rents had to be used for a new well that should last for a decade or longer. However, there was no way we could continue to operate with only one well for a large population for however long the park was to remain open – a population that did not have a third source for water should both wells fail. The cost of the new well and attempted repairs to the old well drained the emergency reserve and we had to ask for a payment schedule for the balance of what we owed.

**2.17 Home Repairs**. While we were not responsible for most repairs to the 35 to 50 year old mobile homes, our staff would assist if there was a situation considered urgently dangerous. The park was too crowded to allow serious hazards to exist. Most home repairs were made by the resident or by a community member with skills. There were outside volunteers I organized and worked with who had appropriate skills to help residents who had need for repairs and rehabilitation. This was usually from church congregations and service organizations and included commercial and licensed contractors who donated time and often were teaching residents repair skills. These outside volunteers were generous in purchasing materials for the jobs. Not only were residents impoverished but the nearest Home Depot was 26 miles away and in a high volume center of "big box" stores that many of our residents did not or could not visit so far from the park, some fearing such a trip because of apprehensions related to legal status.

Trying to keep mobile homes inhabitable for even a short period until relocation of residents could be effected was always a challenge. It was personally distressing as it was with empathizing staff and others to closely follow or be part of efforts to extend use of fast deteriorating mobile homes, some constructed literally when John F. Kennedy was President, and not well maintained over decades. That said, there was considerable work accomplished by residents and outside volunteers, with assistance from staff when appropriate, to "nurse" many units to a time of resident relocation. If it became too dangerous, a recommendation to close the unit was made or the resident made that determination without prompting and moved away or moved in with relatives in the Park.

**2.18 Flooding and Disaster Recovery.**  On September 11, 2012, starting at one in the morning, an unusual weather phenomenon stalled over the Thermal/Mecca/Oasis area resulting in six inches of precipitation over a six-hour period.  The annual precipitation for our area is about three inches.  Severe flash flooding ensued.  The topography west of Duroville that includes many, many square miles of vacant land, forms a funnel for flash flood water run-off directed to the southeast with Duroville in the torrential path.  For several hours, 1.5 to 2 feet of water raced through the southern part of Duroville and started to back up and accumulate in the park.  In addition, an agricultural run-off canal on the north side of Duroville breached its cement wall enclosure, flooded northern parts of the park, and disabled both water wells at the park at five a.m. by submersion of all controls and critical surface equipment.  Mud came with the flooding, as well as moving and standing water, in unpaved Duroville.  This caused significant problems.  Many residents were stranded with over a foot of water surrounding and accumulating under mobile homes.  The force of rain and wind caused damage to many units and vehicles.  Electricity shorted in and out, sewer collection ponds were flooded, and the park's water supply and distribution system was possibly contaminated.

The County emergency operations commands were contacted by us as the scale of the disaster became readily apparent.  County emergency services were in fact already in the area and being reinforced, and heading for Duroville.  First responders were highly organized, responsive, and experienced in rescue and recovery.  Over the next days, a command center for disaster relief was

established in Mecca.  I was included in many meetings at the park and at the off-site command center with leadership of the County Office of Emergency Services ("OES"),  Supervisor Benoit,  Fire Chief Hawkins and Deputy Director Lent. Invaluable entities that helped our Duroville community full time over the next weeks included OES leadership and staff, County Health Department, Department of Environmental Health, Red Cross, Salvation Army, schools, Mosquito and Vector Control District, Economic Development Agency, Transportation Department,  Coachella Valley Water District (CVWD), Catholic Diocese, Dominican Sisters, Coachella Valley Unified School District, Mecca Community Emergency Response Team**,** local businesses, non-profits, and many volunteers.

        The water wells could not be repaired for a week because of limited access/deep mud, standing water, and shorted equipment.  Therefore, the park required thousands of gallons of potable water. The CVWD brought in and staffed a 500 gallon tank of potable water that they continually refilled off-site from five a.m. to ten p.m. for the week.  In addition, thousands of bottles of water and food/supplies were donated and delivered by Office of Emergency Services, a range of charities, Costco, local school leaders/staff, Catholic Charities and organizations, the Catholic Diocese, Dominican Sisters, Home Depot, Stater Brothers markets, Red Cross, Salvation Army, Xavier Prep High School, a Buddhist Foundation, Church of Jesus Christ of Latter Day Saints, Coca Cola Bottlers, Fantasy Springs Hotel and Casino, local public office holders and their staff including Assemblyman Perez and Congresswoman Bono Mack, Dr. Raul Ruiz (then a candidate for Congress) and his campaign staff, 29 Casino, and individual donors and civic groups. Supervisor Benoit and his staff provided ongoing assistance with 24x7 contact as did an array of County departments.  Many of these entities and individuals had been generous providers of services and supplies for the Duroville community over the previous four years, and were familiar with the park and residents.

        An evacuation center was set up by the Red Cross at Desert Mirage High School providing overnight shelter, showers, and meals.  The County Economic Development Agency provided ongoing evacuation lodging at a nearby seasonal migrant farm worker emergency "motel" type facility that took care of eleven families.

        The most urgent concerns involved possible water contamination, possible breaches of sewer lines, intermittent electrical shorts, damaged water wells, physical integrity of mobile homes damaged by flooding/heavy rain/wind, medical situations. All issues were analyzed and resources deployed.

        We contacted Mr. Jack Kerin, former director in the state's mobile home division at Housing and Community Development, who had done inspection and consulting work at Duroville as noted earlier in this report.  Mr. Kerin closely inspected 50 of the hardest hit mobile homes mostly in the southern part of the park and assessed damage and recommended temporary repair.  His findings were shared with parties and departments.  He made recommendations for repairs until residents could finally vacate Duroville and some units were red tagged.  In addition, the water testing protocols that had been followed by park by the Receivership in accordance with U.S. Environmental Protection Agency (EPA) directives were undertaken in daily waves of multiple tests that were analyzed by EPA approved contractor E.S. Babcock and Sons, Inc. laboratories.  All tests had to be "not detected" or "absent" for a range of required categories before the repaired water wells and water distribution system could be returned to service. With all this assistance and attention, the population survived the next weeks and gradually returned to an acceptable but very fragile level of inhabitability for the next eight months as residents relocated a few families at a time. Duroville came very close to becoming uninhabitable had it not been for the massive and expensive response of the County and charitable organizations and generous businesses. The very situation the Court Order had been intended to avoid -- sudden mass

homelessness – came very close to occurring if the park had not received the concerted timely assistance.

## 2.2 Protect Residents and Facilitate Residents Access to Outside Resources

Consistently for the duration of the years of Receivership, the Court expected and directed sustained attention to the ongoing security of residents. In addition, the Court expected co-operation with any charitable, non-profit, religious, or other volunteer organizations offering to assist residents while they awaited relocation.

**2.21 Security**. An early decision was made by me in late 2009 to retain a licensed security contractor to organize and oversee Park security. Mr. Christopher Hilton, Hilton Protective Services, performed this function 2009-2013. Mr. Hilton had the relevant verified experience, relocated his family to nearby Indio from Los Angeles County, had the relevant private security licenses from the State of California along with pertinent permits, and was in good standing with all State and other agencies with no negative entries on state web sites. Experience included private patrol security including management and training, and as a civilian employee with the Los Angeles County Sheriff's Department after serving in the U.S. Air Force. Mr. Hilton recruited local staff for the Duroville assignment, provided training and active oversight, and as with the receivership used e-verify when hiring. He is fluently bilingual. I mention this level of detail because resident security, and testimony about a lack of it, had been a major issue at trial and was a major ongoing concern with residents and the Court. Our usual seven day security patrol coverage over the 40-acre Park was usually 2pm to 5:30am with extra coverage for Park events or large resident gatherings. Additionally, we had monitors at the school bus stop by the main entrance from 6am to 8:30am (when hundreds of children would --or should-- line up for bus pick-ups to elementary, middle, and high schools.) Parents would meet afternoon busses and the office manager on duty would invariably step out of the office to look over the arrivals.

At all times, I believe we maintained good working relationships with the County of Riverside Sheriff's Department and the locally assigned Supervisor and Deputy Sheriffs. Also, the California Highway Patrol periodically assisted in responses to Duroville that was located on State Highway 195/Pierce Street. Under Public Law 280, local law enforcement had pursuit and investigatory access to tribal land including for response to 911 calls that we or residents initiated. Law enforcement also entered the Park to serve warrants, make arrests, or further investigations.  Although the U.S. Customs and Border Patrol was very active in our area, to my knowledge there were only two entries by our federal Border Patrol officers into Duroville both times to try to apprehend identified suspects who, as it unfortunately turned out, were not at the presumed units at those times.

As an overcrowded village of several thousand persons, many of the security needs were what one would expect in such a residential environment. The population of Duroville fluctuated from an estimated average of seven persons per unit at non-harvest periods to an estimated 14 per unit at harvest when migrant farmworkers and others came into the Valley from other areas of mostly California and Arizona. In the summer and early autumn when there was a low level of farming activity in the Coachella Valley and it was harvest season in the Central Valley, Salinas Valley, Oregon and Washington, a percentage of our population became migrant farmworkers and usually with their families would head north and return after the few months of work.

Situations that included our calling law enforcement included serious drunk and reckless driving that too often involved damage or injury, assault/battery, burglary, spousal assault, drug dealing, and some attempted murders. I believe we enforced a zero tolerance to crime including our employees. In the four years of Receivership, three employees were arrested: theft of cash rents, a fight between an employee and a resident teenager, and a security employee who clearly overstepped acceptable procedures in an escalating altercation with a resident. All three were terminated. In an overcrowded community there were neighbor complaints, complaints about the staff or park conditions, or other grievances. Our manager usually handled the matter but I was the final arbiter although in sensitive situations I often enlisted help from Purepechan leaders or other leaders among residents.

Among the most difficult security pressures were those involving drug dealers before the aforementioned serial situations involving threats to park staff and myself in the latter months of the Receivership. When the Receivership was in its initial operating stages, there was open drug dealing and participants did not seem to care at all that they were being openly observed by me or others sometimes standing yards away. During certain times in the early stages of Receivership, non-resident cars would drive to specific mobile homes and wait as someone inside would come outside to interact with driver or passenger. There appeared to be exchanges of money and envelopes or small bags, and the car would drive off. Occasionally, a car's occupant(s) would go inside the residence and depart shortly thereafter. I distinctly recall early occasions when there were lines of occupied cars waiting at a residence like a drive-through fast food establishment. I was informed that these drug dealers had the impression that they were not subject to law enforcement because they were on Native American property and so didn't care who was observing including a newly appointed Receiver. It was not always the same residences as though dealers would make arrangements to use a residence but not be the registered tenant.

Most of the visiting and transiting cars were late model, had occupants who did not appear to be farmworkers or local laborers but rather by car models, demeanor and ethnicity, and in my opinion were likely from more affluent areas of the Coachella Valley. With persistence we made it known that this activity was not acceptable and with persistence, the obviousness of the serial episodes of drug transactions lessened sharply. In my opinion, the dealers were not residents but rather using Duroville as a convenient place of business. The dealers would have too much money than to live in a $275 per month dilapidated mobile home. In addition, we would periodically find implements commonly associated with the heating and mixing of methamphetamines within or near the park. When the Provisional Receiver Mr. Adams assumed responsibility in 2008, 8 of 11 park employees failed or refused drug testing and were discharged although all were offered drug treatment at park expense, which only one accepted. Drug testing was periodically continued.

We always co-operated with law enforcement that was working on the drug problem that was in our area and they had frustrations about the scale of activity, its mobility, and other enforcement difficulties.  It was my understanding that the enforcement challenge included the element that the Mecca-Thermal-Oasis area was a transit stop at times for large scale drug businesses active in delivering to Southern California from nearby Mexico a 110 miles away. State Highway 86-S within sight of our Park was often the scene of drug intercepts by law enforcement.

An ongoing security concern throughout my tenure at the park was the number of guns and other weapons that were present. Many people had serious concerns about protection of selves and family and had weapons that were kept in homes or vehicles.  On one memorable occasion, two men in a vehicle raced toward a night shift security staff member who had earlier warned them to stop recklessly speeding through the narrow streets of the Park. On this night, these men fired a couple of

shots from the passenger window that went over the office building where our staff member was parked and they raced off.  He memorized the license number even when being shot at by these men and could describe the car that was later found by authorities at a nearby large mobile home park on 70th Street.

Aside from clear criminal actors, in my opinion the presence of weapons with residents is a widespread reality in areas like the Eastern Coachella Valley where too many people feel vulnerable to violence. They are often unsure, wrongly I believe, whether their legal status will prevent protection by local law enforcement or other government agencies. It is an easily reached assumption that most if not all of the possessors of guns at our park were not registered.

Let me conclude this brief section by underscoring that in my opinion law enforcement did a superb job consistently for the residents of Duroville and our staff. Many of these well trained and respectful Deputies had come from backgrounds and circumstances similar to the families residing in Duroville. They genuinely understood many of the challenges for residents with particular attention to our, at one point, more than a thousand children.

**2.22 Canine Overpopulation**. Any visitor to Duroville in 2009 and 2010 was usually startled and certainly aware of the presence of hundreds of dogs. The severe and out of any control overpopulation of the canines created a situation that was a serious health hazard to residents and the canines. Attempts at census usually resulted in estimated canine population of 500-800. Three dogs per household multiplied by 267 occupied units would be 801 -- a very reasonable but perhaps low estimate. The situation involved a percentage of dogs well taken care of by owners, others not well treated but with food and water, and a percentage living on their own having been abandoned by once caretakers. Too many dogs lived in the acres of bushes and tamarisk groves surrounding Duroville or across Highway 195 in the wide open acreage but returned to Duroville for water and food scraps. It was a tragic and dangerous situation, obviously, and seemingly uncontrollable and hopeless. Veterinary care was unknown. Dead canine carcasses were a common sight for residents and staff, as were new and multiplying litters of puppies.

The initial accounts in the media when Duroville was opened to media coverage by me after the Court Orders for a Receivership always highlighted the massive overpopulation of dogs. TV news, radio news, and newspapers carried neglected dog stories constantly and were often highlighted stories. As impossible as this problem seemed for a solution to many, particularly in light of the many other problems being addressed by the Receivership staff, we added it to our agenda. The press and public approbation about the dog situation was severe including biting criticism from Coachella Valley canine rescue organizations, many of which were very critical of the Receiver for having let this tragic situation exist however long he had been there.

 I reached out to and visited with representatives of the rescue organizations and asked for all the outside help they could offer. Once they understood that the Court had vested in me the authority to ameliorate this tragic situation but that I did not have any government funding available, spectacular action occurred. I was welcomed and treated as a genuine friend over time by many leaders of the canine rescue organizations. I believe many grew to understand most of our residents were not purposely neglecting canines, but didn't have requisite knowledge or resources for canine care or neutering/spaying. Residents were overwhelmed by circumstances. What followed over time was astounding to me. These rescue organizations sponsored waves of dog adoptions and waves of weekend "events" vaccinating dogs and spaying and neutering groups of dogs at a time in a mobile clinic. Our staff was engaged with these volunteers at every turn and a number of residents joined in group

support of the canine rescue volunteers from the outside. Soon, huge quantities of 50 pound bags of dry dog food and flea control supplies were donated by national manufacturers and chains of national pet stores and regularly trucked to Duroville.

In a large scale weekend event that seems genuinely astounding even in retrospect, these canine rescue and care organizations recruited a group of volunteer veterinarians and scores of their staff and fifty canine rescue/care volunteers to set up an actual "Veterinary M.A.S.H. Unit" of tents and mobile units at Duroville to spay and neuter hundreds of dogs over a long weekend. The medical procedures (surgeries required anesthetizing and resuscitating the canines)  continued literally day and night over a long weekend with all the attributes of a field hospital with some of the best veterinarians in the Valley, Riverside and San Bernardino Counties. Portable operating tables, appropriate lighting, medical supplies and sterilizing equipment along with generators were brought in. We had a group of 11 volunteer veterinarians who usually worked at clinics and practices (many knew one another), 27 of their veterinary staffs, and over 50 volunteers. Canine rescue volunteers and volunteer professional staff prepped dogs and post-op cared for drowsy dogs. It was medical assembly line operations one after another.

The successful event was widely covered and commented on by national and regional (and international) canine rescue and animal rescue organizations some of which had representatives who flew in to observe and help. Then and over time, Duroville dogs were sent for adoptions to as far away as Texas, Louisiana, Montana, Oregon, Washington, Utah, Nevada and all parts of California. The organizations kept up their support with our staff helping with vaccinations and veterinary treatments. The County of Riverside Animal Control Department was enormously helpful and supportive for years even though we were outside of the jurisdiction of the County. The project involving the "impossible" and "shocking" situation at Duroville became a case study for organizations, government entities, universities and even at the United Nations resource center. This was an example of a Third World problem but in a First World country. The leaders and supporters of the Coachella Valley canine rescue organizations, the County, and national groups like the ASPCA and others performed beyond anything one could imagine. All they needed was the catalyst provided by the Court and a Receiver who was pleading for help and totally open to facilitate that assistance in every way. An alternative outcome to our approach is still very difficult to envision and accept although obvious.

### 2.3 Assistance for Residents from the Outside.

Even with the passage of time since the closing of Duroville, the immensity and rich composition of responses from so many quarters to the needs of the Duroville community are still fresh to many of us who were involved. The Court provided a catalyst with its Orders to keep the Park open for an interim period and to open the Park to those inclined to offer help to residents. The massive responses included waves of volunteer activity and tangible donated assistance that was impressive, impactful and inspiring. The tangible positive impact of massive charitable activity for residents was clear early on. I know well that the experience of in-person volunteer service or generously supporting material assistance to this farmworker community was consequential and lasting for many who participated during 2009-2013 for short periods, longer periods, or the entire term.

It was ironic that we had so much volunteer activity and evidence of generosity at Duroville that sadly, occasionally, it generated envy and jealousy in other quarters in the area from some in equally difficult residential and life circumstances. Ironically, on more than several occasions I was called upon to deny that the sustained level of charitable and volunteer activity at Duroville was a result of government subsidy not equitably shared in the surrounding area. The sad fact is that the Coachella

Valley Housing Coalition estimates that there are 10,000 impoverished persons in the Eastern Coachella Valley living in the most distressed and failed shelter.

From the very beginning of the Receivership, it was my intention to exert energy and persistence to find resources from the religious, private, non-profit, and any other sector that could be introduced to the needs that existed among the Duroville community. As long as our community was going to stay intact at Duroville until group relocation then anticipated as two to three years hence, I would seek and facilitate assistance for the community from whatever sources were so inclined. With no government funds available to augment rent collections supporting operations and related obligations, we had to identify potential donated and volunteered assistance from organized sources and individuals. I was very fortunate on behalf of the residents to have so many generous responses. Media coverage that we welcomed helped highlight the activity. I made many presentations and gave interviews about the situation, conditions and needs of Duroville residents and those similarly situated in the Eastern Coachella Valley -- mostly farmworker families. I interacted with the private sector, non-government organizations, religious entities, non-profit service organizations and individuals in a position to help. I tried to be clear and unambiguous about needs. Much more importantly, those reaching out to help the Duroville situation were many organizations and individuals from the Coachella Valley, Riverside County, and beyond offering assistance. There were so many enormously generous people and entities who obviously had a desire to help but just needed a clear way to link into our situation or similar situations of families in need in the Mecca-Oasis-Thermal of mostly farmworker families.

The Court provided a catalyst that provided these entities and individuals with a facilitating point of contact to help this community caught in a tough circumstance, particularly the thousand American children. We often directed assistance to other places in the area when we were literally at temporary overflow points of donated goods and supplies for residents. We received a steady flow of food deliveries including some massive delivered quantities, clothes of all types and sizes, toys and sports equipment, OTC medical supplies, books, school supplies, home repair materials and tools, furniture and more. We did not accept any donated funds and let qualified organizations handle that. Our staff provided logistics for outside groups when we could help, offered activity or meeting space, or offered storage space where park businesses had been closed. Over time literally thousands of volunteers, and members and supporters of churches and organizations, had been involved with supporting the Duroville community with many hundreds having been at the Park at one time or another.

The unrivaled champion bringing assistance to the community was Sister Gabi Williams, Dominican Sisters of Oakford. She was at the Park several times a week for five years and arranged help for our Park from the Diocese, parishes, organizations and individuals. Sister Gabi had been in the Valley for six years having returned from 14 years on mission with the poorest of the poor in South America. Her primary ministry in the Coachella Valley was the hundreds of mobile home parks in the area from the largest – Duroville – to a hundred so-called Polanco parks of 13 units. During the Receivership, Sister Gabi received national recognition and awards from national Catholic organizations. Although relocated to Tucson in 2014 for a new ministry, she left behind the San Jose Learning Center she started from scratch and for which she raised $700,000. It was built with donated double wide mobile units that were repurposed and installed near Duroville, a nearby 400 mobile home units nearby, and Mountain View for after school homework and computer training for children. The first wave of children was from Duroville who now live at Mountain View Estates.

Every day at the Park, Sister Teresita Navarro, also a Dominican Sister, supervised a large group of elementary students for after school tutoring and recreation. The Sisters recruited volunteers to help with the children including students from high schools. The limited education of most Duroville parents and limited English often prevented them from helping their children with school studies. Parties in the litigation and the Court will recall that the Sisters attended nearly every status hearing for years and the entire trial. They were revered in the entire community.

The late Edward "Ted" Foley from Palm Desert, a retired housing developer and philanthropist, accepted an invitation to get involved at Duroville. Through the Foley Foundation, Ted organized and paid for a $35,000 renovation of a double wide (bright green) in the northeast corner of the park that was named by residents "El Refugio" Centro Communitario. It was used constantly as a community center.  He brought Latino Health Access programs to the Park from Orange County with his $308,000 grant just for Duroville residents for children's health initiatives and adult health classes including diabetes management (huge problem in the Park population). The program taught eight of our residents to be paid promortores or health information providers with prepared materials for residents and health related "fun" activities for children, and to assist Latino Health Access professionals and other health lecturers who came to Duroville. Ted Foley had a $12,000 basketball court built on-site with the composite surface serving as a suitable platform for innumerable outdoor events and activities needing smooth hard open space or support for tents, booths, and mobile units (Duroville had all dirt streets). Six two story light standards ($4,000) for night use were installed and the court was frequently in use during cooler evenings for a range of recreation and other activities over three years. Ted knew full well and accepted that the installed physical donations would be left behind when the Park was closed.

Father Howard Lincoln, pastor at Sacred Heart Catholic Church in Palm Desert, became very personally familiar with the needs at Duroville and acted. Sacred Heart organized and funded monthly delivery of 45,000 pounds of nutritious food purchased from area grocery chains. The food was collected in a store room and packed into boxes by volunteers using Martha's Village facilities in Coachella. The packed boxes for each family at Duroville were delivered by up to 50 volunteers on the third Wednesday of every month for two years. The boxes were delivered by the volunteers from a rented panel truck to each unit. If people were not home we kept the boxes in a park store room for them. The leaders of volunteers for the monthly generosity were Jay and Chrys Mueller. Sacred Heart supported the project at $250,000 per year.

Frequently, organizations sponsored events at Duroville bringing an array of volunteers. For example, open house medical screenings involved up to a dozen doctors and additional support personnel for screenings as varied as women's health to diabetes to ophthalmology. Doctors came from the Coachella Valley and Riverside County hospitals, clinics, and private medical practices. Also serving Duroville residents were national and international organizations like Doctors Without Borders and Volunteers in Medicine who specialize in delivering medical service in the Third World. The University of California, Irvine, School of Medicine used to send students and interns to Mexico on several day secundments during the school year to serve needy rural residents. Security in Mexico became a concern. Associate Dean Alberto Manetta MD learned of the media and contacted me. After several visits, Dr. Manetta brought medical students to Duroville as practice for delivery of medical screenings and services in Third World villages. The students came regularly on a schedule with Dr. Manetta and even organized a memorable Christmas Party with generous gift giving to hundreds of children. Astonishingly, most of the children living in isolated enclaves in rural Eastern Coachella Valley had never been with an in-person Santa Claus (one of the medical students). In the same season, organizations combined to arrange for 800 gifts for park children. There was a donation of 400 frozen turkeys for every household at Thanksgiving. For most at Duroville, this was indeed an introduction for

immigrants to an American tradition and there had to be oral instructions on preparing the frozen turkeys for a Thanksgiving dinner. As a grandson of immigrants myself, I imagined my recently arrives ancestors going through a similar new to America experience 135 years ago.

With the Foley Foundation and other contributors Dr. Manetta coordinated the presence at Duroville of aforementioned Latino Health Access, a large Orange County pro bono medical delivery organization. After being introduced to our overall area at Duroville, within two years they opened a permanent clinic in Indio serving farmworker families and other low income persons. A leader and organizer of many of these health and medical initiatives and a *frequent* medical volunteer at Duroville was an Emergency Room doctor at world renowned Eisenhower Medical Center in Palm Springs. Dr. Raul Ruiz is now the United States Congressman from the Coachella Valley having been raised in a farmworker family in impoverished circumstances.

Examples of additional volunteers who actively contributed to the Duroville community and residents included but were not limited to Sisters of Providence of Saint Mary in the Woods (Sister Carol Nolan -- English as a Second Language), Diocese of San Bernardino (Bishop Gerald Barnes visited the park regularly including massive outdoor Masses on Easter Sunday and Palm Sunday in successive years, and provided ongoing support in many ways), Diocese Office of Social Concerns, Church of Jesus Christ of Latter Day Saints, Southwest Community Church, aforementioned Sacred Heart Catholic Church Palm Desert, Saint Francis Catholic Parish La Quinta, Catholic Charities Indio Division, Sanctuary of Our Lady of Guadalupe in Mecca (Father Lucas), and Tzu Chi  Buddhist Foundation in San Bernardino and many many more.

Examples of other generous organizations that helped the Duroville community included but were not limited to River of Hope (Mr. Kenny Dickerson), Healthy Communities-California Endowment, Community Action partnership, El Sol, ICUC, Martha's Village, Rescue Mission, American Red Cross and more.

Examples of university and college students (and staff from the schools) who provided major volunteer assistance included but were not limited to include aforementioned University of California Irvine Medical School, University of Southern California Law School, California State University San Bernardino, UCLA, University of Redlands, University of Oregon ( groups on spring break three years in a row for a week of service), Stonehill College in Worcester Massachusetts (groups on spring break three years in a row for a week of service), UC Berkeley, Pomona College, Loma Linda University, UC Riverside, University of San Diego and more.

Mr. Harvey Duro made a generous monetary contribution that was directed to a program founded by Sister Gabi to help Duroville students.

Examples of repeated visits for medical assistance included Volunteers in Medicine, Doctors Without Borders, Flying Doctors, local doctors and staff on their own time from Eisenhower Medical Center in Palm Springs, Valley Medical Center, JFK Hospital in Indio, Loma Linda Medical Center, and Kaiser Permanente Riverside County, and more.

Examples of animal assistance included Save-a-Pet, Animal Samaritans SPCA, Loving All Animals, Animal Rescue, U.S. Humane Society and more.

Examples of federal programs included Head Start (U.S. Dept. of Education and County of Riverside) and the WIC program (Women, Infants, Children Health and Nutrition).

Teachers and staff helped on their own time from Desert Mirage High School, Toro Canyon Middle School, Las Palmitas Elementary School, other schools and the school district. Also on their own time were volunteers from Cal Fire, Riverside County, local cities and the state and federal governments, CERT (safety training), and California Emergency Management Agency.

Students from local high schools included Xavier Preparatory High School (after school tutoring at Duroville twice a week for three years), Coachella Valley High School After School Hospitality Club, Indio High School, La Quinta High School.

**2.4 Responding to Media Interest and Managing Proactive Public Outreach**.

Media interest in Duroville, both the litigation and the community itself, was strong before the appointment of the Provisional Receiver Mr. Mark Adams February 11, 2008. There was local and regional TV/radio/online news coverage and widespread print coverage including award winning coverage by the Los Angeles Times' David Kelly. High media interest continued during the 14 months of provisional receivership with Mr. Mark Adams prompted by monthly court hearings, eight days of the bench trial in April, 2009, interest about the park itself and the population there, and was intense with the Court's decision April 30, 2009. Media interest certainly continued for the 50 months of this Receivership with peaks of intensity and never completely abating in lulls for very long.

From the beginning, I believed it was important to co-operate with media requests for access and comment. It was my position that because we were conducting operations by order of a federal court as part of well covered litigation, we should co-operate with reasonable media requests responding to wide public interest. I desired accurate coverage of developments at the park impacting the community emanating from Court Orders, and I thought it was important and proper to facilitate interest in the Duroville community that could result in donated and volunteer assistance to people. I referred media interest in the litigation to the parties.

A sense of the media interest is conveyed by the broad scope of news organizations that visited the park including but not limited to the Los Angeles Times, New York Times, Washington Post, Associated Press, United Press International, Telemundo, Univision, local and national NBC, CBS, ABC, CNN and Aljazeera, Desert Sun (part of Gannet), Press Enterprise, San Bernardino Sun, Orange County Register, news crews from Mexico, China, Great Britain, Brazil, Finland, Germany, United Nations News Service, local AM and FM radio and regional and national radio networks. The CBS organization 60 Minutes invested time in researching and scouting a segment but it did not get final okay for a final network airing.

In addition, there was an award winning production of a documentary released and exibited in theatres and before groups in Southern California and Washington DC. It is titled "Purepecha – Poorest of the Poor" from Indivision. I was invited to speak at some film presentations and even on an occasion shared an appearance with Judge Stephen Larson after his retirement from the bench. There was certainly interest in the subject of Duroville.

Not only did we offer accurate information on the Duroville situation, but coverage generated considerable assistance for residents from charities, churches, non-profits, volunteers and others.

### 3.0 Relocation of Residents

The Court's intent in creating a receivership was greatly based on organized relocation of residents to safe and affordable housing.  The County provided assurances that it would cause to be built relocation housing.  From the outset, it was a challenge of how fast a new park could be planned, entitled, funded and built, and concomitant challenge of whether Duroville could be operated at acceptable health and safety levels until the new County Park was completed. To close Duroville before relocation housing was available would, the Court concluded, cause an unacceptable humanitarian crisis of mass homelessness by order of a court.

While the Court was receiving input on the Duroville situation after having received the case, on January 24, 2008 then Chairman of the County Board of Supervisors and Fourth District Supervisor the late Roy Wilson wrote to Judge Larson:

> "Due to serious health and safety concerns for these tenants, Riverside County supports the United States request for a court-ordered closure of this park. However, without a responsible permanent relocation plan for the park's tenants many residents would merely become homeless, exacerbating the health and welfare issues…The County does not have available an inventory of low income to immediately accommodate all displaced tenants from the  Park."

> "To achieve an orderly and successful relocation plan of the Park's tenants, the County of Riverside recommends that closure of the park take place over a reasonable period of time. The very first step of a successful relocation plan should involve a court-appointed receivership, with limited duration, to assume control and management of the Park's day to day operation."

In the same communication to the Court, the County stated:

> "The County of Riverside's recommendations….would be for an immediate appointment by the Court of a receiver to reinvest rents into urgent safety improvements."

> "To date, the County…has provided assistance to move about 80 families from this park into safe housing within County areas. Unfortunately, due to lack of active governmental regulations at the park, as soon as one family's dilapidated trailer was abated, a different family immediately moved into the same space occupying yet another similarly substandard trailer."

> "One idea of the County is the Vista Oasis Mobile Home Park. The county plans to allocate approximately five million dollars ($5,000,000) for the first phase of development…..The County anticipate completion of this first phase within the next eighteen (18) months." (Note: Vista Oasis was renamed Mountain View Estates, and obviously the then anticipated schedule was overly optimistic).

The late Supervisor Roy Wilson made the commitment to the Court to use best efforts to build relocation housing on an accelerated track. Rather than using the common expression "best efforts" in a legal sense, he showed that it meant his personal best efforts too. Roy Wilson provided active leadership on the ambitious project with personal drive and constant attention. His long time senior associate Leticia de Lara was involved actively. From the outset, I had open and welcome communication with Supervisor Wilson and Ms. de Lara. I would attend meetings at his office, and he and Ms. de Lara stopped by Duroville with some frequency, often with other staff from the County. The Supervisor

usually started his conversations with me with questions about conditions at the park including what operating problems were the worst at the moment. Efficacy and longevity of the infrastructure was always of top concern. He always made time to tour and inspect the park when visiting. Supervisor Wilson, Ms. De Lara and other officials fully appreciated that there were seemingly endless problems at Duroville that could cause abrupt closing and encouraged us to hang on.  County funds could not be expended for federal or tribal property so he was always hopeful that federal funds might become available at some point for operations.

In the meantime, planning and other preliminary work for Mountain View was underway. The County was looking for federal and state funds for the new project, but eventually would identify local redevelopment funds. Mountain View would require a 2.5 mile $6.4 million wastewater and water line to link with the Coachella Valley Water District line. The line would serve other users along its route and traverse County, BLM, and Tribal land. Supervisor Wilson worked personally to secure a federal grant including arranging meetings with key officials when he was in Washington D.C.  Senators Boxer and Feinstein became supporters of the grant because of its link to a Duroville solution. Both Senator's offices regularly stayed in contact with me about Duroville – a situation well known to the Senators. Senator Boxer inspected our situation.

Supervisor Wilson passed away suddenly. Within six months, Governor Schwarzenegger appointed Senator John J. Benoit as Supervisor. Supervisor Benoit quickly became a powerful champion and moving force of the Mountain View project and also became a frequent visitor to Duroville with Ms. De Lara staying very involved. The new Supervisor was acutely aware and concerned about the ongoing conditions at Duroville and encouraged our efforts to meet the on-site challenges. Mr. Benoit was very active personally in the Eastern Coachella Valley and asked me to continue to participate in the quarterly housing committee meetings for the area. This meeting included representatives of all major area housing interests along with uniformed and civilian officials from County departments with responsibilities in the area. These relationships proved valuable for our park and residents even with legal restrictions on direct expenditure for the federal/tribal Duroville property. There were programs that could be of assistance to residents. Importantly, relationships from this proved invaluable when Duroville had emergency needs such as from the severe impact from the September 11, 2012 flash flood and normal County restrictions on expenditures on tribal/federal property were temporarily waived for the disaster.

Supervisor Benoit and staff at the Economic Development Agency kept me informed of progress as it occurred in the planning, financing, entitlements, and construction of Mountain View. Mountain View Estates is three miles from Duroville and I visited it often to develop personal knowledge of progress and often met with the developer Mr. Bobby Melkesian. As the parties well know, Judge Bristow ordered monthly status hearings and invited the County to attend. Usually attending were EDA officials and staff and Deputy County Counsel Anita Willis. These hearings provided oral progress reports by the County and opportunities for informal exchanges of information.  EDA staff led by Development Specialist Monica Telles became a frequent presence at Duroville for group meetings and one on one interviewing and consulting with prospective residents of the new park. We made office space available to the County inside our park office.

The County of Riverside Economic Development Agency ("EDA") and the Housing Authority met the monumental challenge of organizing and implementing a massive program for bringing Mountain View into existence. They expended many hundreds if not thousands of staff and managerial hours along the entire five year time line of creating Mountain View including recruiting and qualifying Duroville residents for acquisition of new homes and relocating families to the new park.  The stalwart

leaders in the EDA included Assistant Director Heidi Marshall, Deputy Director John Aguilar, and as mentioned above the leader of the relocation process Monica Telles, Senior Development Specialist. A key leader in the early years of the Mountain View program was then Assistant Director Emilio Ramirez. We worked closely with this team for years.

It is not necessary herein to reprise in full the biggest reasons for the delay from an already revised target date for opening Mountain View in late 2011. Delays started with the statutory abolishing of the existing state redevelopment agency structure with passage of ABx1 26, enactment by Governor Brown June 28, 2011, and affirmed by the California Supreme Court December 29, 2011. Hence forth there would be a replacement funding process for partially completed local projects requiring state approval for release of previously locally controlled redevelopment funds for projects that straddled the abolition of the previous local process. This is well known to the Court and parties. There was an extended period of uncertainty about whether the state would release the final $12.5 million in redevelopment funds for Mountain View as "Previously Obligated" before the law redevelopment law was abolished.

The Mountain View funds were released after considerable effort by many at a time when most other Riverside County projects were not successful on appeal to the State for release of redevelopment funds. What may not be well known is that Judge Bristow's invitation to the State to appear voluntarily in a monthly status hearing to explain the sudden stoppage of funding for Mountain View prompted the California  Attorney General's office to review the merits of the County appeal then in process in the Department of Finance. (Appendix B). The AG's office was alerted to the federal court case by Judge Bristow's invitation – that I forwarded -- to appear to explain the appeal situation. The AG's office informed itself in detail of the active interest of the U.S. District Court in having the County fulfill its commitment to provide relocation housing leading to the closure of the illegal Duroville Park.

I was contacted several times for information by the senior level of the California Attorney General's Office and other high levels of state government including the Governor's Office. I was asked to prepare a document describing my point of view of the situation as on-site property manager and receiver appointed by the U.S. District Court. I was asked to provide my personal knowledge of the timing of planning and actual timeline of entitlement and construction progress of Mountain View as well as information about the dire and deteriorating circumstances at Duroville that prompted the Court Order to close the park when Mountain View relocation was completed. The AG chose not to appear but tagged the Riverside County appeal with extra background information aside from the formal County appeal. I was instructed to address my submission to a Manager in the Department of Finance in the normal appeal process but to fully expect copies to circulate at much higher levels of state government (Appendix A) and to be prepared for contact by senior State officials in the Administration.

The County won the appeal for release of the redevelopment funds for this Riverside County project primarily because County officials and County counsel, including Deputy Counsel Anita Willis who represented Riverside County in our monthly status hearings, made concerted and effective formal presentations and submitted convincing briefs. I was pleased to help and I believe the federal Court's involvement and interest in the matter was important in the release of the final $12 million of redevelopment funds required to purchase the final 147 new mobile homes needed for the major part of our Duroville residents relocation. Unfortunately the delays from the State in abolishing locally controlled redevelopment cost us a lot of time.

As stated above, the County did the heavy lifting in the appeal but I was informed that the District Court interest and the on-site Receiver's submission was considered as added persuasion in

State consideration. I reiterate that the lead was clearly the expert and aggressive advocacy from the County's administrative, legal and elected leaders, with strong independent submissions from other officials including then Assemblyman V. Manuel Perez. I was informed that an excellent and significant package of material from CRLA, an organization I know is well known to Governor Brown and the Administration, prepared by CRLA Attorney Megan Beaman, was very important and persuasive. In addition to us, I know firsthand there was strong intercession to Governor Brown personally by Diocese of San Bernardino Bishop Gerald Barnes. The Bishop was personally interested in the future of Duroville residents and staff with whom he had shared time at Duroville and the Bishop had received regular updates on the Duroville case and site developments from Sister Gabi Williams and on occasion from me.

Similarly, earlier, I was asked to submit a memorandum for the United States Department of Agriculture Rural Development Division regarding the $6.4 million grant application for the 2.5 mile sewer and wastewater lines needed to connect Mountain View to the area's main lines of the Coachella Valley Water District. There was awareness of the federal court litigation regarding Duroville that had prompted interest by Senators Feinstein and Boxer. Accordingly there was interest for a memorandum with background about the case and about the Court Orders along with a verifiable first person description of the condition of the deteriorating Duroville site as a companion to the grant application from the County. Time and completeness was of the essence so as not to delay further the occupancy of a completed Mountain View because of a lack of this essential utility connection. We were pleased to help. (Appendix C). I was asked to keep the Senatorial staffs informed of progress or further problems.

The monumental tasks involved in qualifying and processing Duroville residents for Mountain View units were as noted above led by Ms. Monica Telles. Our staff and I were responsive to every request for residents background information needed in the multi-layered process that the County was required to complete because of multi-agency and multi-jurisdictional involvements in funding for the housing.

The new Mountain View Estates Park started the move-in of new residents November 19, 2012. The official opening and dedication of the new park was January 5, 2013 with a large Saturday event for over a thousand visiting attendees in addition to new residents. The occupancy of mobile homes was one-third complete at that point. Local media covered the event featuring remarks from government officials from county, federal, state and local governments led by Supervisor Benoit, including Assemblyman Perez, and also including Mr. Jose Padilla, Executive Director of CRLA.  Speakers mentioned the powerful role of the federal court in allowing residents to stay at Duroville until relocation, and looking forward to the scheduled closing, at long last, of the too well-known Duroville park with which all were familiar.

New residents relocating from Duroville to the new Mountain View Estates mobile home park arrived every week during the winter and spring of 2013 as new mobile homes were delivered and installed. The final Duroville residents who were relocating moved in shortly before the closing of Duroville. I believe 171 of the 181 of new residential units in the first phase of Mountain View had Duroville families.

**4.0 A Few Observations**

When I was asked to consider, quickly, appointment as receiver by a remarkably persuasive Judge in Chambers it was total surprise at the very end of the trial in April, 2009.  The term was to be for no longer than two years and I agreed to give the Court notice of 90 days if I planned to leave earlier,

which was my intention, to return to an interrupted career in business. Obviously that intended limited term gradually became more than five years of service. The challenge was too irresistible and the needs too great. From the very beginning of my involvement and consistently for years, the parties opposed the appointment of an Intervenor, CRLA proposal for a Receiver, appointment of a Receiver, and extensions of the Receivership even as the $28.5 million relocation park was being completed albeit after delays out of the County control. Objection and opposition was consistent. While coming close at times, I tried not to take it personally. I understood, I believe, the tactical rationale prompting the United States and the Defendant to vigorously advocate opposition to a Receivership created by the Court using its equitable power. I'm confident the spirited and strong opposition has continued and may well continue. The issues litigated in the case in chief were and are significant. I always saw my primary role was to execute comprehensive Court Orders to protect and assist a population caught in the middle of the titanic legal dispute and caught in a very living difficult situation until relocation. I was not to express my opinions about merits of elements of the litigation itself. I always tried to interact with all parties to the litigation forthrightly and professionally. I left the years of hearings with genuine respect for counsel, government officials and their support personnel involved in the matter.

In an ironic twist, initial and ongoing objection to creation and continuation of a Court-appointed Receivership as a "holding action" until relocation of impacted residents was not widely well known or understood among many of those outside the Courtroom in the public or agencies not involved in the litigation who were following the Duroville situation over years. I had no reason to raise it outside the Courtroom. Rather, in my experience, there was invariably expressed interest and support for helping the Duroville community stay together, supporting the relocating of the hard working farmworker community, and then closing well-known Duroville. Over years, I interacted about Duroville with literally thousands: audiences, observers, volunteers, citizens, local, national and even international media, local, regional, federal and even foreign officials from near and far, taxpayers, radio call-ins, members of the public and visitors. The Bush and then Obama Administration, the independent Department of Justice, the Tribe and the County were most often applauded, **as a group**, for forthrightly and successfully working **with the U.S. District Court** to remedy the appalling situation that had attracted local, regional, national and international approbation.

That hard working farmworkers and families at the agricultural end of the Coachella Valley were being protected and relocated by generally presumed co-operative action of the United States, the Tribe, and the County most often elicited support and widespread approval. That said, I did have some instances of hostility, screaming criticism, hate messages, and several tense situations involving persons approaching me with energetic and forceful objections to U.S. immigration policy for whom I was apparently a representative when they saw me in the media or in front of audiences.

Against sometimes very difficult odds involving anticipated challenges on-site and unanticipated setbacks from nature and other forces, the Court's unshakable resolve and faith in achieving goals of the uncommon trial remedy in this case was rewarded by success, and thousands of people are the better for that. I trust this report adequately supports that point of view.  It was suggested to me by a retired powerful East Coast corporate executive who was volunteering at Duroville during his winter stay in the Coachella Valley that his succinct take on the Duroville situation was that the Court was "a catalyst for problem solving not problem ducking." Roy Wilson often said something similar to me. The Court was the powerful catalyst for action by many others to solve a serious problem. The sustained commitment of the County in getting replacement housing installed was remarkable and the County never relented in the face of challenges from many quarters and nature itself (with that awful flash flood).

I would posit that the Duroville community itself played a major role in protecting and advancing itself. After all, it was the collections from the tenants (with no augmenting government funds for operations until the last month) that were directed to maintaining a functioning park that required at times heavy capital expense, ongoing operating expenses, and also included my compensation and expenses as Receiver until the last months, the monthly stipend for Mr. Duro until the last months, partial CDFI repayments until last months, and other requirements and obligations. The community itself with most earning the minimum wage was the financial bedrock for attaining the goal of having a surviving intact community until relocation was effected.

As a grandson of immigrants, I always considered this tight-knit immigrant community as literal pioneers from far away that were sacrificing and working so hard for their American children's bright futures. A majority of the Duroville community with whom I shared over five years of my daily life were Purepecha people, also known as Tarascans, from the central part of the Mexican state of Michoacan around the famous mountain lakes Patzcuaro and Cuitzeo. They are an indigenous minority in Mexico with a proud history and have a unique primary language still spoken by only about 200,000 with many Duroville families having Spanish as a second language. Many felt discrimination back in Mexico as an indigenous minority as well as enduring bleak and deteriorating economic conditions and rising violence of organized crime in their regions.

With second or third grade educations in Mexico, most adults at Duroville had no foundation to understand even rudimentary dimensions of the Duroville litigation. Fortified frequent rumors and often confusing or contradictory news or purported news accounts (too often poorly translated or paraphrased if not from a Spanish speaking source, or just inaccurate reports in English or Spanish) only added to confusion and fear. How many times over a decade were residents "informed" from various sources that closure was imminent? Too many. There was suspicion by some about me when the receivership started and for a while I was "Agente Govrnment", "Funcionario del Gobierno" or simply "Hombre de Gobierno" ("Government Agent, Government Official, or simply Government Man") before eventually being just Senor Tom or Mr. Tom and not considered a threat to act or inform regarding one's legal status.

The initial reaction among many in Duroville to being of such interest to a federal court and federal judge was understandable nervousness if not fear because of legal status in an area where patrol, detainment and deportations were common.  CRLA was thankfully a trusted influence and often the counter balance to misinformation and fear. Over time emanating from observation of my daily presence and observation of daily performance of tasks by me and our staff, and with CRLA and County presentations and robust interaction, residents gradually came to understand more. I knew we had made progress when I was informed at one point by an educator about a group of our students in a class project formally referring to Judge Bristow as "Nuestro Protector de Estados Unidos Juez Bristow" ("Our Protector United States Judge Bristow").

Fully appreciating that this extended legal case has had its own dynamics over years, I believe there was another context surrounding what we were all a part of that went way beyond the litigation. The Duroville situation that became known to so many was undertoad by so many as part of a significant American challenge of where our farmworkers fit into the greater American economy and society. The adults of Duroville came to the agricultural area in the Coachella Valley for work and their hard work is beyond adequate descriptive vocabulary. When there was hiring for work in the fields, Duroville men and women would leave just before dawn and return exhausted and spent only to return to fields day after day until planting, tending, or harvesting was done. I was witness to this often. Their labor was for contractors for some of the largest and most well-known agricultural interests in our

country and the world. But the living conditions of our farmworker families were literally from the Third World as has been the fact for many decades and into the past century even the century before that in California.

Long ago in 1936, living conditions in abysmal agricultural migrant labor camps near Bakersfield were described in a six-part series by a 34-year old reporter for the San Francisco News named John Steinbeck. His reporting then could have been describing Duroville. The words of then journalist Steinbeck literally describe Duroville and similar places. But included in the Steinbeck newspaper series entitled "The Harvest Gypsies" and later his novel "Grapes of Wrath" were descriptions contrasting conditions in the worst farmworker camps with life in a United States Government sponsored federal camp where workers and families had decent housing and running water. Perhaps only the ethnicity, primary spoken language, and origin of the farmworkers have changed but not the gap between decent farmworker housing and the worst of the worst. I would like to believe that the on-site Duroville experience now that it is over even with all the behind the scenes disagreements, challenges, and high temperature litigation is accepted as a success, as  an example of the best tradition of involved co-operating entities, agencies, departments, institutions, and motivated individuals. It is certainly in the best tradition of the federal judiciary. A small part of a large societal problem was solved for at least a group of workers and their families involved in American agricultural production who were drawn by fate to a very difficult but available living situation and then caught in the middle of the litigation and in danger of losing the modest shelter they had.

It is certainly not my role or place to comment herein on the substance of legal proceedings nor am I qualified to do so. But I do want to comment on CRLA – beyond the legal representation by the succession of the four supervising CRLA attorneys and pro bono co-counsel who worked so hard on this case. The role CRLA played in the Duroville community in sustained outreach, leadership, care and casework -- aside from work related to the courtroom – deserves comment. The  supervising attorneys were frequent, respected, and trusted presences at the Park in resident meetings large and small. Megan Beaman, Rosalio Castro, and Blaz Gutiérrez were powerful influences beyond their formal legal roles and each a frequent presence at the park. Arturo Rodriguez was essential, central and important in the early years of the Receivership. Co-Counsel Chandra Spencer was  equally highly respected and influential especially when among residents who knew full well she was coming all the way from Los Angeles many times to Duroville as a volunteer attorney. CRLA Executive Director Jose Padilla and Director of Litigation and Advocacy Ilene Jacobs were powerful  beyond their legal leadership in supporting the Duroville community that often felt  exposed, vulnerable and under seige. The best community outreach workers I have ever observed, and I've seen many over the years in this country and other nations, were CRLA's Lorena Martinez and Emmanuel Benitez – both with few peers anywhere. The team at CRLA, beyond their legal roles, was crucial in keeping the Duroville community calm, informed, and unified throughout often difficult times of uncertainty and stress.

I gained similar admiration and respect for the role and  demonstrated steadfastness of CDFI executives and staff, and its representatives, who support so many projects of tremendous merit in the Coachella Valley and Southern California. Clearinghouse Community Development Financial Institution invests widely in new and rehabilitated housing through affordable financing that is unavailable in the conventional markets. In recent years, CDFI has established an increasingly strong link with the Riverside County Housing Authority with even more projects in the Eastern Coachella Valley.

The early and significant role of Provisional Receiver Mark Adams in the initial 14 months (February 11, 2008-April 30, 2009) of Judge Larson's order for interim receivership was significant and of consequence. Mr. Adams initially recruited me to get involved at Duroville "for a few months."

Many decades ago I was fortunate in college to study with Professor Margaret Mead emphasizing Third World conditions and cultures, and I later served in the U.S. Department of State with a term at the United Nations including working on a range of Third World problems. How improbable that late in my working career I would be a Receiver and property manager in a decidedly Third World situation within California involving court ordered protection of farmworkers. It would have been equally improbable to imagine the same when I served in Governor Brown's earlier Administration decades ago that included work with farmworkers before embarking on a career in business. Certain of our experiences, challenges, and successes on-site at Duroville 2009-2013 "nursing" extended use of the deteriorating park and helping the community as much as we did in various ways will likely be studied for years to come I am informed. It has already started with outreach from the Peace Corps, universities, foundations and organizations.

On a Saturday in an early year of the Receivership we had volunteer clean-up crews at the south end of the park working to move by hand scattered and piled debris into dumpsters. The remarkable and effective crews of strong young men this Saturday were off duty United States Marines from the Marines Air Ground Combat Center in Twenty-Nine Palms (military shorthand "MCCS 29 Palms").

These Marines were donating volunteer morning hours to Duroville community debris loading before starting week end leave in the Coachella Valley.  Most were from Third Battalion, Fourth Marines ("3/4 Thundering Third") Company K ("Kilo Company").  As we spoke during the morning, it was learned that more than a few in the group came from very economically stressed family backgrounds and understood life in dilapidated places like Duroville. They were due for Afghanistan deployment shortly to join Operation Enduring Freedom with the 4th Marines Regiment and they were with their NCO Sergeant Downs.

One group of Marines was particularly eager to learn more details about the specific Duroville situation about which they had seen coverage in the media and had discussed in church before arranging to volunteer that Saturday morning collecting and loading debris into ten 40-foot industrial dumpster bins until we ran out of bins to load. What a work crew! The volunteering Marines were themselves the lead on local TV news that day from Duroville spurring more volunteers from various parts of the Coachella Valley and among other off duty soldiers.

One Marine made a parting comment that stayed with me. After asking me questions about the rough living conditions, maintenance problems, resilience of the people, and arguments and background of the legal controversy about keeping Duroville open, the Marine asked: "That Court that sent you here Mr. Flynn is not the type to cut and run, is that right Sir?" "That's right" I replied. He offered, "Sir, neither do we."

Thomas J. Flynn

Court Appointed Receiver

Final Receiver's Report                                    Case 05:07-01309-DTB

## 5.0 Summary Collections/Expenses

### 5.1 January 2013 Collections/Expenses

| | |
|---|---|
| Collections | $67,127.88 |
| Expenses | |
| Employee Payroll Checks | $21,952.67 |
| Payroll Related Disbursements | $13,082.22 |
|   (EFTPS, EDD, Fed., State, PEx) | |
| Mr. Duro | $5,000.00 |
| Imperial Irrigation District | $9,337.16 |
| Management Fee T. Flynn | $7,500.00 |
| Hilton Security Services | $3,000.00 |
| Utility vehicles and supplies | $4,371.65 |
| Off-site housing and storage | $704.00 |
| Rent refund Juan Collantes* | $100.00 *Rent refund for overpaying estimated rent until actual move to new park |
| Rent refund Abelardo Lorenzo* | $273.00 |
| Rent refund Fidel Magana* | $127.04 |
| Rent refund Armando Cruz* | $31.50 |
| Jan. Operating Expenses Paid | $65,479.20 |
| Jan. Operating Surplus or (Loss) | $1,648.68 |

### February 2013 Collections/Expenses Summary

| | |
|---|---|
| Collections | $48,900.63 |
| Expenses | |
| Employee Payroll Checks | $17,437.53 |
| Payroll Related Disbursements | $8,628.28 |
|   (EFTPS, EDD, Fed., State, PEx) | |
| Mr. Duro | $0 |
| Imperial Irrigation District | $9,082.06 |
| Management Fee T. Flynn | $3,750.00 |
| Hilton Security Services | $0 |

Final Receiver's Report                                                    Case 05:07-01309-DTB

| | | |
|---|---|---|
| Utility vehicles and supplies | $420.00 | |
| AT&T | $414.50 | |
| Off-site housing and storage | $704.00 | |
| Feb. Operating Expenses Paid | $40,436.37 | |
| Feb. Operating Surplus or (Loss) | $8,464.26 | |

## March 2013 Collections/Expenses Summary

| | | |
|---|---|---|
| Collections | $46,484.20 | |
| Expenses | | |
| Employee Payroll Checks | $15,153.87 | |
| Payroll Related Disbursements | $7,792.11 | |
| (EFTPS, EDD, Fed., State, PEx) | | |
| Mr. Duro | $0 | |
| Imperial Irrigation District | $8,752.80 | |
| Management Fee T. Flynn | $0 | |
| Hilton Security Services | $3,000.00 | |
| Utility vehicles and supplies | $2,000.00 | |
| Johnson Equipment Rental | $5,071.13 | |
| Off-site housing and storage | $1,266.37 | |
| ES Babcock (water testing) | $80.00 | |
| Gasoline | $505.10 | |
| All Right Services (refuse) | $1,200.00 | |
| Virgin Wireless | $35.00 | |
| Verizon | $398.63 | |
| Sprint | $270.00 | |
| Alarm Protection | $24.95 | |
| Rent refund Bravlio Valdez* | $100.00 | Unit #275 |

*Rent refund for overpaying estimated rent until actual move to new park

| | | |
|---|---|---|
| Rent refund Francisco Cinco* | $92.00 | #274 |
| Rent refund Roberto Clemente* | $285.70 | #214 |
| Rent refund Juan Casarez* | $129.75 | #267 |

Final Receiver's Report                                          Case 05:07-01309-DTB

| | | |
|---|---|---|
| Rent refund Tolidia P. Benito* | $49.69 | #162 |
| Rent refund Juan Hernandez* | $55.21 | #146 |
| Rent refund Oscar V. Sanchez* | $179.00 | #82 |
| Rent refund Jose M. Ochoa* | $292.30 | #89A |
| Rent refund Josefina F. Basilia* | $47.84 | #176 |
| Rent refund Antonio G. Rafael* | $310.26 | #20 |
| Reimburse Manuel Marroquin | $307.81 | maintenance items |
| Reimburse Carlos Arroyo | $39.16 | heavy gloves for crew |
| | | |
| Mar. Operating Expenses Paid | $47,438.68 | |
| Mar. Operating Surplus (Loss) | ($954.48) | |

## April 2013 Collections/Expenses Summary

| | |
|---|---|
| Collections | $31,707.89 |
| Paid Expenses | |
| Employee Payroll Checks | $18,955.23 |
| Payroll Related Disbursements | $9,295.62 |
| (EFTPS, EDD, Fed., State, PEx) | |
| Mr. Duro | $0 |
| Imperial Irrigation District | $7,627.99 |
| Management Fee T. Flynn | $0 |
| Hilton Security Services | $0 |
| Johnson Equipment Rentals | $2,610.83 |
| Utility vehicles and supplies | $1,500.00 |
| ES Babcock Labs (water testing) | $80.00 |
| Alarm Protection | $24.95 |
| Off-site housing and storage | $883.23 |
| All-Right Services | $1,800.00 |
| Gasoline | $614.35 |
| Virgin | $70.00 |
| Verizon | $155.42 |

Final Receiver's Report                                    Case 05:07-01309-DTB

| | |
|---|---|
| Cardenas | $22.19 |
| A-I-A | $30.00 |
| Winco | $8.95 |
| Bank fee | $18.00 |
| Apr. Operating Expenses Paid | $43,616.76 |
| Apr. Operating Surplus or (Loss) | ($11,909.07) |

### May 2013 Collections/Expenses Summary

| | |
|---|---|
| Collections | $26,310.89 |
| Paid Expenses | |
| Employee Payroll Checks | $14,629.47 |
| Payroll Related Disbursements | $6,701.99 |
| (EFTPS, EDD, Fed., State, PEx) | |
| Mr. Duro | $0 |
| Forfeit IID deposit from 2010 | $6,500.00 |
| Management Fee T. Flynn | $0 |
| Hilton Security Services | $0 |
| Utility vehicles and supplies | $3,241.55 |
| Off-site housing and storage | $704.00 |
| May Operating Expenses Paid | $31,777.01 |
| May Operating Surplus or (Loss) | ($5,466.12) |

### June 2013 Paid Expenses from Funds Provided by Torres-Martinez

### Desert Cahuilla Indians and U.S. Bureau of Indian Affairs

| | |
|---|---|
| Funds Received by Receiver: | $16,970.00   (June 6, 2013 received $8,485.00; June 28, 2013 received $8,485.00) |
| Expenses | |
| Management Fee T. Flynn | $4,000.00 |
| Jack Gradias | $2,531.11 |
| Delfino Mendoza | $969.06 |
| Manuel Marroquin | $1,729.14 |

Final Receiver's Report                                             Case 05:07-01309-DTB

| | | |
|---|---|---|
| Carlos Arroyo | $770.70 | |
| Equipment, Tools, Machinery, | | |
| Vehicles and Supplies (partial) | $3,500.00 | |
| Off-site housing | $1,340.04 | |
| Misc. cash outlays | $2,407.50 | |
| June Operating Expenses Paid | $17,247.55 | |
| June Operating Surplus or (Loss) | ($277.55) | |

Expenses Paid After Closure of the Park on June 30, 2013

| | | |
|---|---|---|
| Florinda Quiroz | $1,161.92 | (June 28) rent refund |
| Jack Gradias | $800.00 | (Aug. 26) partial reimbursement for expenses |
| Manuel Marroquin | $500.00 | (Aug.26) partial reimbursement for expenses |
| Jack Gradias | $200.00 | (Nov.18) partial reimbursement for expenses |
| Manuel Marroquin | $155.00 | (Nov.18) partial reimbursement for expenses |
| Post June 30 expenses paid | $2,816.92 | |

| | |
|---|---|
| 2013 Collections and BIA Fee | $237,501.49 |
| Expenses Paid | $248,501.49 |
| 2013 | ($11,311.00) |

Final Receiver's Report                                              Case 05:07-01309-DTB

## 5.2 Collections/Expenses May 2009-June 2013

| | | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|
| **Jan.** | Collections | | 109,110.50 | 116,359.81 | 97,441.28 | 67,127.88 |
| | Expenses | *** | 109,163.69 | 107,947.36 | 99,276.81 | 65,479.20 |
| | + (-) | | (53.19) | 8,412.45 | (1,835.52) | 1,648.68 |
| **Feb.** | Collections | | 105,583.86 | 88,151.90 | 84,705.61 | 48,900.63 |
| | Expenses | *** | 96,426.02 | 102,192.10 | 88,506.28 | 40,436.37 |
| | + (-) | | 9,157.84 | (14,040.20) | (3,800.67) | 8,464.26 |
| **Mar.** | Collections | | 123,371.99 | 108.763.40 | 95,030.30 | 46,884.20 |
| | Expenses | *** | 113,409.55 | 117,440.86 | 95,557.77 | 47,438.68 |
| | + (-) | | 9,962.44 | (8,677.46) | (527.47) | (954.48) |
| **Apr.** | Collections | | 98,406.14 | 107,103.36 | 81,807.86 | 31,707.89 |
| | Expenses | *** | 95,095.07 | 104,686.32 | 90,566.03 | 43,616.76 |
| | + (-) | | 3,311.07 | 2,417.04 | (8,758.17) | (11,908.87) |
| **May** | Collections | 104,536.16 | 100,871.46 | 106,418.09 | 86,349.30 | 26,310.89 |
| | Expenses | 95,003.19 | 98,422.14 | 120,527.60 | 84,511.06 | 31,777.01 |
| | + (-) | 9,532.97 | 2,449.32 | (14,109.51) | 1,838.24 | (5,466.12) |
| **June** | Collections | 115,178.82 | 112,393.55 | 106,799.66 | 99,878.51 | 16,970.00* (*BIA funds) |
| | Expenses | 116,074.04 | 109,810.75 | 117,043.46 | 82,347.82 | 17,247.55 |
| | + (-) | (895.22) | 2,582.80 | (10,243.80) | 17,530.69 | (277.55) |
| **July** | Collections | 127,058.86 | 131,854.47 | 124,980.65 | 102,718.19 | |
| | Expenses | 106,952.34 | 99,587.71 | 106,765.16 | 96,501.18 | *** |
| | + (-) | 20,106.52 | 32,266.76 | 18,215.49 | 6,217.01 | |
| **Aug.** | Collections | 80,850.52 | 78,599.97 | 85,943.15 | 77,904.58 | *After 6/30/15* 0.0 |
| | Expenses | 99,241.35 | 101,986.00 | 101,634.11 | 79,331.75 | 2,816.92 |
| | + (-) | (18,390.83) | (23,386.03) | (15,690.96) | (1,427.17) | (2,816.92) |
| **Sept.** | Collections | 88,746.19 | 79,263.51 | 86,742.12 | 86,819.99 | |
| | Expenses | 88,668.38 | 83,756.98 | 99,450.91 | 89,325.29 | *** |
| | + (-) | 77.81 | (4,493.47) | (12,708.79) | (2,505.70) | |
| **Oct.** | Collections | 98,908.04 | 110,166.51 | 113,392.07 | 89,963.48 | |
| | Expenses | 98,735.54 | 115,800.63 | 108,329.40 | 98,760.66 | *** |
| | + (-) | 172.50 | (5,634.12) | 5,062.67 | (8,817.18) | |
| **Nov.** | Collections | 114,360.22 | 116,534.86 | 98,636.37 | 85,809.87 | |
| | Expenses | 98,897.07 | 106,219.26 | 87,608.76 | 78,491.17 | *** |
| | + (-) | 15,463.15 | 10,315.60 | 11,027.61 | 7,318.70 | |
| **Dec.** | Collections | 96,980.55 | 87,726.29 | 96,824.46 | 62,096.11 | *** |
| | Expenses | 107,809.94 | 103,270.50 | 88,946.70 | 80,586.74 | |
| | + (-) | (10,829.39) | (15,544.21) | 7,877.76 | (18,490.63) | |
| **Total** | Collections | 826,619.36 | 1,253,883.11 | 1,240,115.04 | 1,050,525.08 | 237,901.49 |
| | Expenses | 811,381.85 | 1,232,948.30 | 1,262,572.74 | 1,063,762.56 | 248,812.49 |
| | + (-) | 15,237.51 | 20,934.81 | (22,457.70) | (13,237.48) | (11,311.00) |

Receivership 2009-2013
($10,433.86)

**6.0 Appendices A, B and C.**

**Appendix A. Text of Letter May 2, 2012 from Receiver to Department of Finance, State of California, regarding State denial of releasing redevelopment housing funds that should have been approved as previously obligated to complete purchase and installation of new mobile homes for Mountain View relocation housing for Duroville residents. State reversed its decision October 2012.**

**Thomas J. Flynn**

**Receiver Appointed by United States District Court**

**Central District of California, Eastern Division**

**United States v. Harvey Duro Sr. et al**

**Case 05:07-01309-DTB**

**Hon. David T. Bristow, Presiding**

May 2, 2012

Ms. Jennifer Whitaker

Manager

Department of Finance

State of California

Dear Ms. Whitaker:

Re: Mountain View Estates Mobilehome Housing Project, County of Riverside

I am the Court Appointed Receiver in an ongoing federal civil action that started in 2007, and in my role, and as will be described herein, I have been intimately aware of and involved in the County of Riverside actions starting in 2008 regarding the Mountain View Estates mobilehome project that is nearly complete. My contact information is presented at the conclusion of this letter and I would be more than pleased to provide additional information.

Mountain View Estates is a mobilehome project that was created by the County of Riverside to provide relocation housing for thousands of farmworkers and their families who have been residents in a densely inhabited mobilehome "slum" commonly called "Duroville." Duroville is in unincorporated Thermal, Riverside County, California, and has included up to five thousand farmworkers and their families starting in 1999-2000. The distressed and dilapidated mobilehomes were typically between 35 to 50 years old when pulled onto the 40-acre property twelve years ago.  Most axels and wheels were removed. The mobilehome site is located on a 40-acre allotment owned by the United States and administered by the U.S. Bureau of Indian Affairs ("BIA") for the benefit of the Torres Martinez Cahuilla Desert Indians. The illegal mobilehome park was never permitted or the recipient of lawful leases from the BIA. The park is inhabited by farm workers who are integral to the surrounding agricultural industry in the Eastern Coachella Valley that include 100,000 planted acres and are a significant contributor to the Riverside County economy.

During the period 2003-2007, the United States brought civil suit and administrative actions seeking permit applications, leases, major repairs, major remediation, and compliance regulations at the large slum Duroville park. The common name "Duroville" derives from the Allottee and Defendant Mr. Harvey Duro, Sr. In October 2007, the United States filed suit seeking an injunction to close Duroville which would have resulted in the eviction of up to five thousand then residents at the mobilehome park. The United States District Court, Eastern Division, Central District of California, based in Riverside, California, was assigned the case. The sheer scale and acutely distressed conditions at the Duroville mobilehome park had received widespread regional, national and international press coverage for years.

In January, 2008, then Riverside County Supervisor the late Roy Wilson met with the U.S. District Court Judge to support the appointment of a Receiver for the illegal park to keep it operational with interim safety and health improvements until the County could build relocation housing for a preponderance of the residents of Duroville. This commitment was evidenced in a letter from Supervisor Wilson to the U.S. District Court dated January 24, 2008. In February, 2008, the U.S. District Court appointed an Interim Receiver and Special Masters for the Duroville property and initiated a series of what turned out to be ten hearings in 18 months on the Duroville matter to receive updates, receive testimony and adjudicate the United States petition for an injunction to close the park. During this period, the County of Riverside submitted updates regarding the planning, permitting, and funding for relocation housing for Duroville that would become known as Mountain View Estates.

In April, 2009, the U.S. District Court held an eight day trial about the causes of the Duroville slum and about options for relocation of Duroville residents. An official of the County of Riverside EDA was a sworn witness at the trial and provided testimony regarding County action to fund and cause to be built the Mountain View Estates mobile home park. The timeline presented indicated completion by early 2011. The U.S. District Court rendered a decision on April 30, 2009 that the injunction would be granted to close the Duroville site BUT THAT: "Until and unless alternative housing is available – alternative housing that is safe, healthy, affordable and truly available to the residents – this Court will not close Duroville." (Page 7 of April 30, 2009 Court Findings of Fact and Conclusions of Law.)  The Court noted that to close Duroville without relocation housing may be to initiate the largest mass eviction in California history since the Japanese internment in 1942.

As noted above, by the time of this Court Decision in April 30, 2009, the County of Riverside had already started the planning and funding for the Mountain View housing project a few miles from Duroville. In fact, in the Court's April 30, 2009 Decision" the Court ORDERS the Receiver to … Encourage park residents to relocate to safe, healthy, affordable and available housing …including Riverside County's DHAP program and Mountain View Estates program." (Page 10, Court Decision April 30, 2009).

I was appointed by the U.S. District Court as the sole Receiver of the Duroville property on April 30, 2009 after having been part of the Receivership team starting February 11, 2008. The park was to remain open under Receivership with the understanding that the Receivership would terminate when the Mountain View project was completed and a preponderance of the new residents at Mountain View would be from Duroville. Construction of the infrastructure at Mountain View Estates began and progress was being accomplished including roads, electrical system, internal utility and service lines, community center and community use amenities, installation of utility pedestals for electricity and water/sewer hook ups and so on.

The Receivership created at the end of the trial on April 30, 2009 was originally scheduled to terminate in two years by April 30, 2011 which would have covered the original anticipated opening of Mountain View. However, delays in the associated wastewater sewer line connecting Mountain View to the regional sewer station 2.5 miles away convinced to Court to extend the Receivership to December 31, 2011 based on reports from Riverside County that occupancy of Mountain View Estates by a large percentage of current Duroville residents would occur albeit not on the previous schedules. The Mountain View project infrastructure was greatly completed, but the new mobilehomes could not be moved onto the property until the 2.5 mile wastewater line was under construction. Because of the time delays in the 2.5 mile sewer construction, the Receivership was extended again by the U.S. District Court from December 31, 2011 until December 31, 2012.  The wastewater line has been fully funded by a $6.3 million grant from the United States Department of Agriculture. Senator Feinstein was an active supporter of the USDA grant starting in 2009. The wastewater line is now under construction and is expected to be completed within months.

The County of Riverside EDA personnel have been very active at the Duroville site since 2010 recruiting and working with residents to qualify for the housing available at Mountain View. Hundreds of residents representing thousands of family members have been part of this qualifying program. The County of Riverside EDA officials have been presenting updates at nearly monthly intervals at status hearings in federal court on Mountain View over this past year.

The Court has been justifiably relying on the completion of the Mountain View Estates project for several years as the agreed upon solution for the unconscionable distress and deteriorated conditions that were allowed to be created at Duroville. While repairs and remediation have been ongoing by the Receivership at Duroville over the past years in terms of electricity, water, sewage disposal etc., it has been in the overall effort to keep conditions as satisfactory as possible as far as health and safety conditions while Mountain View Estates was readied for occupancy as the principal relocation site for Duroville residents. For those in the County, the Court process, and other government agencies this has been five year process of achieving tangible milestones of achievement in funding, construction, cooperation and perseverance to get this almost completed project so close to final occupancy --to have Mountain View completed as far as in tact new infrastructure, to have the initial new mobile units installed at the Mountain View site, to have the 2.5 mile wastewater line under construction with the $6.3 million United States Department of Agriculture funding, and to have most of the new units at Mountain View assigned to qualified Duroville residents who are ready to move. It is so important and close to the finish line for those who have been part of this almost five year monumental effort where most of the physical work is done and the progression of funding and administrative steps have been completed.

The U.S. District Court has indicated repeatedly that Duroville will close when the relocation to Mountain View is completed. The purchase of the mobilehomes through the County's Mobile Tenant Loan Program is an essential part of the County's commitment. The relocation cannot occur without the

Final Receiver's Report                                              Case 05:07-01309-DTB

provision of the mobilehomes to complete the Mountain View project. The next hearing of this case is May 23, 2012 before Judge David T. Bristow in U.S. District Court, Riverside, California.

Please let me know if I can provide additional information or background.


Sincerely,


Thomas J. Flynn

Receiver Appointed by United States District Court

Central District of California, Eastern Division

United States of America v. Harvey Duro Sr. and Desert Mobilehome Park Inc., a California Corporation

Case 05:07-01309-DTB

Hon. David T. Bristow, Presiding


Contact Information for Tom Flynn:

Mobile: 310-721-2425

tflynn101@gmail.com

Office: Duroville Receivership

68-800 State Highway 195

Thermal, CA 92274

**Appendix B. Letter May 15, 2012 from Receiver to Department of Finance, State of California, extending invitation to participate in a previously scheduled U.S. District Court status hearing May 23, 2012. This letter prompted a telephonic response from an official in the State Attorney General's Office and other subsequent interaction with State executives.**

Thomas J. Flynn

Receiver Appointed by United States District Court

Central District of California, Eastern Division

United States v. Harvey Duro Sr. et al

Case 05:07-01309-DTB

Hon. David T. Bristow, Presiding

May 15, 2012


Ms. Jennifer Whitaker

Department of Finance

State of California


Dear Ms. Whitaker:

Re: Mountain View Estates Mobilehome Housing Project, County of Riverside

As the Court Receiver for the above captioned case, please know the Court would welcome participation by the State of California Department of Finance in the upcoming status hearing on May 23, 2012 10:00 a.m. in the U.S. District Court in Riverside. Telephonic participation can be arranged if preferred. As would be clear in the filings, the Court has been receiving frequent updates since 2008 from the County of Riverside and agencies, and contractors, regarding the Mountain View Estates mobilehome project as phases were completed. Mountain View Estates has been the intended relocation for thousands of residents currently in the nearby Duroville mobilehome park that has been ordered closed by the U.S. District Court because of distressed conditions when the Mountain View project is available for occupancy.

Information that could be provided to the Court directly by the State of California Department of Finance on this matter of denying final installment of previously obligated redevelopment funds to complete the relocation housing would be very helpful.

I am available to assist in any way needed. Thank you very much.

Sincerely,

Receiver Appointed by United States District Court

Contact: 310-721-2425

Tflynn1013@gmail.com

Final Receiver's Report                                                     Case 05:07-01309-DTB

**Following is a subsequent invitation after the damaging September 11, 2012 flash floods through Duroville to the Department of Finance to attend a Court status hearing. The State release of redevelopment funds for Mountain View had not yet been made. This invitation elicited responses. The State reversed its initial denial in October**.

To:   **Department of Finance**

      **State of California**

      **Fax 916-327-0213**

From:   Tom Flynn

        Receiver Appointed by U.S. District Court

        Re: "Duroville" Litigation/Riverside Redevelopment Appeal/Mountain View

        United States of America v. Harvey Duro Sr. et al

        Case 05:07-01309-DTB

        Judge David T. Bristow, Presiding

        U.S. District Court, Central District of California, Eastern Division

        (U.S. Courthouse 3470 Twelfth Street, Riverside CA 92501)

        Judge Bristow's chambers: 951-328-4440

        Contact for Tom Flynn: cell 310-721-2425

        tflynn101@gmail.com

As the enclosed indicates, it would be very useful and helpful if a representative of the Department could attend (in person or telephonically) a status conference in Court on the rapidly changing situation at "Duroville" in the Eastern Coachella Valley (Thermal, Riverside County). I would be pleased to provide information or a briefing. "Duroville" is a community of thousands of farmworkers and their families. Flooding three weeks ago caused severe damage. Relocation housing has been close to completion at nearby Mountain View Estates before the change in the redevelopment law.  Support is needed to help with the current deteriorating situation.

Sent herewith is a Docket Entry from the U.S. District Court asking for attention for a status conference on October 3, 2012 at 10am. This is an informational conference and is not an evidentiary hearing.

Please feel free to contact me as cited above.

Thank you very much.

Tom Flynn

Federal Court Receiver

Contact Information:

Mobile: 310-721-2425

tflynn101@gmail.com

Office: Duroville Receivership

68-800 State Highway 195, Thermal CA 92274

Final Receiver's Report                                           Case 05:07-01309-DTB

**Appendix C. Memorandum July 18, 2011 from Receiver to United States Department of Agriculture Rural Development Division on "Current Status of Duroville Infrastructure" as support/justification for $6.3 million grant application by County of Riverside for 2.5 mile wastewater line connecting Mountain View Estates to main lines of Coachella Valley Water District.  USDA had knowledge of the federal court's orders regarding Duroville and the relocation housing solution that Mountain View would provide funded by Riverside County. USDA was sent this status memo.**

**Senators Feinstein and Boxer had been following the Duroville case and their staffs had also requested similar updated status information and that was provided. The USDA grant was approved and a condition was added by USDA, that considering the federal court orders regarding Duroville, the grant provided would require that 75% of residents at Mountain View must be former Duroville residents.**

*****************************

### *Current Status of Infrastructure at Duroville*

Prepared for **USDA** by Thomas J. Flynn

Receiver Appointed by U.S. District Court

Central District of California

United States of America v. Harvey Duro Sr. et al

Case: 05:07-01309-DTB

Hon. David T. Bristow, Presiding

Date: July 18, 2011

Summary: (1) The Court extended the receivership of Duroville from the previously scheduled termination of April 30, 2011, to December 31, 2011 based on assurances from Riverside County that occupancy of Mountain View Estates by a percentage of current Duroville residents would occur albeit not on the previous schedules. (2) The "slum" infrastructure and conditions at Duroville continue to require extensive ongoing repairs and capital intensive maintenance. Deteriorating infrastructure adds uncertainty to expected physical longevity and inhabitability of the mobile home park.  There has been no funding for repairs from government agencies.

**Background.** At the request of USDA, I am preparing this brief status as of July 18, 2011 regarding certain conditions of the infrastructure at Duroville. Duroville is the label attached to a mobile home

community on a 40-acre allotment near Thermal, California, held in trust for the Torres Martinez Cahuilla Desert Indians under the jurisdiction of the Bureau of Indian Affairs, U.S. Department of Interior. It has a population of farm workers and their families fluctuating during the year between approximately 2000 and 4000. Most of the mobile homes are between 30 and 55 years old and are in distressed condition.

After administrative actions and litigation starting in 2004 seeking approved leases and permitted rehabilitation and/or rebuilding by Defendants, as well as lawful operation of the park and closure of illegal businesses, the United States sued in US District Court in October, 2007, for an injunction to close Duroville. After 10 court hearings over 18 months and an eight day trial over three weeks, on April 30, 2009 the US District Court granted the injunction but allowed Duroville to remain open under a court appointed receiver based on assurances from the County of Riverside that replacement housing for a large percentage of Duroville residents would be built at what is now known as Mountain View Estates. To do otherwise, the Court noted, would cause a "humanitarian crisis" and be the largest mass eviction in California since the internment of Japanese-Americans in 1942. The Court created a two year receivership expiring April 30, 2011. This was considered more than enough time for the replacement housing to be constructed and made available for occupancy at Mountain View. Phase one would have 181 units, and when fully built out there would be 396 units. Those Duroville residents who did not move into Mountain View would be expected to seek alternative housing with assistance from the County or non-profit housing organizations, or secure individual private housing on a case by case basis.

When the receivership period expired on April 30, 2011, the Mountain View Estates project, although with completed intra-park infrastructure and an initial list of Duroville a resident evaluated and qualified by the County to move into Mountain View, was unavailable for initial occupancy because of the lack of a sewer line to a substation 2.5 miles away. Based on a presentation by the County of Riverside in US District Court, the Court granted an extension of the receivership until December 31, 2011. The next hearing on the Duroville case will be in US District Court on August 14, 2011.

During the term of the receivership, Duroville has not received any government funding from the federal, state, regional or local governments. Rents received by the receivership from tenants are used to provide for day to day operations, including maintenance, electricity, insurance, security and daily trash pickup, and to fund large repairs by staff and outside licensed contractors.

The park's small maintenance staff and needed outside contractors continue to make repairs to sewage lines, water lines, the electrical system, water wells and pumps, dirt roads, fire safety and suppression, and the sewage evaporation ponds (lagoons) all of which serve the thousands of residents. The goal is incrementally to extend the use of the park until relocation housing is available, but there is no chance that the infrastructure of Duroville will survive beyond some point in the near future. The receivership had correction and construction guidelines that tried to address needed repairs and improvements while recognizing the limited money resources and the knowledge that many code requirements are general in scope but could not be met in every instance. For example, while electrical and water testing had strict code compliance, other repairs were best efforts. This was not to challenge the validity of recognized codes, but rather to meet health and safety intent of the codes.

**Sewage**. The sewage system at Duroville is crude and fragile, and it requires frequent ongoing repairs and maintenance. Based on my experience with the US Department of State assigned to the United Nations, I believe the Duroville sewage system would be very familiar in many Third World villages. Sewage flows from the aging mobile home units into a grid of mostly four inch plastic PCV pipes that are buried a few inches to a foot underground although some links of sewage pipes lay on top of the ground. The sewage is gravity fed through approximately 10,500 linear feet of pipes that run through the mobile home park to two open air collection ponds on the southern perimeter of the Duroville residential community (across the boundary line from the illegal dump on the next door allotment that was closed by the federal court a few years ago.) At the first stage sewage collection ponds, chlorine is added and the sewage is then pumped about 2000 feet in two four inch pipes into a series of seven contiguous sewage evaporation ponds that cover approximately 11 surface acres. Sewage is pumped to and through the series of open air evaporation ponds. The evaporation ponds are located on an allotment near Duroville that is assigned to a member of the family of the primary Defendant in the Duroville lawsuit.

Because Duroville was built as an unpermitted "slum", it is not a surprise that the design, materials and workmanship on the sewage system were below or simply beyond any applicable equivalent code standards and materials were the cheapest imaginable. First, most mobile units themselves are decades past their designed expected useful life and have not had consistent or in most cases minimal meaningful maintenance over the decades. The sewage pipes in the residential park that were installed to handle sewage discharge a decade ago were predominantly four inch thin walled PVC irrigation piping or plastic piping appropriate to indoor plumbing. The seven sewage evaporation ponds that cover 11

acres, also called sewage lagoons, were not well maintained and there was evidence of weakened berms that contain the lagoons of human waste that evaporate by sunlight and exposure to ambient temperature.

The Receivership has redirected tenant rents to make repairs to the sewage system with the goal to extend the use of the system until park closure in a way that as best as possible meets health and safety expectations issued by the Court. The initial inspection of the park after the creation by the Court of the receivership revealed numerous deficiencies and emergencies that required urgent if not immediate attention. However, because all repairs had to be paid for from tenant rents (no outside sources of funds), it was clear that the program and process of repairs would have the goal of extending inhabitability in the park until relocation. It was not a substitute for long term rehabilitation and rebuilding of the park that would require a capital rebuilding program based on recognized professional engineering and construction.

Hundreds of mobile home units had broken sewage lines inside units or between units and the hook-up to the park sewage system. It was clear that over the years, duct tape, cardboard, glue and paste and other remedies had been used to attempt home repairs on park sewage lines. The receivership has made repairs to most units at Duroville primarily involving replacing tees, elbows, couple piping or a combination of the aforementioned. Similarly, the sewage lines that form a grid in the park showed evidence of innumerable previous breaks and failures on which shoddy repairs had been effected, and there were active breaks and leaks requiring repair. During the receivership, at least 208 major sewage line breaks have been repaired mostly by splicing in new sewer line sections with appropriate ABS DWV rating and proper ABS fittings. Approximately 40 drain access points have been installed or replaced throughout the system. Repairs to the deteriorating system continue.


To repair sewage ponds (lagoons), the receivership has expended over $50,000 of accumulated tenant rents on outside contractors, $35,000 in rented earth moving equipment, and hundreds of hours of maintenance staff time. Besides the weakened integrity of the earthen berms and lining of the ponds, the receivership inherited a particularly dangerous condition involving public health involving the sewage ponds. The Coachella Valley Mosquito & Vector Control District (CVM&VCD) informed the receivership that because there had been no defoliation or other preventative or remediation work on the 11 acres of ponds for at least eight years if not longer, the buildup of foliage had created a serious

mosquito breeding problem impacting the entire agricultural and residential area surrounding Duroville. The area has had positive West Nile virus tests for years. The 11 acres of sewage ponds were a prime breeding place for mosquitoes. In one reporting period there had been 48 positive test traps. The 11 acres of sewage ponds for Duroville had at least eight years of tall and dense foliage rooted in and around ponds and covering the surface of the ponds. This included extensive and dense salt cedar, tamarisk, and tulle reeds. For the CVM&VCD to apply the organic treatments by tanker and helicopter to destroy mosquito larvae and breeding in water surfaces, the water surfaces obviously must be clear of foliage. The sewage ponds were a serious Eastern Valley public health danger to the area. The massive remediation work by the receivership was important to the district after years of not often being able to even inspect the breeding problem. The authorities had received no co-operation from the previous managers of the Duroville park before control was seized by the federal court. Maintenance is continuous on both the integrity of the berms and the defoliation. The district continues its mosquito abatement and vector control treatments.

**Water Systems and Quality.** The receivership has worked closely with the United States Environmental Protection Agency Region #9 and contractors approved by the EPA to comply with regulations involving the water system and rigorous water testing. Duroville has two water wells drilled to about 500 feet. There is no access to Coachella Valley Water District lines that do not come closer than several miles away. The entire area has ground water that is in excess of the current arsenic level limits that the federal government reset in 2006 at 10 parts per billion. Duroville wells draw water at 16 parts per billion. System wide treatment equipment for all of Duroville water would be approximately $386,000 which is not available. Therefore, residents must use a reverse osmosis water treatment on a unit by unit basis that has a replaceable filter, or drink bottled water.


The water lines in the park are checked six days a week for leaks or deterioration and repairs are made promptly when detected. As noted above, water samples are collected on the strict EPA schedule and submitted to an EPA approved laboratory with results being transmitted to the EPA and the receivership.

Recently, water well #2 failed irreparably and after six weeks of attempted repairs by a contractor, a new well was drilled and connected on July 1, 2011. With a limited life expectancy of some duration for Duroville, it was unfortunate that scarce tenant rents had to be used for a new well that should last for a

decade or longer. However, there was no way we could continue to operate with only one well for a large population for however long the park is open – a population that does not have another source for water should well water not be available. The cost of the new well and attempted repairs to the old well was about $40,000 which drained the accumulated emergency reserve for the park collected from tenant rents over a period of time.

**Fire Safety.** Duroville had a history of fires. Six units burned to the ground in the year before the receivership started and four units burned to the ground in the months immediately following creation of the receivership. The fires probably started from poor and overused electrical connections as well as improperly installed propane tanks. The extensive wooden structures in the form of add-on rooms and wooden covered carports and covered side yards were accelerants of the fires. The Court ordered removal of the wooden add-ons and combustible structures effective 2009. The most recent park independent inspection indicates that this fire safety measure has been maintained. The removal of tons of combustible materials that were part of, next to, and between mobile home units created huge piles of debris on the south side of the park next to the sewage ponds. Funding limitations have prevented the full removal of the debris from the park to a county transfer station, although a recent independent inspection estimates that the debris pile has been reduced by 50% from 2009. It is estimated that it would require 85 to 100 dumpsters (the large 40 cubic yard dimension) to remove the debris fully. The same report by the retired chief inspector of mobile home parks for the State of California notes that the debris pile is less of a fire danger to inhabitants in a fenced in area of the park than as available fuel for fire that could engulf inhabited mobile homes.

The Court ordered safety procedures and enforcement for all propane tank installations to prevent toppling including pads, straps and rebar for straps, testing of fittings and shut off valves, and testing for leaks. All propane tanks must be outside the mobile units. There were charitable donations to fund every unit and common areas with fire extinguishers and smoke alarms, and other safety items. The fire suppression system of eight hydrants backed by 35,000 gallons of water in two tanks was repaired and is tested regularly. If this park were being rebuilt, there should be 23 hydrants and 155,000 gallons of available water.

**Electricity.** Because Duroville was built as a "slum", it is no surprise that the electrical system was haphazard and unreliable. In fact, there are 14 separate electricity "districts" within the park that are not linked with one another. Each of the 14 "districts" gets a separate monthly bill from Imperial Irrigation District (electric utility). Each mobile home unit has a meter. During the receivership, there

have been half a dozen major electrical failures that have cut off service to up to 19 units at a time. About 50 smaller electrical failures cut off service for extended periods for smaller groups of units. Some of the larger failures could not be repaired for months and generators had to be used to supply electricity. With each repair, licensed electricians are retained. Replacement components and electricians are paid by tenant rents. Electricians invariably encounter what they call "spaghetti wiring" from previous projects under previous "management" of fixing failing and dangerous electrical situations by clearly unlicensed workers. This was astoundingly dangerous to residents. The licensed electricians continue to make repairs to the electrical connections. It would be too expensive to rip out the entire 14-part electrical grid and install what would be required.

As far as the units, there is a continuing need to upgrade or repair electrical systems however long a unit may stay in use before it is retired considering the crowded inhabitation of the park. Repairs are in order for exposed conductors and exposed energized components, missing dead front covers and open wiring connectors in open boxes or outside boxes, and missing cover plates. There is a need to provide and monitor correct over current protection rated higher than the wiring they protect. Drop cord wiring is a constant problem. There is a need to protect electrical conductors on all non-metallic cable (NMC or ROMEX) and the cable needs to be protected from mechanical damage and weather. There is a need to place NMC into conduit.

**Conclusion.**  This document was meant to be a response to a request for summary information about the Duroville infrastructure and a summary of the current legal action before the United States District Court. The goal of the Court and many parties with an interest in removing families from distressed conditions that were allowed to occur and persist at Duroville is simply to get the relocation process underway so that orderly closure of Duroville under court order can occur. Until then, the receivership will continue to maintain the increasingly difficult tasks involving the deteriorating infrastructure. Agriculture is a huge positive contributor to the Riverside County economy and safe housing for farm workers who are so integral to planting, maintenance, harvesting and preparing fresh fruits and vegetables for transportation to markets or processing is important. The health and safety of these farm workers and their families at Duroville was at the core of the Court's decision in of this case.

**\*\*\*End of Receiver's Report \*\*\***

Final Receiver's Report                                                    Case 05:07-01309-DTB