1   MARK S. ADAMS, SB 68300
    150 S Barrington Ave. St. 100
2   Los Angeles CA 90049
    (310)471-8181
3   Fax (310)471-8180

4

5                UNITED STATES DISTRICT COURT

6           FOR THE CENTRAL DISTRICT OF CALIFORNIA

7

8   UNITED STATES OF AMERICA,     Case No. EDCV07-1309 SGL (JCRX)

9          Plaintiff,

                   **DECLARATION OF MARK ADAMS**
10     v.                  **AND REPLY TO OPPOSITIONS TO**
                   **APPLICATION FOR AN ORDER**
11   HARVEY DURO, SR. and       **DIRECTING REIMBURSEMENT OF**
    DESERT MOBILEHOME PARK,    **RECEIVERSHIP ADVANCES AND**
12   INC., a California corporation,     **EXPENSES**

13         Defendants.        **Date:**   **July 6, 2009**

14                         **Div.:**    **1 (Larson)**

15                         **Time:**   **10:00 a.m.**

16

17

18       1. The most noteworthy fact about all of the pleadings filed in response to my fee

19 application is that not one party challenged (or even questioned) my core assertion: I was

20 instrumental in making sure that over 3,000 people had a place to live and that no one was

21 seriously injured at Duroville from May 23, 2008 to April 30, 2009. Each party has a slightly

22 different reason that I shouldn't be paid for the more than 600 hours I worked to accomplish those

23 goals and I will respond to those arguments below. But I ask the Court first and foremost to note

24 that no one disputes the success of my efforts.[1]

25       2. It is also noteworthy that not one party raised one objection to the 129 page final

26 accounting of Duroville Renaissance Corp. filed on May 27, 2009. Over one million dollars came

27

28

---

[1] As noted in my application, of course I do not claim exclusive credit. Tom Flynn, Chris Hilton and others also devoted themselves daily to the herculean challenges we faced. Messrs. Hilton and Flynn were paid for their efforts and the purpose of this application is to request comparable compensation for myself.

                                           REPLY TO OPPOSITIONS

1  into and out of the bank account of Duroville Renaissance Corp. over the last year. It is a

2  testament to my accounting/bookkeeping staff that not one issue has been raised about the quality

3  or accuracy of their work. In that regard, I remind the Court that Mr. Duro and his partners

4  charged the park over $300,000 per year for their administrative work. And during the Mark

5  Adams receivership the Court authorized reimbursement of $10,000 per month to reimburse me

6  for the cost of my staff preparing such financial reports and handling other administrative matters

7  relating to the receivership. Based on that $10,000 monthly fee authorized by the Court, I submit

8  that $120,000 (12 months at $10,000 per month) of my $240,000 claim is warranted to reimburse

9  me for my staff costs over the last 12 months.

10      3. Since my request for fees and reimbursement of advances does not ask for any

11  additional funds to be drawn from park operations, I submit that none of the parties has a

12  monetary interest in whether the Court awards me compensation for my work. In case any of the

13  parties simply misunderstood the nature of my application I restate it as follows: I seek

14  reimbursement of $14,505.83 in personal funds I advanced to the DRC receivership [2] and an

15  award of $224.303.33 for my time between May 23, 2008 and April 30, 2009. I also ask that

16  $5,000 of the $15,000 property management fee previously authorized by the Court be paid to me

17  by the current receiver until those sums are fully paid.

18      4. Again, I am not asking that other park revenues  be used to pay whatever amounts are

19  ordered by the Court. That being the case it would not appear that any of the parties have a

20  monetary interest in whether I am paid out of the already authorized property management fee.

21  The only person with a monetary interest is Mr. Flynn and I believe the fact that he did not take

22  up the Court's invitation to file a pleading can only be interpreted to mean he does not object. Mr.

23  Flynn, more than anyone else involved with Duroville over the last year, understands just how

24  instrumental my work was in accomplishing our goals. [3]

25      5. Plaintiff would have this Court find that I served as a "volunteer" over the last year. As

26

27  [2] Or $10,880.83 if the Court decides I am responsible for some of the interest on the CDFI line.

28  [3] CDFI of course also has a monetary interest in having its loan paid back. I have already worked out the arrangements with CDFI of which portion of the monthly $5,000 would be paid over to CDFI in the event it is awarded by the Court.

- 2 -

LA/84436.1

1  noted in my application, however, I was never asked to serve without compensation nor did I

2  offer to serve without compensation. Given the emergency situation we faced at Duroville [4], I

3  thought it was only fair to allow Mr. Flynn to pay himself the entire $15,000 monthly fee awarded

4  by the Court. But both of us expected that the allocation of that monthly fee would be adjusted

5  once the Court ruled on the future of Duroville.

6      6. Defendant Duro's concerns are addressed by paragraph 3 above.  I have not asked for

7  any sum beyond $5,000 per month payable out of the already authorized $15,000 property

8  management fee.

9      7. It is difficult to determine how, once and for all, to put to rest Intervenors' seeming

10  obsession with the handling of the unsecured line of credit I arranged at CDFI. [5] I hope that the

11  following puts the issue to rest decisively and finally.

12      8. The number $220,000 arises in 2 entirely different contexts in this case. First, the Court

13  awarded me, Jack Shine and Pierre Prosper a combined total of $220,000 in fees for the Special

14  Master period early in 2008. None of that award has been paid by Mr. Duro. Separate and apart

15  from that Court order, CDFI made available a $220,000 unsecured line of credit ($150,000

16  initially) to me for the Duroville receivership. No one other than me is obligated to repay that line

17  of credit. Much of the confusion sown by Intervenors stems from a failure to distinguish between

18  the two different contexts in which the number $220,000 arises.

19      9. How was the $220,000 advanced by CDFI spent? In an effort to further clarify the

20  situation, I've attached as Exhibit 1 my Quickbooks accounting records [6] for the entire period of

21  the Duroville receivership. As can be seen, I received $112,015 of the $122,000 awarded by the

22  Court; Jack Shine was paid $31,125; and Pierre Prosper was paid $16,665. Importantly, this line

23  of credit was also used to pay the operating expenses of the Adams receivership: $15,000 in

24  property management fees to Tom Flynn;  $10,486.46 in travel expenses; $6,917.04 in

25  miscellaneous expenses; and $30,000 in administrative fees previously approved by the Court for

26

27  [4] And given certain private,  personal considerations relating to Mr. Flynn's health and his family
[5] Intervenors' counsel may also have confused CDFI, see Declaration of Kristy Ollendorff filed in connection with
28  this application.
[6] Page one being a summary cashflow statement, the balance being a check by check detail.

- 3 -

LA/84436.1

1   the period March-May, 2008. The total expenses of that receivership period were $233,852.72.

2   The deficit, i.e. the amount beyond the $220,000 CDFI line of credit, was covered by personal

3   advances from me in the amount of $14,505.83 (the amount I've requested). [7]

4       10. <u>I do not claim (and never have claimed) that the receivership or the Court (as opposed</u>

5   <u>to me personally) legally owes CDFI the amount of this line of credit.</u>  I believe that the Court

6   understands  that besides my legal obligation to repay CDFI there is a moral obligation of the

7   highest degree to see that CDFI is fully repaid. No lender other than CDFI would have stepped

8   forward especially at the time CDFI did step forward and provide the financing it did. Why

9   Intervenors are going to such lengths to undermine CDFI's ability to be repaid is simply

10  incomprehensible to me. As noted previously, I have already worked out the arrangements with

11  CDFI regarding whatever amount the Court awards me via this application.

12      11. Intervenors make much ado about the fact that my time records do not include any

13  time from May 1, 2008 to May 23, 2008. Amidst the ado, <u>they fail to note for the Court that I did</u>

14  <u>not ask for reimbursement of my time during that period</u>.  The simple reason that I didn't request

15  that time is because I thought it might be more confusing than it was worth. In other words, the

16  Court entered its fee order on May 26, 2008 based on my billings through April 30, 2008. Rather

17  than cause more confusion, I simply elected not to seek reimbursement for May 1 to May 23,

18  2008.

19      13. Intervenors also criticize my billing description of work performed and specifically

20  critique my entries for January 23 and 24, 2009,  "property site management". That weekend was

21  the most important 4 days of the entire receivership due to enforcement of the Court's fire safety

22  order. The only possible explanation for Intervenors' professed lack of knowledge regarding the

23  events of that weekend is that they don't read their emails, see chain email attached as exhibit 2

24  which describes in detail and chronologically what I was doing during that most important

25  weekend.

26

27  _____

    [7] The only benefit of Intervenors' obsession on this matter has been to cause me to dig deeper and deeper into the
    history of these matters. I did not realize, for example, until doing this Reply that instead of having been overpaid I
28  was under paid by $10,000 under the Court's original compensation order ($122,000 being awarded, only $112,015
    being paid.

                                          - 4 -

LA/84436.1

14. For the information of the Court and Intervenors, I was on site on this most important weekend of the entire receivership period because neither Mr. Flynn nor Mr. Hilton were present. Mr. Hilton was attending to some personal affairs with his wife who had flown up that week from Guadalajara. Mr. Flynn was dealing with his personal, serious health issues and was also trying to assist his 85 year old father with his medical issues in San Diego. After having received complaints from the Riverside County Fire Department that there was so much rubbish and debris on the streets of Duroville that their emergency vehicles could not gain entry, it would seem obvious that someone had to be in charge of supervising the hauling of tons of debris off those streets. With both Mr. Flynn and Mr. Hilton gone, I agreed to spend the weekend at Duroville to attend to this matter.

15. While there I received an email from Mr. Flynn that Imperial Irrigation District had notified him that IID intended promptly to shut off all power to the park due to nonpayment. I spent one entire morning negotiating with IID's attorney and was pleased to be able to work out an arrangement by which no further shutoff threats would be made through the end of the Duroville trial in April.

16. While there, I fielded a number of complaints from residents and from staff that no one ever seemed to be in the office. I did not feel (and do not feel) that details need to be described in a public document. I did discuss these concerns with both Mr. Flynn and Mr. Hilton later that week and concluded that there was no need to bring the matters to the Court's attention.

17. While there, I also fielded staff complaints that Frank Ramos, husband of the bookkeeper who had stolen $26,000 from the office, was being paid $60,000 per year and was only working 1-2 hours per day. I investigated the matter further and, after tracking down Messrs. Flynn and Hilton, thereafter terminated Mr. Ramos' employment immediately, supervised the cleanout of his desk, and escorted him from the premises.[8]

18. All of these activities were simply a court-appointed receiver doing his job and never would have been disclosed in such depth except to refute the critique that my billing descriptions were inadequate. In truth, I believe that all interested parties are all well aware of just how much

---

[8] More recently, I also prepared the legal work to defeat his unemployment claim.

- 5 -

LA/84436.1

1  hard work went into our accomplishments at Duroville over the last 12 months.

2       19. Finally, the artificial distinctions Intervenors attempt to draw in explaining how they

3  see 4 different periods and why in each of the 4 periods I should not be paid for the work I did

4  borders on legalistic sophistry in my view. The role I played did not vary during any of those 4

5  alleged periods and for purposes of this equitable application I ask the Court to ignore their

6  attempted distinctions.

7       20. On the question of whether I should be paid for the time I spent at the trial, without

8  discussing private matters in detail, I can only say that I understood that the Court wanted me to

9  be there. In any case, I felt an obligation as an officer of and lawyer for Duroville Renaissance

10 Corp. to be there to help Mr. Flynn to prepare for his vital testimony. Had I understood that my

11 presence wasn't required, I most assuredly could have changed my focus to the other 11

12 receiverships I was handling during the term of the Duroville case.

13

14 Executed this 26th day of June, 2009 at Los Angeles California.

15 I declare under penalty of perjury that the foregoing is true and correct.

16

17

18                                         By _____

19                                            Mark S. Adams

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

- 6 -

LA/84436.1