1

1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF CALIFORNIA
2                EASTERN DIVISION

3      HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

4

5

6

7   UNITED STATES OF AMERICA,

8               Plaintiff,

9        VS                    Case No. EDCV 07-01309 SGL

10  HARVEY DURO, SR., ET AL,

11              Defendants.

12

13

14                    DATE:   July 6, 2009

15                    TIME:   10:00 A.M.

16                    PLACE:  United States Court House
                              3470 12th Street
17                            Riverside, CA

18

19

20

21

22

23              GARY D. GEORGE, RPR, CSR
                 Contract Court Reporter
24              170 N. Via Las Palmas #6
                 Palm Springs, CA 92262
25                  (260) 402-5060

1    APPEARANCES:

2

3                        THOMAS P. O'BRIEN
                         UNITED STATES ATTORNEY
4                        BY:  Jonathan B. Klinck
                         Assistant United States Attorney
5                        Federal Building, Suite 7516
                         300 N. Los Angeles Street
6                        Los Angeles, CA 90012

7                        On behalf of the United States;

8

9                        J. SCOTT ZUNDEL, ESQ.
                         74000 Country Club Drive
                         Suite C3
10                       Palm Desert, CA 92260
                         (760) 568-0387
11
                         On behalf of Defendants Harvey Duro and
12                       Duro Mobile Park;

13

14                       FRANKEL & TENNANT
                         BY:  Douglas G. Tennant and
                              Kristy Ollendorff
15                       895 Dove Street
                         Suite 119
16                       Newport Beach, CA 92660
                         (949) 222-3456
17
                         On behalf of Clearinghouse CCDFI;
18

19                       CHANDRA GEHRI SPENCER
                         ATTORNEY AT LAW
20                       445 S. Figueroa Street
                         Suite 2700
21                       Los Angeles, CA 90071
                         (213) 489-6826
22
                         On behalf of Intervenors;
23

24

25

```
 1    APPEARANCE CONTINUED:

 2

 3                        CALIFORNIA LEGAL ASSISTANCE, INC.
                          BY:  Arturo Rodriguez and
 4                             John Spencer
                          1460 Sixth Street
 5                        Coachella, CA 92236
                          (760) 398-7261
 6
                          On behalf of Intervenors;
 7

 8                        THOMAS J. FLYNN
                          68-800 Pierce Street
 9                        Thermal, CA 92274
                          (310) 721-2425
10                        Current Receiver;

11
                          MARK ADAMS, ESQ.
12                        3435 Ocean Park Boulevard
                          Suite 107
13                        Santa Monica, CA 90405
                          (310) 739-7359
14
                          On behalf of Intervenors.
15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2

3          THE DEPUTY CLERK:  Please be seated and come to order.

4          Calling Item Number 1 on the calendar.  Case number

5   EDCV 07-01309 SGL, the United States of America vs. Harvey

6   Duro, Sr, et al.

7          Counsel, please state your appearances for the record.

8          MR ADAMS:  Good morning, Your Honor.

9          Mark Adams as a former receiver.

10         THE COURT:  Mr. Adams.

11         MR. KLINCK:  Good morning, Your Honor.

12         Assistant U.S. Attorney Jonathan Klinck Assistant for

13   the plaintiff the United States.

14         THE COURT:  Mr. Klinck.

15         MR. RODRIGUEZ:  Good morning, Your Honor.

16         Arturo Rodriguez and John Spencer for Intervenors.

17         THE COURT:  Mr. Rodriguez.

18         MR. TENNANT:  Good morning, Your Honor.

19         Douglas Tennant and Kristy Ollendorff on behalf of

20   Clearinghouse CDFI.

21         THE COURT:  Counsel.

22         MR. ZUNDEL:  Good morning, Your Honor.

23         Scott Zundel for the Defendants Harvey Duro and Duro

24   Mobile Home Park, Inc.

25         THE COURT:  Good morning to you all.

1          Why I'm calling you this morning based on the

2    application received by the former receiver Mr. Adams, the

3    Court had provided leave to Mr. Adams to seek essentially

4    remuneration for services rendered while acting as part of the

5    Duroville Renaissance Corporation, which was appointed as the

6    receiver and at other times as well.  The Court has received

7    and reviewed the papers.  I wanted to give the counsel and

8    everyone an opportunity to address the Court given the various

9    positions staked out by the respective parties and interested

10   parties.

11          Mr. Adams, if you wish to proceed first and then we

12   will do so throughout the case.

13          MR. ADAMS:  Your Honor, I would like to submit on the

14   papers unless the Court has any questions that you would like

15   me to address.

16          THE COURT:  Not at this time.

17          Let me hear from everybody else then I might.

18          Mr. Klinck, anything further for the government?

19          MR. KLINCK:  Your Honor, unless the Court has some

20   questions we would be willing to submit on our papers.

21          THE COURT:  Very well.

22          From CDFI?

23          MR. TENNANT:  Your Honor, I think we've stated our

24   position in the papers and so I appreciate the Court's

25   consideration of the good faith efforts that CDFI has exhibited

1    as a lender to the receivership.  If the Court has this

2    questions we would certainly be happy to answer them.

3          THE COURT:  Just to make sure that I understand.  The

4    point is made by certain interested parties that the loan was

5    not to the receivership, but rather to Mr. Adams personally; is

6    that correct?

7          MR. TENNANT:  Yes, Your Honor, it was to Mr. Adams.

8          THE COURT:  I understand the purpose of it.

9          MR. TENNANT:  Exactly, Your Honor.  And I think that's

10   been the ongoing understanding that specifically that the

11   dollar amount of $220,000 was the amount that the Court had

12   approved for a purpose.  So this is a lender who is exactly

13   what the public should wish is out there who is a lender of

14   last resort who makes as their mission statement loans that are

15   risky loans for the benefit of communities and loans to

16   individuals and we are just trying to insure the best we can

17   that, and in a reasonable manner that the lender gets repaid

18   from the proceeds.

19         THE COURT:  Well, and I just want to take the

20   opportunity to thank CDFI for their involvement in this case.

21   Certainly that initial $220,000 loan was critical to getting

22   all of this started and I know that there was a hope throughout

23   the last year and the early part of this year that the larger

24   loan -- the redevelopment loan would have come through and that

25   $220,000 seed loan as it were -- those are my words, the

1  parties the may have their own ways of viewing this, would have

2  been fully repaid with the funding of the larger loan.  It's

3  unfortunate that has not happened.  It not clear to me that's

4  necessarily off the table at that point.  Is that your

5  understanding?

6         MR. TENNANT:  That's my understanding, Your Honor,

7  that's it's not necessarily off the table, but that we need to

8  see where things go and the parties are still working on

9  things.  They probably have more privy to the details of that

10 but that certainly was the hope from my client's perspective

11 that it was seed money that would get repaid, but now we may

12 have to look to the revenues and income of the park.  And my

13 client's representative Kristy however has spoken several times

14 with Mr. Flynn and we are hopeful as the park operations

15 stabilize that there will be sufficient funds to repay.

16        THE COURT:  You have identified the issue that's

17 before the Court is that there are many creditors and there are

18 many who people need money.  There are many claims on very

19 limited resources.  I wish there was more money.

20        MR. TENNANT:  As I think everybody.  I think we can

21 all agree on that.

22        THE COURT:  I wish there was more money.  Thank you

23 very much.

24        The intervenors?

25        MS. SPENCER:  Your Honor, I think we've addressed

1    pretty much everything in our paper except for there was a

2    recent filing by Mr. Adams and I would like to make a couple of

3    points as to that.

4              THE COURT:  Yes, please.

5              MS. SPENCER:  First of all, as between the declaration

6    that was filed by Ms. Ollendorff and a declaration that was

7    recently filed by Mr. Adams there is still a mystery I think

8    that hasn't been resolved as to what exactly was done with the

9    full $220,000 and why if the park is going to be responsible

10   for paying it back because I think there is a huge discrepancy

11   there if $150,000 clearly was spent to pay off the study group,

12   but we still have a gap of what happened to the extra $70,000

13   that was borrowed from Clearinghouse CDFI that was going to be

14   paid to the study group and it clearly wasn't.  And there would

15   seem to be some various explanation from Mr. Adams, "Well, it

16   went to the $54,000 that I billed later and it went to this,"

17   and it's clear that the Court approved $220,000 to be paid for

18   the study group.

19             In the recent declaration filed by Mr. Adams he is now

20   stating that the expenses of the prior receivership -- the

21   first receivership period were $233,000 and I am having a hard

22   time following all the math back and forth between the various

23   where the monies went and why and what they were using these

24   for.  I think that's a significant problem.

25             THE COURT:  Well, to try to clarify that because I do

1    agree that there needs to be clarity and CDFI needs to

2    understand, and I will hear from Mr. Adams in a moment, but my

3    understanding is that of the $220,000, except for the money

4    that was paid to Ambassador Prosper and the money that was paid

5    to Mr. Shine, the remainder of the money went to Mr. Adams.

6    Correct, Mr. Adams?

7            MR. ADAMS:  Well, of the 220, Your Honor, as I laid

8    out in my reply, there were certain expenses that were paid out

9    to Mr. Flynn to meet certain operating expenses, but no

10   question the lions share of it went to me.

11           THE COURT:  I think out of the operating expenses was

12   your receivership operating expense; correct?

13           MR. ADAMS:  No, Your Honor.  There were -- in the

14   reply I keep trying to distinguish between the $220,000 this

15   Court ordered to be paid to me, Mr. Shine and Mr. Prosper.

16           THE COURT:  I'm not talking about that.  I'm talking

17   about the $220,000 that was loaned by CDFI.  That is the

18   question.  Of that $220,000 an amount went to Mr. Shine, an

19   amount went to Mr. Prosper and the remaining and I suppose I

20   spoke broadly when I said "you," you -- people working for you,

21   people working under your direction, operating expenses that

22   you incurred as the receiver, I use that all as "you."

23           MR. ADAMS:  That is correct.  That is absolutely

24   correct.  They were all expenses that were either paid to me to

25   cover the Court's ordered fees for operating expenses of the

1    receivership.  That is true.

2              THE COURT:  Very good.

3              So, Ms. Spencer, I think that is as clear an answer as

4    you are going to have in terms of what happened to the

5    $220,000.

6              MS. SPENCER:  And I would note, Your Honor, that this

7    Court, as we had pointed out in our papers, only has approved

8    $122,000 to be paid to Mr. Adams and the operating expenses of

9    the receivership.  And in his most recent declaration he seems

10   to be making a claim that somehow he is owed more than that

11   because he has raised that $220,00 to $234,000.  The line keeps

12   moving and that's one of our significant concerns.

13             I think the other thing that seems to be highly

14   emphasized in the most recent declaration and the point in

15   dispute between the parties is the claimant somehow Mr. Adams

16   volunteered his time.  I think it's clear that from May of 2009

17   -- May of 2008 until January 13, 2009, that DRC was acting as

18   Mr. Duro's property management manager and it was at the

19   request of Mr. Duro, with the Court's approval, that DRC was

20   acting as the property manager and that entire time period the

21   receivership should be left between Mr. Duro and DRC and there

22   should be no monies awarded out of this existing receivership

23   for that time period.  There was a set amount of money

24   established.  They were in full control of the books and

25   records, the accounting for that time period with no claim for

1   fees -- additional fees to be paid to Mr. Adams.  So I think we
2   made that pretty clear in our papers.
3          The final thing is with respect from January 13, 2009
4   forward to April 30, 2009, the basic difficulty we are having
5   with that time period is it appears that Mr. Adams' work that
6   he is seeking to be paid for went up some $90,000.  We are
7   having a very difficult time being able to analyze that.  It's
8   not the kind of records, it's not the kind of detailed billing
9   records I certainly use to preparing when I'm seeking my fees
10  from the court and to be able to determine whether those fees
11  are reasonable, and there were certain things that jumped out
12  at us as being unreasonable.  For example meeting with the
13  press.  The charging $350 an hour to meet with the press.
14  Doing bankruptcy research.  The receiver is supposed to have a
15  fiduciary obligation to all of the parties in the litigation
16  and we don't believe it's in Mr. Duro's fiduciary interest for
17  Mr. Adams to be doing bankruptcy research.  I mean this list
18  goes on and on and without having the detailed billing records
19  to be able to really challenge those.  That's our challenge
20  here.  So if the Court were so inclined to award Mr. Adams some
21  payment for January 13, 2009 to April 30, 2009, I would request
22  that the Court order him to provide more specific, more
23  detailed billing records so we can do an adequate analysis to
24  what he should be fairly compensated for.
25          THE COURT:  Ms. Spencer, there is two issues that the

1    Court is struggling with on this.  The first relates to the

2    loan from CDFI.  I do believe that it was a good faith loan

3    made by CDFI to explore whether this process might work and

4    that they might be able to eventually fund the larger loan.

5    There is no question as a matter of law it was a personal line

6    of credit afforded to Mr. Adams, so legally he is responsible

7    for the $220,000.

8             As matter of equity though there is no question also

9    that I think that he was acting in good faith when he obtained

10   the loan.  It has been used to pay for -- that $220,000 has

11   been used to pay for expenses associated with the study group

12   and I would like to see a way to come up with a way to make

13   sure that $220,000 got paid back at some point in time in some

14   manner whether or not a further development loan was used to

15   pay that, whether or not there was some manner that we could do

16   that.  So that's one issue.

17            Separate and apart is this issue of additional

18   expenses incurred by Mr. Adams since that time.  Since that

19   $220,000 was paid.  The Court authorized up to $15,000 -- the

20   Court authorized various amounts at various times of money that

21   could be paid concurrent with the work that was being done out

22   at Duroville.  For much of that time I assumed that money was

23   being paid to cover whatever costs that the receiver or the

24   different means and nomenclature that was used and it was only

25   somewhat later that I found out that Mr. Adams was running up

1   essentially this account payable.  And that puts us in an

2   awkward position because -- it puts the Court in an awkward

3   position because essentially what it does is then it creates a

4   situation where we would have to bust the cap that the Court

5   had previously imposed.  And despite all of the very good work

6   that has been going on since the trial, as reported by

7   Mr. Flynn, a surplus of money is not one of the things that we

8   currently have.

9          So I'm trying to keep those two issues separate and

10  not necessarily link them together because I don't think they

11  are.  I think those are identifiable interests that CDFI has

12  that's separate and identifiable from the issue and interest

13  that Mr. Adams has for that work.

14         What are your thoughts on the former?

15         MS. SPENCER:  On the CDFI loan if Mr. Adams were to

16  actually pay off Mr. Prosper and Mr. Shine and all $220,000

17  that went to pay off the study group expenses at this point,

18  then I don't see any -- well, certainly I can speak for

19  intervenors, we would have no objection to the CDFI loan being

20  considered and attempted to be paid off through the revenues of

21  the park to the extent that the park is capable of doing that.

22         We believe that CDFI did act in good faith and did act

23  in reliance on the fact that there was a court order.  Whether

24  the court specifically ordered the loan, I don't think the

25  court did, but there was a court order for $220,000 payment to

1   the study group.  The problem is that there is still a balance

2   due to both Mr. Shine and Mr. Prosper.

3          THE COURT:  About $45,000.

4          MS. SPENCER:  Mr. Adams kept those additional monies

5   for other expenses that he would like to spend them on.  If

6   Mr. Adams were to now be ordered to take the money that was

7   given to him by CDFI and pay off Mr. Shine and Mr. Prosper,

8   then we would accept that.  The Park should assume

9   responsibility for paying off that loan to the extent that it

10  is capable of doing so.  I think that would resolve that

11  concern.  And after the two year receivership period we could

12  spend that.

13         And I would defer to the recommendation of Mr. Flynn

14  as to what the park's revenue can bear in terms of payment.  I

15  would suspect it may be something that changes over time as the

16  park's revenues and expenses stabilize and it may be a smaller

17  payment now and a larger payment over time and that at the end

18  of the two year receivership period we will see what the

19  balance due and what else is to be paid off.  And again I would

20  defer to Mr. Flynn's expertise as the receiver who understands

21  the accounting for the park as they currently stand.

22         THE COURT:  Putting aside the roughly $45,000 which is

23  still outstanding, so then you would not object then to say

24  $175,000 of the loan?

25         MS. SPENCER:  Your Honor, the amount accounted for

that's the discrepancy.  The amount accounted for is somewhere
around $154,000.  And I think we've made it clear we said 150,
but I think it's closer to 154.  The intervenors would have no
objection to that because it was clear that those monies were
spent on study group -- court approved study group expense.
And so to that extent the intervenors have no objection to
having that loan being paid off to the extent that the park is
able to meet that obligation along with all the other
obligations that the park has and Mr. Flynn believes that the
park is capable of doing that at a minimum interest to keep the
loan current and a minimum in hopefully paying off some of the
principal in the mean time.

       THE COURT:  Thank you.

       MS. SPENCER:  Could I just add one more point with
regard to all of these other receivables, et cetera?

       In the recent court order the court ordered that
$15,000 could be allotted for the property management expense,
which would include Mr. Flynn's payment, legal fees, accounting
services, all of those.  In the Duroville Management
Corporation's profit and loss statement that's before the Court
on the May 27, 2009 initial application there are a number of
items of expense outside of the management fees that would also
be included.  If the Court is inclined to say, "Okay, well, I
will give you $15,000 total times X number of months that you
were the property manager," I think the other fees need to be

1  added into that as well similar to the way they are with the

2  current receivership.  There is a $5,200 accountant fee.  There

3  is the $3,000 in legal fees.  I don't know what this is but

4  $28,000 of professional fees.  If we take all of those overhead

5  type property management fees and put them together if the

6  court is inclined to go ahead and say $15,000 should be

7  awarded.

8           THE COURT:  Thank you.

9           MS. SPENCER:  Thank you, Your Honor.

10          THE COURT:  Mr. Zundel.

11          MR. ZUNDEL:  Your Honor, we have nothing further to

12  add.  We believe, Your Honor, that intervenors should agree

13  that we have no objection to the CDFI loan being repaid to the

14  extent possible out of the proceeds of the park, but we would

15  like to see you give some priority to distribution of money to

16  Mr. Shine and Mr. Prosper's firm prior to any other

17  reimbursement.

18          THE COURT:  Thank you.

19          All right, Mr. Adams I will give you the last word.

20  You get the first and you get the last.

21          MR. ADAMS:  Thank you, Your Honor.

22          Just a couple of things.  First of all a couple of

23  points on the issues raised by Ms. Spencer.  This $14,000

24  figure has not been a moving target.  It has been the same

25  number since I filed report with the court before the end of

1    the trial as I think if the Court would recall.  If you need

2    any further clarification I would be happy to do it.  Those are

3    hard cash dollars that I paid out of my own bank account, not

4    out of the draw from CDFI, to cover expenses that were not

5    otherwise going to be covered by the receivership.  That was my

6    money.  That wasn't borrowed money and the amount of it has

7    remained the same throughout these proceedings.

8         With regard about the specificity of billing rates, I

9    can only assume that Ms. Spencer has some other examples that

10   she found because I so effectively refute the point that she

11   made with regard to the property management work that I did on

12   the fire safety weekend.  If the Court read my report on that I

13   don't think it can refuted by any fair minded person that I was

14   the only responsible person on the site that weekend.  And sure

15   I could have written 18 paragraphs on all of the different

16   things that I did, including fire employees, but I think I've

17   given adequate specificity.  If the Court doesn't agree I would

18   be happy to give you even more.

19        On the two points that the Court raised.  I agree with

20   the Court first of all that the biggest issue is how to get

21   CDFI paid because without their money none of this would have

22   happened at all, and I know that the Court is aware of that.

23   I tried to allude to it in general terms in my papers the

24   arrangement that I've made with CDFI in terms of what would

25   happen to any payments that were awarded to me by the Court

1    today.  Let me be specific with the Court since there seems to

2    still be questions about it.

3         I've represented to Mr. Tennant and to Ms. Ollendorff

4    that if the Court did award the $5,000 a month out of the

5    existing property management fee that I would assign that money

6    to CDFI until CDFI was paid because there is no higher priority

7    for any of us.  It's a legal obligation for me, it's a moral

8    obligation to me and I think it's a moral obligation for a lot

9    of -- the participants in the Duroville saga, but there is no

10   question that if any monies awarded by the Court is going to

11   CDFI until that date would be due.  The $5,220 is 40 months or

12   something.  So we are going to be this for awhile.

13         THE COURT:  That raises an interesting issue.  As

14   probably everybody in this courtroom understands the economic

15   circumstances in this country have changed rather dramatically

16   since the first quarter of 2008.  We are now the third quarter

17   of 2009.  Has there been any discussion or any thought given to

18   the principal parties sitting down and negotiating this

19   particular loan?

20         MR. ADAMS:  You mean as between CDFI in terms

21   compromising it?

22         THE COURT:  Yes.

23         MR. ADAMS:  There have been extensive conversations

24   and negotiations among Mr. Tennant, Kristy Ollendorff and

25   myself about to what's going to happen to that loan, but there

1    was no discussions about compromising it because I think all

2    three of us have the same opinion, which is that there is no

3    higher priority than them getting paid back this $220,000 that

4    they advanced.

5          THE COURT:  And I assume you understand, and I

6    appreciate everyone wants to get a hundred cents on the dollar,

7    that's generally what people want to get, but the circumstances

8    have changed not only in the general economy, but also in the

9    circumstances out at Duroville.

10         And so again my question is, and perhaps I should ask

11   it the form of future tense, would there be a willingness to

12   sit down, not just between Mr. Adams and CDFI, but perhaps to

13   include the source that you are looking to to pay this loan,

14   namely the management at Duroville and trying to work something

15   out?

16         MR. ADAMS:  Of course, Your Honor, we all know each

17   other.  We've got a history of dealing with each other and that

18   would be fine.

19         THE COURT:  Would CDFI have an interest in doing so?

20         MR. ZUNDEL:  Yes, Your Honor, I think that CDFI and

21   Ms. Ollendorff already had a couple conversations with

22   Mr. Flynn and I think the concept is that he's trying to get

23   the park operations stabilized and I think it would be

24   appropriate for them to have further conversation subsequent to

25   this hearing and see where reality is.  We understand that

1    reality may intersect with what the ideal in the transaction

2    with a different outcome.  Sometime that happens.

3          THE COURT:  Sometimes that happens.  And that's where

4    compromise and reasonability are used to intercede.

5          MR ZUNDEL:  Yes, Your Honor.

6          THE COURT:  All right.  Well, perhaps the Court might

7    be able to facilitate that discussion further.

8          Any other points, Mr. Adams?

9          MR. ADAMS:  Your Honor, I just wanted to address the

10   final point about the $15,000 fee because I did want to remind

11   the Court, and I'm glad that the Court has seen that in the

12   papers because this is a personal obligation.  The entire

13   $220,000 is a personal obligation.  I wouldn't be standing here

14   or I wouldn't have made an application for fees if either CDFI

15   or somebody else said you know Duroville ought to take over

16   that obligation because then I could have walked away freely.

17   But as it stands now CDFI does have legal remedies that they

18   can pursue against me for the $220,000 and as long as that's

19   the case I have to stand before the Court and ask for payment.

20         As to the $15,000, Your Honor, I just wanted to

21   highlight one thing.  I think it was possibly a surprise when

22   it was explained that the entire $15,000 fee over the last six

23   months or 12 months or whatever it was that was going to Flynn,

24   and I address that in my papers by pointing out that I thought

25   he was living there, that he's got family obligations and it

1   didn't --

2          THE COURT:  Please don't get me wrong.  I'm not

3   questioning your decision to do that, but understand when the

4   Court said that $15,000 was go to the receiver, I assumed the

5   $15,000 would go to the receiver, and the receiver with

6   Duroville Land and come back post hoc and say, "Well, I was

7   only giving it to one aspect of the receivership we have been

8   racking up these accounts payable."  That defeats the Court's

9   effort to try to put a cap on how much was going to the

10  receiver.  I mean if $15,000 was not a workable number then the

11  Court at least would have had the opportunity then to decide,

12  well, this receivership is not working and I need to come up

13  with another receivership or I need to find somebody else who

14  is not going to charge as much.

15         The problem that you present to the Court at this

16  point is that in putting that cap thought that was the most

17  that the park could bear and now I'm being presented with a

18  bill essentially that greatly exceeds that amount that I had

19  targeted it for.

20         I'm not questioning your judgment that because

21  Mr. Flynn was the one putting in the hard sweat out of

22  Duroville, and anyone who has visited Duroville in the last

23  year and a half knows that it is Mr. Flynn who has been putting

24  in the day in and day out hard work out there, so I'm certainly

25  not questioning that decision.  It's the complication that has

1    arisen by the Court not having a full understanding of the

2    arrangement.

3           MR. ADAMS:  I understand that, Your Honor.

4           The only point I would like to make in closing on that

5    is that with respect to that $15,000, let's say I had taken

6    $5,000 of it over that year period to cover my portion of it,

7    if you think about it what I'm really proposing here is the

8    same thing, it's just being out of the future revenues not the

9    past.

10          THE COURT:  Right.  But, I would like to have been

11   apprised of that contemporaneously as opposed to again

12   essentially because now it is a fait accompli.  Either I have

13   to take money from the future to pay for the past, which I

14   don't want to do, or I have to leave you without having

15   compensation for work that you claim you have done, which I

16   don't want to do either.  I mean like I say it goes back with

17   this feeling I wish there was more money there.  The question

18   is in equity what is the appropriate thing to do?

19          Well, I appreciate your comments.  I appreciate

20   everyone's submissions.  The Court will issue an order

21   hopefully resolving this issue.  Certainly part of the

22   framework with respect to the CDFI loan will be, since both

23   parties accede to this, some settlement effort.  The Court will

24   try to assist in that and bring a resolution.  I hope that

25   makes sense hopefully for everybody.  Thank you for your

1  efforts in that.

2          I see Mr. Flynn is here in the courtroom.  I

3  appreciate your most recent report and I wish to you well in

4  your continued efforts.  Good day.

5          (Whereupon, the hearing was concluded.)

1         C E R T I F I C A T E

2

3         I hereby certify that pursuant to Section 763.

4    Title 18, United States Code, the foregoing is a true and

5    correct transcript of the stenographically reported proceedings

6    held in the above-entitled matter and that the transcript page

7    format is in conformance with the regulations of the Judicial

8    Conference of the United States.

9

10   Dated:  October 24, 2012

11

12

13                          /s: _____

14                              GARY D. GEORGE
                                RETIRED CONTRACT REPORTER

15

16

17

18

19

20

21

22

23

24

25