LAW OFFICE OF
J. SCOTT ZUNDEL
J. SCOTT ZUNDEL SBN 63303
74-000 COUNTRY CLUB C-4
PALM DESERT CALIFORNIA 92260
ATTORNEY FOR DEFENDANTS HARVEY DURO, SR.,
And DESERT MOBILEHOME PARK INC.,
a California corporation

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED SATES OF AMERICA<br><br>PLAINTIFF,<br><br><br><br>Vs.<br><br><br><br>HARVEY DURO, SR., AND DESERT MOBILEHOME PARK INC., a CALIFORNA corporation,<br><br>DEFENDANTS<br>_____<br>CRUZ NAVARRO DELFINA OCHOA, PEDRO LOPEZ, and ORBELINA ESCOBAR.<br><br>INVERVENORS-DEFENDANTS | CASE NO: EDCV 07-1309 SGL (OPx)<br><br>MOTION TO:<br><br>1. CLOSE DUROVILLE OR IN THE ALTERNATIVE TERMINATE RECEIVERSHIP IN WHOLE OR PART<br><br>DATE: April, 11, 2013<br>TIME: 10:00 a.m.<br>DEPTS: Courtroom 4<br>       HON. David T. Bristow<br>       3470 Twelfth Street<br>       Riverside CA 92501 |

MOTION TO CLOSE DUROVILLE AND RELATED MOTIONS

- 1

# I

## BACKGROUND

On October 9, 2007, the United States of America filed this action against Defendants, Harvey Duro, Sr. and Desert Mobilehome Park Inc., hereinafter ("Defendants") which relates to the operation of a mobilehome home park known as "Duroville" on an allotment at the Torres Martinez Band of Indians Reservation. The United States Government holds the allotment in trust for Defendant, Harvey Duro Sr.

Defendants own no interest whatsoever in the individual coaches of the Tenants at Duroville and Defendants were not involved in any way in selling to the Tenants or providing the Tenants those coaches. The Tenants owned and own their own coaches. Defendants merely rent to Tenants space and provide them to their rented space, sewer, water and electricity.

In December 2007, four (4) named residents of Duroville, hereinafter ("Defendant/Interveners") moved to intervene in this action. Their motion was grated on January 14, 2008. Defendant/Interveners sought to have their interests heard concerning health, and safety matters at Duroville. Throughout this litigation CRLA has claimed to represent the four (4) named as residents of Duroville. CRLA in repeated filings and pursuant to the requirements of the California Rules of Professional Conduct have claimed to have met with clients, and filed and argued numerous motions, briefs, appeared at hearings and appeared at the 9 day court trial. Attorneys for Interveners now indicate that NONE of these individuals currently reside at Duroville.

MOTION TO CLOSE DUROVILLE AND RELATED MOTIONS
- 2

On February 11, 2008, the Court heard Plaintiff's motion for a preliminary injunction.  The court granted the preliminary injunction and ordered further hearings.  In this hearing the court appointed a "provisional director" and two "special master" to study Duroville and make recommendations.  Defendant remained in control of Duroville.  The court also expressed a desire to allow Defendant to participate in the management of the park and ordered the "establishment of a professional property management team that has day-to-day operation control of the mobile home park . . . ."  and that "Defendant Harvey Duro, Sr, as the Tribal Allotee, shall approve the composition of the professional management team, shall serve as a principal member of the professional management team and shall receive reasonable compensation . . . ."

It turns out that Defendant was not able to assemble this team due to disagreements he had with Mark Adams, the provisional receiver and Judge Larson's determination to make Mark Adams part of that "management team".

In June of 2008 Judge Larson gave Mark Adams exclusive control of Duroville but provided Defendant through a notice and magistrate monitored process to inspect the books and object to management practices. [Doc 101, June 15, 2008 Judge Larson's Minute Order]  Mark Adams and Tom Flynn had non-exclusive management control of Duroville until January 2, 2009.  During this period Judge Larson encouraged and Defendant continued to try to assemble what he believed as a professional and proper management team and he became even more disillusioned with the actions of Mark Adams.

1    In December of 2008 after receiving ex-parte communication
2 with Mark Adams Judge Larson determined that Defendant was not
3 cooperating with the Receiver, terminated Defendant's lease
4 payments and set a hearing for the termination of Defendant's
5 involvement in management of Duroville and the appointment of a
6 permanent receiver.  Judge Larson was unhappy that Defendant
7 would not arrange a **personal** loan and turn roughly $250,000.00
8 to $600,000.00 over to Mark Adams.
9    In January of 2009, Defendant filed a motion for the
10 appointment of a new receiver and/or professional management
11 team. [Doc 151, January 2, 2009, Opposition and Counter Request
12 for Receiver].  Defendant believed his proposal was the only way
13 to assemble a "professional management team" with the ability to
14 provide proper management and through the people named in the
15 motion the ability to raise money required to make the repairs
16 to Duroville required to satisfy the courts health and safety
17 concerns and to keep Duroville open.  The people involved in
18 this request included a Certified Public Accountant with an
19 impeccable reputation and accomplished experience and
20 qualifications and a group of wealthy Agua Caliente American
21 Indians interested in assisting Defendant with money and with
22 management expertise.  Defendant argued: he had no trust in Mark
23 Adams; there was no hope to fix Duroville's problems with Mark
24 Adams involvement; and that his proposal was the best hope to
25 assemble a professional management team to arrange the finances
26 and management to rectify Duroville's health and safety
27 deficiencies and keep it open.  Defendant's motion was denied
28 and Mark Adams and his team were made permanent receivers until

trial in this matter in April 2009.  Just prior to commencement of the trial in April of 2009 Interveners raised objections to Mark Adams continuing as Receiver.  These objections do not need to be discussed in this Motion except as to point out that they were the same reasons why Defendant could not work with Mark Adams.  Judge Larson removed Mark Adams as receiver. Defendant's distrust and problems with Mark Adams were fully vindicated.

It is Defendant's position that his lack of faith in Mark Adams was justified and subsequent events proved that to be true.  It is also important to point out that Judge Larson's desire to have Defendant involved in or responsible for assembling a management team ended as a result of Defendant's problems with Mark Adams and retrospect his lack of faith in Mark Adams were subsequently proved to be justified.

On April 30, 2009 Judge Stephen G. Larson issued an order, hereinafter, the "Order", which determined that [Document 226, Order of Judge Stephen G. Larson at page 8]:

1. The Park was "unlawful";

2. The Park was "unsafe and unhealthy";

3. There was "presently" no available relocation facilities for the vast majority of residents of the Park; and

4. Immediate closure of the Park would create an "unacceptable humanitarian crisis".

Judge Larson's Order:

       1. Outlined procedures for the operation of the Park for One(1) two-year period under the Receivership of Thomas Flynn;

       2. Set forth goals with regards to the relocation of the Park tenants to alternative locations which were expected to become available though Riverside County Economic Development Agency efforts;

       3. Encouraged the BIA to work with Defendants to "provide an opportunity for Mr. Duro to satisfy legitimate requirements necessary, in the properly exercised discretion of the BIA, to obtain a lease to operate a commercial mobile home park if, and only if, that is what Mr. Duro wants to do with his allotment";
       and

       4. Recognized that the "BIA has a fiduciary relationship with Native Americans for whom they oversee the Indian reservation land that the United States Government [Department of Interior] holds in trust" [Document 226, Order of Judge Stephen G. Larson at page 4]

Despite testimony at trial by Riverside County officials that alternative housing would be available with in two years it is now four years later and only within the last 75 days have alternative housing been made available by Riverside County.  It is not disputed that pursuant to California Law, Riverside County acting as a County and through its then Redevelopment Agency had a state imposed obligation to meet the housing needs of the poor within its jurisdiction.  Further, it is also clear

that Riverside County mistakes and other priorities have contributed significantly to the four year delay.

It can be demonstrated that health and safety progress has been made under Mr. Flynn's leadership cleaning up the Park, one must also consider the colossal financial failures of the previous Receiver, Mr. Mark Adams; the ex-parte discussions & decisions resulting in unnecessary and unreasonable cost to the defendant and the continued deterioration of the Tenant's living conditions and failures of Riverside County to meet its California legal requirements to provide affordable housing to those qualified poor within its boundaries.  Mr. Flynn and volunteer groups and tenants have done a great deal to remove dangerous conditions created by tenants including uncovered garbage cans, wooden additions, leaking water and sewer hook ups and illegal electrical wiring and unsafe mobilehome anchoring.

Prior to the Court appointed Receivership, which is now over 60 months ago, the Park's fiscal obligations were in balance for the preceding 8 plus years. Bills from Imperial Irrigation District and other vendors were current; although admittedly the Park was a health and safety problem.

Other than drilling a new well because the old well failed due to age and use, the water system, sewage treatment system and electrical system remain virtually the same that existed at the time Defendant was deprived of the ownership and use of his Allotment.  The major health and safety problems of the park, lack of fire suppression and risk of electrical outages remain.

Through the efforts and patience of the Court, the work of the Receiver and Riverside County efforts there is now an end in site to Duroville. There remain three essential problems:

1. As tenants move out total clean up of their rented space is either not occurring or is delayed or is unsafe;
2. Some tenants seem to be unwilling to move and/or identify alternative housing after Duroville closure; and
3. As tenants move there will come a time when the receivership and even possibly the park itself without a receiver is no longer sustainable due to lack of financial resources.

## III

## DEFENDANT'S PLAN

Defendant argues that the Court announce a closures date of June 1, 2013 or a date adjusted based on a time when Riverside County can make available to Duroville tenants move in ready alternative housing at Mountain View estates and those tenants remaining after that date will be removed by the Court. The order should include various provisions ordering tenants to clean up and remove their coaches and trash and a requirement that to be eligible to move into Mountain View Estates that Duroville tenants are current (during the Receiver Managed time frame) on Duroville obligations including rent and clean up.

Defendant has waited 5 years.  His Allotment has been used for the benefit of the tenants for 5 years.  He is NOT receiving a fair return on the use of his Allotment.  The United States, the State of California, the BIA and Riverside County have appropriated his property, for a public purpose, which is to provide housing to the poor within its jurisdiction.

As time has passed since the commencement of this case, in December of 2007, attribution of blame for this ongoing Duroville problem and lack of housing for the poor in Riverside County falls less and less on the shoulders of Defendants and more an more on the shoulders on other parties responsible to meet housing needs of the poor.  Moore and more as time passes this becomes a taking of his property without just compensation in order to meet the obligations of Riverside County and the State of California.  After 5 years Defendant should be able to use his Allotment to try to make a living for he and his family and not just a sustenance living.

Should the Court not be willing to consider this proposal Defendant requests in the alternative that the receivership be terminated and control of Duroville be returned to Defendants and his proposed professional management team.  This is consistent with the original desires of Judge Larson, it gives the Court more flexibility in determining closure dated and allows Defendant to receive some compensation for the use of his Allotment.  Defendant's Plan is as set forth in the attached "Letter to Honorable Judge Bristow" a copy of which is attached hereto as Exhibit A and made a part hereof by this reference.  It involves Defendant using the professional expertise of

MOTION TO CLOSE DUROVILLE AND RELATED MOTIONS
- 9 -

Kenneth Dickerson.  The qualifications of Mr. Dickerson and his various entities are attached hereto as Exhibit B and made a part hereof by this reference.

## IV

## LEGAL AUTHORITY

Defendants have conferred with the US Attorney about the filing of this motion. Defendants have indicated in general terms to counsel for Interveners that it intends to file this Motion.  However, Defendants contend that because none of the Interveners reside at Duroville.  They have neither standing nor interest in the remaining issues in this case and subject matter of this Motion. According to Interveners counsel none of their clients reside at Duroville.  They further indicate that only one of their clients who lives outside Duroville has an possible interest in moving to Mountain View Estates.  Because this single Intervener does not live at Duroville, the possible interest in moving into Mountain View Estates is completely independent of and unrelated to the closure of Duroville and/or the termination of the receivership.

In order to commence and continue litigation of a case in Federal District Court, the litigant must have standing.  The litigant bears the burden of showing that for each claim he/ or she seeks to press that the litigant has standing pursuant to Article III of the United States Constitution, which limits jurisdiction of Federal Courts to the resolution of cases and

controversies. [*Horne v Flores*, 129 S. Ct 2579, 174 L. Ed. 2nd 406, 234 Ed. Law Rep, 572; *Davis v Federal Election Com'n* 554 U.S. 724, 128 S. Ct 2759. 171 L. Ed. 2nd 737 (2008)] The standing requirement is designed to ensure that a party has a personal stake in the outcome of the controversy. *[Miller v Silverman, 951 F. Supp 485 (1997)]* While it is undisputed that if Interveners actually resided at Duroville at the time the lawsuit commenced they had standing at that time, those Interveners who no longer reside at Duroville have no interest of any sort in the remaining issues before this Court.

Defendants further argue that the use of Defendant, Harvey S. Duro Sr.'s Allotment in order for the purpose of providing housing to the poor constitutes a taking of his property without just compensation or even a jury trial on the amount of compensation to be paid to him. Article 1, Section 19 of the California Constitution provides that;

**"Private property may be taken or damaged for public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."**

'When . . . [the] power [of eminent domain] is exercised by the United States Government, it can only be done by giving the party whose property is taken or whose use and enjoyment of such property is interfered with, full and adequate compensation, not excessive or exorbitant, but just compensation. The Fifth Amendment's to the United States Constitution guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing

some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.

# V
# CONCLUSION

1. Closure after 5 years is reasonable and allows Defendants to seek to use the Allotment for a fair return.
2. The request to either close or terminate the receivership meets and exceeds all previous court direction from Judge Larson.
3. Defendant's proposal is the ONLY viable option that provides for a flexible end to this Court case.
4. The proposal protects the interests of all parties moving the Allotment forward, not backwards with an ultimate destination as a toxic dumpsite.
5. The Plan fulfills all concerns raised by Attorneys for both the Plaintiffs, Defendant & Interveners and provides the maximum flexibility for the Court on final closure.

Defendant would also be willing to consider offering to hire Tom Flynn hourly as a consultant to report directly to the Court regarding his observations about the conduct of Defendants' management team and to advise Defendants.

March 1, 2011

Respectfully submitted,
LAW OFFICES OF J. SCOTT ZUNDEL
BY

| | |
|---|---|
| 1 | <u>S/J. SCOTT ZUNDEL</u> |
| 2 | J. SCOTT ZUNDEL, ESQ. ATTORNEY DEFENDANTS, HARVEY DURO SR. and |
| 3 | DESERT MOBILEHOME PARK, INC., a California corporation |