ANDRÉ BIROTTE JR.
United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division
JONATHAN B. KLINCK
 Assistant United States Attorney
 California Bar Number 119926
MONICA L. MILLER
 Assistant United States Attorney
 California Bar Number 157695

Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-8561/4061
Facsimile: (213) 894-7819
Email: jon.klinck@usdoj.gov
Email: monica.miller@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. EDCV 07-01309 DTB |
|   Plaintiff, | |
|   v. | UNITED STATES' OPPOSITION TO |
| HARVEY DURO SR., et al. | CDFI REQUEST FOR PAYMENT |
|   Defendants. | |
| | The Honorable David T. Bristow |

## TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ........................................................................................ 1

II.     THE APPROPRIATIONS CLAUSE FORBIDS THE UNITED STATES FROM INCURRING ANY DEBT, OR SPENDING ANY MONEY, WHICH HAS NOT FIRST BEEN APPROPRIATED BY CONGRESS ............. 2

III.    THE RECORD SHOWS THAT THE COURT ORDERED -- AND CDFI, MARK ADAMS, THE DEFENDANTS AND INTERVENORS AGREED -- THAT DEFENDANTS WOULD BE LIABLE FOR THE COSTS OF THE STUDY GROUP AND THE CDFI LOAN ................................................. 3

IV.     EQUITABLE PRINCIPLES DO NOT SUPPORT HOLDING THE UNITED STATES LIABLE FOR THE CDFI LOAN ............................................ 8

        1.      Receivership Costs in General ...................................................... 8

        2.      The U.S. Did Not Seek Appointment of the Receiver or the Study Group .......................................................................................... 9

        3.      CDFI Has Not Demonstrated It Sought Payment of the CDFI Loan from Mr. Adams .......................................................................... 10

        4.      Benefit Conferred ....................................................................... 11

        5.      The Balance of Equity Lies in Plaintiff's Favor ......................... 12

        6.      The Court's Discretion Should Be Exercised in Plaintiff's Favor.............. 13

V.      THE COURT'S RULING THAT DEFENDANTS ARE LIABLE FOR PAYMENT OF THE CDFI LOAN IS THE LAW OF THE CASE ..................... 14

VI.     TO THE EXTENT CDFI MAKES A CLAIM AGAINST THE UNITED STATES FOR EXPRESS OR IMPLIED CONTRACT, JURISDICTION LIES IN THE COURT OF FEDERAL CLAIMS ................................................. 15

VII.    CONCLUSION ........................................................................................ 15

i

# <u>TABLE OF AUTHORITIES</u>

**PAGE**

## <u>FEDERAL AND STATE CASES</u>

<u>Andrade v. Andrade,</u>
216 Cal. 108 (1932) ............................................................................ 9

<u>Baldwin v. Baldwin,</u>
82 Cal. App. 2d 851 (1947) ............................................................ 9, 13

<u>Cincinnati Soap Co. v. United States,</u>
301 U.S. 308 (1937) ............................................................................ 3

<u>City of Chula Vista v. Gutierrez,</u>
207 Cal.App. 4th 681 (2012) ........................................................... 8, 9

<u>Cobell v. Norton,</u>
226 F. Supp. 2d 1 (D.D.C. 2002) ....................................................... 3

<u>Federal Crop Ins. Corp. v. Merrill,</u>
332 U.S. 380, 385-86 (1947) ............................................................... 3

<u>Office of Personnel Management v. Richmond,</u>
496 U.S. 414, 110 S. Ct. 2465, 110 L. Ed. 2d 387 (1990) .................. 2

<u>Ingle v. Circuit City,</u>
408 F.3d 592, (9th Cir. 2005) ............................................................ 15

<u>Inglewood Fed.Sav. & Loan Ass'n v. Richardson,</u>
121 F. Supp. 80 (S.D. Cal. 1954) ..................................................... 13

<u>McCarthy v. Poulsen,</u>
173 Cal. App. 3d 1212 (1985) ........................................................ 9, 10

<u>Mitchell v. Robert DeMario Jewelry, Inc.,</u>
361 U.S. 288 (1960) .......................................................................... 14

<u>Pioche Mines Consol. Inc. v. Dolman,</u>
333 F.2d 257, (9th Cir. 1964) .................................................. 9, 11, 13

<u>Porter v. Warner Holding Co.,</u>
328 U.S. 395, (1946) ........................................................................ 14

<u>United States v. Lummi Indian Tribe,</u>
235 F.3d 443 (9th Cir. 2000). ........................................................... 14

## <u>STATUTES</u>

25 U.S.C. § 415 ........................................................................... 12, 13

28 U.S.C. §§ 1346 ............................................................................ 15

1

28 U.S.C. § 1491 (a) (1)................................................................................ 15

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

Non-party Clearinghouse Community Development Financial Institution ("CDFI") has filed its "Status Report re Payment of the Clearinghouse Receivership Loan and Declaration of Kristy Ollendorff" (hereafter "CDFI Request"), which seeks, in part, to require the United States to pay the loan CDFI made to Mark Adams ("CDFI Loan"). (Dkt. #469)   The CDFI Request should be denied.

CDFI is not a party to the action, and the United States did not enter into the CDFI Loan or any contractual agreement with CDFI.   The United States opposes CDFI's Request – as it opposed the imposition of the Study Group prior to its inception and has continuously opposed the appointment of receivers – for several reasons.

First, the Appropriations Clause of the United States Constitution forbids the United States from incurring any debt, or spending any money that has not first been appropriated by Congress.   CDFI cites to one case in support of its argument that the Appropriations Clause is inapplicable, a case which has been vacated and is otherwise distinguishable.

Second, the record of this action shows that the Court ordered -- and CDFI, Mark Adams, the Defendants and Intervenors accepted -- that Defendants would be liable for the costs of the Study Group and the CDFI Loan.   Moreover, the record reflects that the United States opposed the appointment of the initial receiver, Mark Adams, and his successor, Tom Flynn, and any costs they incurred, including the CDFI Loan.   The CDFI Loan arose out of a highly irregular series of *ex parte* meetings which were not noticed by the Court, did not include Plaintiff, and were apparently not open to the public.

Third, the United States sought the closure of Duroville, and received no benefit from the Study Group, the initial or successor receivers, or the CDFI Loan.

Fourth, equitable principles do not weigh in favor of holding the United States liable.   The CDFI Loan is an agreement entered into by CDFI and Mark Adams.   CDFI's recourse is against Mark Adams.   It is inequitable for CDFI to now assert a claim against the United States.   Moreover, the United States has already spent a considerable amount

of taxpayer dollars to remove the health and safety hazards from the trust property because Defendants stated their inability to do so.  It would be unfair to ask taxpayers to pay for a loan to which it was not a borrower or guarantor, especially when the U.S. has consistently opposed the actions *(i.e.* the receivership) which served as the basis for the loan.

Fifth, the Court has already ruled that Defendants are liable for payment of the CDFI Loan.  The law of the case doctrine applies to estop CDFI from requesting a modification of that ruling.

Finally, the evidence presented by CDFI lays the foundation for only one type of claim – a contractual claim against Mark Adams.  Even if the documents presented a claim for contractual or quasi-contractual debt between CDFI and the United States, in excess of $10,000.00, exclusive jurisdiction for such claims lies in the Court of Federal Claims.

## II.    THE APPROPRIATIONS CLAUSE FORBIDS THE UNITED STATES FROM INCURRING ANY DEBT, OR SPENDING ANY MONEY, WHICH HAS NOT FIRST BEEN APPROPRIATED BY CONGRESS

The Court's authority to commit the United States to payment of the expenses of the receivership is limited.  In <u>Office of Personnel Management v. Richmond</u>, 496 U.S. 414, 110 S. Ct. 2465, 110 L. Ed. 2d 387 (1990), the U.S. Supreme Court addressed whether a retired employee was entitled to payments from the federal treasury because he had been given erroneous advice by a federal employee.  In ruling in favor of the government, the Court held "that payments of money from the Federal Treasury are limited to those authorized by statute." <u>Id</u>. at 416. The <u>Richmond</u> Court made its ruling based on its recognition that the Appropriations Clause of the United States Constitution provides that no money shall be drawn from the Treasury unless Congress enacted a statute authorizing the expenditure.  <u>Id</u>. at 424; U.S. Const., Art I, § 9, cl. 7. "Our cases underscore the straightforward and explicit command of the Appropriations Clause. 'It means simply that no money can be paid out of the Treasury unless it has been

2

1  appropriated by an act of Congress.'" <u>Richmond</u>, 496 U.S. at 424 (quoting <u>Cincinnati</u>
2  <u>Soap Co. v. United States</u>, 301 U.S. 308 (1937)).

3        The <u>Richmond</u> Court did not overlook the fact that its ruling could occasionally
4  render a seemingly unjust result.  It observed, "[w]e recognized that 'not even the
5  temptations of a hard case' will provide a basis for ordering the recovery contrary to the
6  terms of the regulation, for to do so would disregard 'the duty of all courts to observe the
7  conditions defined by Congress for charging the public treasury.'" <u>Id.</u> at 420 (quoting
8  <u>Federal Crop Ins. Corp. v. Merrill</u>, 332 U.S. 380, 385-86 (1947)).  Accordingly, for this
9  Court to impose the costs of the receivership on the United States, it must identify
10  specific statutory authorization to do so.  No such statute applies to the facts of the
11  instant case.

12        CDFI argues that the Appropriations Clause does not preclude U.S. liability for
13  the receivership loan. (CDFI Request at 15-17.)  CDFI principally relies on a district
14  court opinion which was vacated on appeal and has no precedential value.  <u>See</u> <u>Cobell v.</u>
15  <u>Norton</u>, 226 F. Supp. 2d 1 (D.D.C. 2002) <u>vacated,</u> 334 F.3d 1128 (D.C. Cir. 2003).
16  Accordingly, contrary to CDFI's contention, the Appropriations Clause bars United
17  States liability for the CDFI Loan.

18  **III.    THE RECORD SHOWS THAT THE COURT ORDERED -- AND**
19  **CDFI, MARK ADAMS, THE DEFENDANTS AND INTERVENORS**
20  **AGREED -- THAT DEFENDANTS WOULD BE LIABLE FOR THE**
21  **COSTS OF THE STUDY GROUP AND THE CDFI LOAN**

22        On January 25, 2008, Intervenors filed a motion seeking, *inter alia*, appointment
23  of Mark Adams as receiver of Duroville.  (Dkt. #43)   Plaintiff filed its opposition to the
24  appointment of Mark Adams on February 7, 2008 (Dkt. #55).   In its opposition, Plaintiff
25  noted that the appointment would violate the United States' plenary control over Indian
26  land, and observed the receivership would benefit the mobile home park tenants, not the
27  allotment owner or the United States.  (<u>Id.</u>)  The United States has maintained its
28  opposition to a receivership since the inception of the action.

3

1    After a series of *ex parte* meetings between the Court and various non-parties,

2    without notice to Plaintiff, the Court, *sua sponte,* appointed two Special Masters and

3    Mark Adams as Provisional Receiver.[1] (Dkt. #59)   Once again, without notice to

4    Plaintiff, and again apparently *sua sponte*, the Court issued what it termed "Minutes of

5    Chambers Order Regarding Communications From Special Masters and Provisional

6    Receiver With the Court" on February 25, 2008 (Dkt. # 64), "Minutes of In Chambers

7    Order Regarding Communications From Special Masters and Provisional Receiver With

8    the Court" also on February 25, 2008 (Dkt. #65), and Minutes of In Chambers Order

9    Notice of Under Seal Filing of First Receiver's Report of Mark S. Adams" on March 6,

10    2008 (Dkt. #66).  Accordingly, on file is: "Sealed Document: Receiver's First Report of

11    Mark S. Adams" filed on March 6, 2008 (Dkt. #68).

12    Then, on April 10, 2008, the Court ordered, *inter alia,* (1) the Special Masters to

13    submit their Report and Recommendation, (2) Mr. Adams to submit his Receiver's

14    Report, and (3) the parties to not disclose the contents of the Report and

15    Recommendation until April 18, 2008 before 4:00 p.m.  (Dkt. #74)  In "United States'

16    Response to First Compliance Report" (Dkt. # 98), the United States sets forth concerns

17    it had regarding any loans or lines of credit  Mr. Adams was endeavoring to secure.  (Id.

18    at p. 13-14)

19    An Amended Report and Recommendation was filed on May 9, 2008.  (Dkt. #94)

20    Intervenors, Plaintiff, Defendants and the Torres Martinez Tribe filed their comments to

21    the Report(s).  (Dkt. #33, 77, 78, 81, 86, and 95)

22    On May 23, 2008, the "Minutes of Chambers Proceedings" ordered Defendants,

23    jointly and severally, to pay the Study Group and provide proof of payment to the Court

24    by July 1, 2008; the Minutes specified that Defendants were to pay Ambassador Pierre-

25    Richard Prosper $62,000, Jack Shine $36,000, and Mark Adams $122,000, including

26

27    [1] The February 11, 2008 Order directed, at ¶ 5, that [t]he Provisional Receiver
[Mark Adams] shall post a $100,000 fidelity bond."  According to the Docket, no bond
28    was ever filed.

1   costs and fees relating to the Receivership.  (Dkt. #96)

2          In yet another *sua sponte* and *ex parte* proceeding, of which Plaintiff had no notice

3   and could not attend, on June 25, 2008, the Court announced its "Minutes of In Chamber

4   Order" (Dkt. #101) which ordered, *inter alia*, that the Duroville Renaissance

5   Corporation, acting through Tom Flynn, would henceforth assume exclusive control of

6   the park (and impliedly excluded Mark Adams from management).[2]  The Order also

7   contained provisions allowing "non-party entity and potential lender CDFI … to inspect

8   the books," paying Duro $7,000 per month (if the CDFI loan went through), and stating

9   "[t]he property management team, non-party CDFI, and Harvey Duro shall jointly

10  initiate the loan application process and shall make assessments regarding the financial

11  feasibility of undertaking the project of bringing the park into compliance with

12  applicable building codes."  Id.  The Order compelled only CDFI and Defendants only to

13  take certain actions.  (Dkt. # 91)

14         On January 22, 2009, Mark Adams filed three documents:  (1) "Sealed Document:

15  Ex Parte Application" (Dkt. #157), (2) "Sealed Document:  Declaration of Mark Adams,

16  etc." (Dkt. #158), and (3) "Sealed Document:  Declaration of Mark Adams, etc." (Dkt.

17  #159).

18         Plaintiff and Defendant filed a stipulation to close the park on March 12, 2009

19  (Dkt. #177) which the Court interpreted as an *ex parte* application and denied it without

20  prejudice on March 13, 2009 (Dkt. #179).

21         Mark Adams filed his "Receiver's Report re Rehabilitation Proposal and Plans for

22  Duroville" on March 27, 2009 (Dkt. #192).  He filed another Receiver's Report on April

23  6, 2009 (Dkt. #199), and he filed a "Sealed Document: Declaration of Mark Adams re

24  various accounting issues" on April 27, 2009 (Dkt. #221).  Mr. Adams filed a "First

25  Application of Order Directing Payment of Receivership Advances, etc." on May 8,

26  _____

27     [2]  Plaintiff received no notice regarding any hearing relating to the removal of
    Mark Adams or his replacement by Tom Flynn.  The record suggests it was the result of
28  one of the several *ex parte* proceedings held by the Court.

1    2009 (Dkt. #229), and Plaintiff filed its Response on that same day (Dkt. #230).  In its
2    Response, the United States observed it was "not privy to the agreement by which the
3    Court established the Receivership." (Id. at p. 1)

4         Mark Adams filed the "Final Accounting of DRC" on May 27, 2009 (Dkt. #233).
5    In it, Mr. Adams conceded he has no contractual right to payment. (Id. at p. 2.)
6    Plaintiff, Intervenors and Defendants filed their Opposition to Mr. Adams' Motion (Dkt.
7    ## 235, 237 and 238).  Kristy Ollendorff of CDFI filed a Declaration in support of
8    Adams' Motion on June 15, 2009 (Dkt. #239).

9         Ms. Ollendorff's declaration attaches the Promissory Note and Business Loan
10   Agreement.  The Promissory Note evidences a contractual agreement between CDFI and
11   Mark S. Adams. (Id. at Ex. A and attached hereto as Ex. 1 for convenience.)

12        Mr. Adams filed his supplementary Declaration on June 26, 2009. (Dkt. #241)
13   The Court heard oral argument on July 7, 2009, and took Adams' Motion under
14   submission (Dkt. #242).  On October 1, 2009, the Court issued its Order, which, *inter*
15   *alia,* denied Mr. Adams' Fee Application (Dkt. #248).

16        One year later, on August 9, 2010, CDFI filed a Motion for Order Increasing
17   Payments. (Dkt. #264).  CDFI confirmed that its initial (April 2008) $150,000 loan was
18   to Mark Adams, and was for the express purpose of funding the "Study Group." (Id. at
19   Declaration of Kristy Ollendorff at 2:21-3:12.)  CDFI advanced a further $128,420.00 on
20   April 8, 2010, and an additional $21,000.00 on April 21, 2010 "for the benefit of the
21   property," although Ms. Ollendorff does not identify what person or entity CDFI paid.
22   (Id.)  Ms. Ollendorff further observed that the May 23, 2008 Order approved $220,000
23   incurred by the Study Group and expressly found Defendants Duro and Desert
24   Mobilehome Park jointly and severally liable for the sums due the Study Group, and that
25   Defendants never paid any part of those sums. (Id.)

26        Plaintiff filed its Response to CDFI's Motion on August 13, 2010 (Dkt. #266),
27   which attached the May 1, 2008 Order, granting Plaintiff's Motion for Preliminary
28   Injunction, as Exhibit B, and attached the May 23, 2008 Order, finding the Study

1   Group's costs and fees were $122,000.00 and ordering Defendants to pay that sum by
2   July 1, 2008, as Exhibit C.  The Response stated:

3           After granting the preliminary injunction, the Court entered into ex parte
4           communications with the various parties and non-party entities because
5           such communications "could be helpful in facilitating compliance with the
6           Court's May 1, 2008 Order [granting preliminary injunction]."  June 25,
7           2008 Order (Dkt # 101) attached hereto as Exhibit D, at 1.  Mr. Adams filed
8           his Application for Order Directing Reimbursement of Receivership
9           Advances and Expenses on May 8, 2009 (Dkt # 229.)  The Application was
10          supported by the Declaration of Kristy Ollendorff (Dkt # 239), a copy of
11          which is attached as Exhibit E.  Then, on October 1, 2009, the Court denied
12          Mr. Adam's request for additional fees, and addressed the CDFI loan as
13          follows:

14                  The Receiver [Mr. Flynn] reports that he has had an inquiry from
15                  CDFI regarding repayment of the loan guaranteed by the former
16                  Receiver Mark Adams.  The Court held a hearing on the related
17                  matter of payment to Mr. Adams for his services on July 6, 2009, at
18                  which time the Court expressed its concern regarding repayment of
19                  the CDFI loan, much of which, but not all of which, was paid to Mr.
20                  Adams for his services, and <u>which loan Mr. Adams had personally
21                  and voluntarily secured and guaranteed.</u>  Based on the July 6, 2009
22                  hearing, the evidence before the Court on the matter, and the entire
23                  record, the Court DENIES Mr. Adam's application for order directing
24                  reimbursement.  [Emphasis added] (Docket # 229).

25          Increased payment to CDFI was also opposed by Defendants (Dkt. #271) and by
26  the Intervenors (Dkt. #272).  Intervenors further noted that of all three members of the
27  Study Group, only Mark Adams was paid in full.  (<u>Id.</u>)
28          CDFI filed its Reply on September 14, 2010 (Dkt. #273).  The Reply pursued

1  payment from Defendants; in no section of it or CDFI's subsequent Surreply (Dkt.

2  # 277) did CDFI seek payment from the United States.  In ruling on CDFI's request for

3  increased payments, the Court again observed it had ruled Defendants personally liable

4  for payment of the CDFI Loan.  (Dkt. #282)

5         Thus, when reviewed in detail, the record is replete with evidence that CDFI and

6  the Court looked solely to Defendants for payment of the CDFI Loan.  The United States

7  was not involved in meetings concerning the CDFI Loan.  The United States is not a

8  borrower or guarantor on the CDFI Loan.  Plaintiff was not even permitted to see

9  documents filed by Mr. Adams, the person who secured and guaranteed the CDFI Loan.

10  Until its recent Request, six years after making the line of credit available to Mr. Adams,

11  the record shows CDFI has not asserted the United States should be responsible for

12  paying the CDFI Loan.  Moreover, Plaintiff opposed the appointment of a receiver and

13  the associated expenditures.  Accordingly, there is no basis in the record on which to

14  hold the United States liable for payment of the CDFI Loan.

15  **IV.  EQUITABLE PRINCIPLES DO NOT SUPPORT HOLDING THE**

16  **UNITED STATES LIABLE FOR THE CDFI LOAN**

17         CDFI argues that equity requires imposing liability for the receivership loan on the

18  U.S.  (See CDFI Request at 5-12.)  CDFI's position is incorrect under both the law and

19  the facts of this case.

20                  1.   Receivership Costs in General

21         Not surprisingly given this unique case, Plaintiff could not find cases in equity

22  with facts similar to the ones before the Court.  The most analogous cases fall under

23  receivership law.  Hence, the United States characterizes the CDFI Loan (which funded

24  the Study Group personnel and perhaps its activities) as a receivership expense and

25  applies the receivership body of law to its analysis of CDFI's arguments founded in

26  equity.

27         As CDFI correctly observes, the costs of a receivership generally are paid from the

28  property in the receivership estate.  City of Chula Vista v. Gutierrez, 207 Cal. App. 4th

1 | 681, 685 (2012); <u>McCarthy v. Poulsen</u>, 173 Cal. App. 3d 1212, 1219 n.3, (1985);

2 | <u>Andrade v. Andrade</u>, 216 Cal. 108, 110 (1932); <u>see</u> 6 Witkin, Cal. Proc. 5th (2008) Prov.

3 | Rem. § 459, p. 389.  But "this is not an invariable rule.  In many cases a direct liability is

4 | imposed upon the parties to the action, or upon some of them, for the remuneration of

5 | the receiver. Such direct liability may result from an irregularity in the appointment,

6 | insufficiency of the property, agreement of the parties, etc." <u>Andrade</u>, 216 Cal. at 110;

7 | <u>accord</u> <u>City of Chula Vista</u>, 207 Cal. App. 4th at 691; <u>Baldwin v. Baldwin</u>, 82 Cal. App.

8 | 2d  851, 856 (1947).

9 |      Under such circumstances, courts exercise their "broad discretion in determining

10 | who is to pay the expenses of a receivership." <u>City of Chula Vista</u>, 207 Cal. App. 4th at

11 | 686.  This determination is fact-driven and "depend[s] upon circumstances." <u>Baldwin</u>,

12 | 82 Cal. App. 2d at 856. In particular, courts consider which party sought the appointment

13 | of the receiver and whether a party has benefitted from the receivership.[3]

14 |           2.   The U.S. Did Not Seek Appointment of the Receiver or

15 |               the Study Group

16 |      Where a party seeks the appointment of a receiver, it is more likely to bear the

17 | costs of the receivership. Indeed, when a receiver is appointed in error, the party that

18 | sought the appointment of the receiver bears the costs of the receivership.[4] <u>Andrade</u>, 216

19 | Cal. at 110; <u>Lewis v. Hall</u>, 38 Cal. App. 329, 336 (1918).  In <u>Andrade</u>, a receiver was

20 | appointed at the plaintiff's request in an action involving a dispute over ownership of

21 | real property.  <u>Andrade</u>, 216 Cal. at 109.  When the court found the property to be the

22 | sole and separate property of the defendant, the plaintiff was held to be solely

23 | responsible for the cost of the receiver because "[i]t would be inequitable to charge the

---

25 |    [3] These factors are often considered, but do not appear to be exhaustive. Though

26 | authority on this issue is limited, it appears that courts are not explicitly limited in their considerations.

27 |    [4] But where a party would have incurred certain costs even if no receiver was appointed, the party will be charged with those costs regardless.  <u>Pioche Mines Consol., Inc. v. Dolman</u>, 333 F.2d 257, 276 (9th Cir. 1964).

1    expenses and fees of the receiver against the property of one who has established her
2    right to the property in hostility to the entire receivership proceedings." Id. at 110.

3        Here, the receiver was appointed by the Court at the request of Intervenors, and
4    not requested by either Plaintiff or Defendants. Both Plaintiff and Defendants opposed
5    the appointment, as discussed in the section *supra*. One California Court of Appeal has
6    suggested (but not held) that when a receiver is so appointed at the discretion of the
7    court, "only the property in receivership [should be] available to defray the costs of the
8    receivership." McCarthy, 173 Cal. App. 3d at 1219 n.3. The McCarthy court reasoned
9    that, "it would not appear appropriate to impose such liability directly on the litigants
10   because they did not seek a receivership, did not create the situation which gives rise to
11   the present legal predicament, and are not parties in the ordinary sense." Id.

12       Similarly, the United States should not be forced to bear the costs of the loan when
13   it sought neither the appointment of the receiver nor the issuance of the CDFI Loan.

14           3.    CDFI Has Not Demonstrated It Sought Payment of the CDFI Loan
15                 From Mr. Adams

16       Mr. Adams, as the sole Borrower, signed a Promissory Note payable to
17   CDFI for $150,000.00 on April 4, 2008. (Ex. 1 at Ex. A.) The unsecured Promissory
18   Note evidences a straight line of credit. (Id.) The note requires that all disputes, claims
19   and controversies between CDFI and Mr. Adams be arbitrated in accordance with the
20   agreement. (Id.) CDFI also entered into a Business Loan Agreement with Mr. Adams
21   on the same date. (Id. at Ex. B.) The Business Loan Agreement required Mr. Adams to
22   furnish a guarantee in the amount of $150,000.00 before the disbursement of any loan
23   proceeds. (Id.)

24       CDFI has not provided evidence it has even attempted to recover payment from
25   Mr. Adams. It is wholly inequitable for CDFI to claim payment of the CDFI Loan from
26   the United States before having requested the funds from the actual and only borrower,
27   Mr. Adams. Given the contractual agreement between CDFI and Mr. Adams, and given
28   Plaintiff's consistent opposition to the installation of the Study Group and the

10

1   receiverships, it is unreasonable for CDFI to demand payment from the United States.

2   Not only is Plaintiff not a signatory to the Promissory Note or Business Loan

3   Agreement, it was excluded from discussions pertaining to the agreements.

4                    4.  Benefit Conferred

5        CDFI argues the United States should pay the CDFI Loan because it allegedly

6   benefitted from the funding of the Study Group.  (CDFI Request at 11)  CDFI cites no

7   legal authority at all in support of its argument.  While there is authority for a court to

8   consider the benefit conferred on a party in the case of a receivership, as discussed

9   below, the equities again lie in favor of the United States.

10       Expenses that a party "would have had to incur had there been no receiver, and

11  expenses that confer a genuine benefit upon the [party], should be charged to it."  Pioche

12  Mines Consol. Inc. v. Dolman, 333 F.2d 257, 276 (9th Cir. 1964); accord Murphy v.

13  Costentino, 204 Cal. App. 2d 614, 616 (1962).  In Pioche Mines Consol., Inc., a receiver

14  was erroneously appointed to manage a corporation.  Pioche Mines Consol., Inc., 333

15  F.2d at 276. When deciding how to allocate the receivership costs, the Ninth Circuit

16  found that "expenses that the corporation would have had to incur had there been no

17  receiver, and expenses that confer a genuine benefit upon the corporation, should be

18  charged to it."  Id.  By contrast, "those costs of the receivership that would not have

19  arisen but for the [erroneous] appointment should be charged against the party invoking

20  the receivership."  Id.

21       In the instant case, Mr. Duro (and the departed tenants) received the benefits of the

22  receivership and the loan.  The U.S., as trustee, holds trust property for the benefit of Mr.

23  Duro.  Mr. Duro profited from rents collected while the mobile home park operated, and

24  part of the rents collected by the receiver were transferred to Mr. Duro.  Mr. Duro also

25  was the beneficiary of a new well commissioned by the receiver, as well as associated

26  water rights.  Mr. Duro has additionally benefited by having health and safety violations

27  on the trust property eliminated by the receiver.  Had no receiver been appointed and no

28  loan been obtained, Mr. Duro would have been responsible for the costs necessary to

                              11

1  ensure the safety of mobile home park and protection of the land.

2       The United States, in contrast, would not have been responsible for any of the

3  costs of operating the park. Indeed, in the absence of specific statute, the United States

4  has no legal obligation or authority to manage trust property.  The regulatory obligations

5  of the United States are limited to the approval of leases for the benefit of the Indian

6  landowner.

7       In contending the United States benefitted from the CDFI Loan because the

8  funding contributed to the Study Group's findings of health and safety hazards, CDFI

9  blindly ignores critical facts.  First, as discussed above, Defendants were the

10  beneficiaries of the CDFI Loan.  Second, CDFI has not demonstrated that its funds,

11  versus funds provided by Defendants or funds from tenant rents, were used for the

12  improvements.  Third, the United States relied on an inspection and findings contained in

13  a report performed by its contractor, Municipal Compliance Consultants (MCC), as the

14  basis of its request for preliminary injunction. (Dkt. #4)  The Court's grant of a

15  preliminary injunction to Plaintiff was based on the MCC report, not on the Study

16  Group's report. (Dkt. #34)  Plaintiff also relied on MCC for the basis of its evidence of

17  human and environmental hazards at trial.  Thus, CDFI erroneously contends Plaintiff

18  benefitted from the CDFI Loan in sufficient amount to warrant forcing repayment of the

19  CDFI Loan on the United States.

20      5.  <u>The Balance of Equity Lies in Plaintiff's Favor</u>

21       As CDFI requests repayment based on equitable principles, the United States

22  requests damages based on equitable principles, which should be borne in mind in

23  assessing CDFI's request.  As discussed in its Opening Brief Regarding Plaintiff's

24  Request for Damages, the United States maintains it is entitled to monetary relief based

25  on equity because that was the only remaining judicial avenue available to Plaintiff.

26  Plaintiff observes the United States does not typically bring suits to close illegal

27  operations conducted on trust property when they pose health and safety threats to the

28  property and surrounding area because normally, pursuant to 25 U.S.C. § 415, the BIA is

1  obligated to determine when leases are required and to approve leases for such

2  operations on trust property.  Because neither Defendant obtained a lease for the mobile

3  home park consistent with 25 U.S.C. § 415 and the implementing regulations, the BIA

4  did not have an opportunity to incorporate health and safety safeguards and requirements

5  in a lease in accordance with its regulatory obligations and procedures.

6        The United States was compelled to take emergency action to manage and protect

7  the condition of the trust asset-that could have affected the health and safety of park

8  residents and the surrounding community, by seeking enforcement of BIA's 2006 cease

9  and desist notice. As a result of the failure of Defendants to obtain a lease in compliance

10 with the law, the United States was forced to expend taxpayer dollars to remedy the

11 health and safety trespasses the trailer park posed to the trust asset the United States is

12 entrusted with preserving.  Because Defendants deliberately violated their legal

13 obligations and because no other remedies are available for the United States to recoup

14 funds required to remedy those violations, equity requires that Mr. Duro reimburse

15 taxpayers for the expenditures undertaken by the United States pursuant to its role as

16 caretaker of the trust asset.  Compelling the United States to pay a loan it vigorously

17 opposed would have a further chilling effect on the United States' willingness and ability

18 to pursue actions such as this one.

19        6.    The Court's Discretion Should Be Exercised in Plaintiff's Favor

20        While in ordinary circumstances the court is vested with broad discretion,

21 Baldwin, 82 Cal. App. 2d at 856; Pioche Mines Consol., 333 F.2d at 276; Inglewood

22 Fed. Sav. & Loan Ass'n v. Richardson, 121 F. Supp. 80, 82 (S.D. Cal. 1954), here the

23 factors support placing liability for the receivership loan on Mr. Adams or on Mr. Duro.

24        First, it would be entirely just to require CDFI to request and pursue payment of

25 the CDFI Loan from Mr. Adams.  Mr. Adams is the named borrower on the Promissory

26 Note, and the only one.

27        Second, Defendants were responsible for creating the conditions that degraded the

28 property by establishing a mobile home park in violation of law requiring Mr. Duro to

13

1   first obtain a lease before sanctioning the construction of a trailer park on the trust

2   property.  The receivership would not have had to be established if Defendant had not

3   violated the law, and consequently all resulting costs to rectify Defendant's actions

4   should be borne by Defendant.

5          Third, the United States has continuously objected to the appointment of

6   receiverships.

7          Fourth, at no time prior to CDFI's Request (other than an oral suggestion at a

8   status conference) has CDFI sought to assert a claim against the United States.

9          CDFI argues that the Court's equitable powers are here "broader and more

10  flexible" because this is a "proceeding[] affecting the public interest."  (CDFI Request at

11  8.)  CDFI cites Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288 (1960), for this

12  proposition.  In Mitchell, the Court held that a district court has jurisdiction to order an

13  employer to reimburse employees who were subject to discrimination for lost wages. Id.

14  at 296.  CDFI relies on a partial quotation, which in full provides that "since the public

15  interest is involved in a proceeding of this nature, those equitable powers assume an even

16  broader and more flexible character *than when only a private controversy is at stake*." Id.

17  at 291 (quoting Porter v. Warner Holding Co., 328 U.S. 395, 398 (1946) (holding that

18  courts have equitable power to order restitution of illegally required profits, rents or

19  property)) (emphasis added).

20         While Plaintiff acknowledges the Court has discretion in equity, CDFI has not

21  identified a case in which the Court should ignore a potential funding source for

22  reimbursement of a claim (*i.e.* Mr. Adams) and belatedly pursue a claim against a party

23  which continuously opposed a receivership. The Court should exercise its broad powers

24  in this circumstance in favor of the United States.

25  **V.    THE COURT'S RULING THAT DEFENDANTS ARE LIABLE FOR**

26  **PAYMENT OF THE CDFI LOAN IS THE LAW OF THE CASE**

27         The law of the case doctrine preludes a court from "reconsidering an issue

28  previously decided by the same court, or a higher court in the identical case."  United

14

1   States v. Lummi Indian Tribe, 235 F.3d 443 (9th Cir. 2000). The doctrine allows for

2   consistency and avoids reconsideration of matters already decided in the course of a

3   lawsuit. See Ingle v. Circuit City, 408 F.3d 592, 594 (9th Cir. 2005).

4          The Court ordered Defendants to pay the CDFI loan on May 23, 2008. (Dkt. #96)

5   CDFI did not object to the Court's ruling. The Court's ruling is the law of the case, and

6   CDFI cannot now, five years later, request that the Court set aside or modify that ruling.

7   Such an act would prejudice the United States, which had no reason to anticipate the

8   claim against it.

9   **VI.    TO THE EXTENT CDFI MAKES A CLAIM AGAINST THE**

10          **UNITED STATES FOR EXPRESS OR IMPLIED CONTRACT,**

11          **JURISDICTION LIES IN THE COURT OF FEDERAL CLAIMS**

12          The Court of Federal Claims has exclusive jurisdiction for claims, *inter alia,* based

13   on express or implied contract against the United States in excess of $10,000.00. 28

14   U.S.C. §§ 1346, 1491(a)(1). There is no contract between CDFI and the United States.

15   (See attachments to Ex. 1.) If a contract existed, it arguably would be an express or

16   implied contract. Therefore, the claim for payment of the CDFI Loan is not properly

17   before this Court.

18   **VII.  CONCLUSION**

19          For the foregoing reasons, the United States requests that the Court deny CDFI's

20   request that the United States be required to pay the CDFI Loan. The loan is an

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

15

1  agreement between CDFI and borrower Mark Adams; it has been ordered to be paid by

2  Defendants; and it would be violative of law and equity to require taxpayers to pay it.

3      DATED:  May 16, 2014.

4                              Respectfully submitted,

5                              ANDRÉ BIROTTE JR.
                               United States Attorney
6                              LEON W. WEIDMAN
7                              Assistant United States Attorney
                               Chief, Civil Division
8

9

10                             /s/ Jonathan B. Klinck
11                             JONATHAN B. KLINCK
                               Assistant United States Attorney
12                             MONICA L. MILLER
13                             Assistant United States Attorney

14                             Attorneys for Plaintiff
15                             United States of America

16

17

18

19

20

21

22

23

24

25

26

27

28